**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**

---

CRISTHIAN HERRERA CARDENAS;
MARIBEL XIRUM; JAVIER JAIMES
JAIMES; and BAIJEBO TOE, on behalf of
themselves and all others similarly situated,

     *Plaintiffs*,

     v.

U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT (ICE); U.S.
DEPARTMENT OF HOMELAND
SECURITY (DHS); ALEJANDRO
MAYORKAS, *under the title of Secretary of
DHS*; TAE JOHNSON, *under the title of
Acting Director of ICE*; RICARDO A.
WONG, *under the title of ICE Deputy
Assistant Director, Oversight Compliance and
Acquisition Division*; MONICA S. BURKE,
*under the title of ICE Acting Assistant Director
of Custody Management*; SYLVIE RENDA,
*under the title of Acting Field Office Director
of the ICE Chicago Field Office*; TRAVIS
GRAHAM, ANGELINA RAMOS, and
VIRGINIA SUTTER, *under the title of ICE
Officers*;

CLAY COUNTY, INDIANA; CLAY
COUNTY COUNCIL; CLAY COUNTY
BOARD OF COMMISSIONERS; CLAY
COUNTY JAIL; CLAY COUNTY
SHERIFF'S OFFICE; PAUL B. HARDEN,
*under the title of Clay County Sheriff*; JACKIE
MITCHELL, JASON BRITTON, JASON
THOMAS, LARRY J. MOSS, JOHN
NICOSON, DAVE AMERMAN, and
PATRICIA HEFFNER, *under the title of Clay
County Council Members*; BRYAN
ALLENDER and MARTY HEFFNER, *under
the title of Clay County Commissioners*; PAUL
SINDERS, *under the title of President of the
Clay County Board of Commissioners*;

No. _____

**<u>CLASS ACTION COMPLAINT</u>**

ELIZABETH HUGHETT, DAVID PARKER,
and JASE GLASSBURN, *under the title of*
*Clay County Sergeants and ICE Contract*
*Coordinators*; JENNIFER M. FLATER, *under*
*the title of Clay County Auditor*; and DEBRA
JAMES, *under the title of Clay County*
*Treasurer*,

     *Defendants*.

## <u>TABLE OF CONTENTS</u>

**PAGE**

INTRODUCTION ................................................................................................................1

JURISDICTION AND VENUE ........................................................................................7

PARTIES ...........................................................................................................................8

I.      Plaintiffs .................................................................................................................8

        A.      Cristhian Herrera Cardenas ...................................................................... 8

        B.      Maribel Xirum ........................................................................................... 9

        C.      Javier Jaimes Jaimes .............................................................................. 10

        D.      Baijebo Toe .............................................................................................. 11

II.     Defendants ...........................................................................................................12

        A.      ICE Defendants ....................................................................................... 13

        B.      Clay County Defendants .......................................................................... 14

FACTUAL AND LEGAL BACKGROUND ....................................................................16

I.      Clay County Illegally Profits from the Detention of Plaintiffs and Other People
Detained by ICE at the Clay County Jail. ...........................................................16

        A.      By Signing the Federal Detention Agreement, the County Agreed to Use
Federal Payments Solely to Provide Adequate Care to Plaintiffs and Other
People Detained by ICE. ......................................................................... 16

        B.      The County Has Treated the Agreement like a Cash Cow, Improperly
Using Federal Funds to Pay for County Expenses Unrelated to Caring for
Plaintiffs and Other People Detained by ICE. ....................................... 19

II.     While the County Diverts Federal Payments Elsewhere, Plaintiffs and Other
People Detained by ICE Suffer in Grossly Inadequate Conditions at the Jail..................23

        A.      As a Facility Holding Individuals for ICE, the Jail Must Meet Federal
Standards of Care Known as the Performance-Based National Detention
Standards ("PBNDS"). ............................................................................ 23

        B.      Conditions at the Jail Are Grossly Inadequate under the PBNDS....................... 24

                i.      Environmental Health and Safety Standards ............................. 25

                ii.     Personal Hygiene Standards ...................................................... 26

                iii.    Food Service Standards.............................................................. 30

                iv.    Medical Care Standards ............................................................. 31

                v.      Correspondence and Other Mail Standards ............................... 35

                vi.    Recreation Standards ................................................................. 35

                vii.   Religious Practices Standards .................................................... 36

                viii.  Telephone Access Standards....................................................... 37

|  |  | ix. | Special Management Unit Standards | 38 |
|  |  | x. | Use of Force and Restraints Standards | 39 |
|  |  | xi. | Sexual Abuse and Assault Prevention and Intervention Standards | 40 |
|  |  | xii. | Law Libraries and Legal Materials Standards | 40 |

III.    For Years, ICE Has Turned a Blind Eye to the Conditions at the Jail Because It Depends on the Jail to Support Its Detention Operations. .................................................42

IV.    Federal Law Requires that ICE Terminate the Agreement and End Its Payments for Detention at the Jail Because It Failed Its Overall Performance Evaluation in May 2021 and Should Not Have Been Certified as Passing in December 2021 Based on Nakamoto's Flawed Inspection. ..........................................................................43

      A.    It Is Extremely Difficult for a Facility to Fail Its Overall Performance Evaluation Because ICE Employs a Private Inspector, Nakamoto, Whose Methods Are Flawed and Unreliable. ..................................................... 43

      B.    Despite Nakamoto's Flawed Inspection Process, the Jail Failed Its Overall Performance Evaluation in May 2021 Because of Its Grossly Inadequate Conditions. ........................................................................................... 47

      C.    Following the May 2021 Inspection, ICE and the County Scrambled to Avoid Documentation of a Second Failure and Thereby Avert a Mandatory Termination of the Agreement. ........................................ 50

      D.    Despite Continuing Violations of the PBNDS, ICE Arbitrarily and Capriciously Certified that the Jail Passed Its Overall Performance Evaluation in December 2021 ............................................................ 53

CLASS ACTION ALLEGATIONS ................................................................................57

CLAIMS FOR RELIEF ................................................................................................59

    COUNT I ...................................................................................................... 59

    COUNT II ..................................................................................................... 64

    COUNT III.................................................................................................... 67

PRAYER FOR RELIEF ..............................................................................................69

**INTRODUCTION**

1.      Plaintiffs and proposed class representatives Cristhian Herrera Cardenas, Maribel Xirum, Javier Jaimes Jaimes, and Baijebo Toe are noncitizens who are being detained by U.S. Immigration and Customs Enforcement ("ICE"), an agency within the U.S. Department of Homeland Security ("DHS"), at the Clay County Jail in Brazil, Indiana (the "Jail").

2.      Plaintiffs bring this suit because Clay County, Indiana (the "County"), is unlawfully diverting federal funds intended for the care of Plaintiffs and other people detained by ICE to pay for unrelated County expenses and discretionary expenditures, while ICE turns a blind eye to the County's diversion of funds and the Jail's blatant violations of ICE's own detention standards. As a result, ICE has avoided its statutory obligation to cease detaining people at facilities that are in violation of ICE's detention standards for two consecutive inspections, and Plaintiffs and other people held by ICE are forced to suffer in grossly inadequate conditions.

3.      Plaintiffs are being detained by ICE at the Jail pursuant to an agreement (the "Agreement") between the U.S. Marshals Service, ICE, and the County. *See* Ex. A (original Agreement and ICE addendum); Ex. B (extension and modification of the Agreement).

4.      Under the Agreement, ICE pays the County more than one million dollars each year to detain dozens of noncitizens like Plaintiffs. By federal law, and under the express terms of the Agreement, the federal funds paid to the County must be used only for expenses related to the care of people detained by ICE at the Jail, including for basic necessities like sanitation, medical care, food, and personal hygiene.

5.      Instead, the County treats the Agreement like a cash cow. In recent years, the County has spent hundreds of thousands of federal dollars on County expenses and discretionary expenditures that are unrelated to the care of Plaintiffs and others detained by ICE at the Jail. For

1

example, in 2021, the County purchased an $83,000 air conditioning system for its courthouse using ICE money paid under the Agreement. The County also gives its employees raises and bonuses using those funds, and it publicly proclaims to its residents that it profits from the Agreement, and that those profits allow the County to avoid raising taxes.

6. While the County diverts federal money intended to ensure that Plaintiffs and other people detained by ICE receive adequate care, Plaintiffs and other noncitizens suffer in grossly inadequate conditions at the Jail.

7. Facilities used by ICE must comply with its detention standards called the Performance-Based National Detention Standards ("PBNDS"). By law, ICE must immediately end its use and funding of any facility that fails two consecutive "overall performance evaluations," *i.e.*, comprehensive inspections to evaluate a facility's compliance with the PBNDS. Consolidated Appropriations Act of 2021, Pub. L. No. 116-260, Div. F, Tit. II, § 215(a) (Dec. 27, 2020), 134 Stat. 1457.

8. Conditions at the Jail violated the PBNDS during the relevant period, as well as to this day, in a wide variety of ways. For example:

   a) In violation of the PBNDS' requirement that sanitation be maintained at federally recognized standards, the Jail is filthy. The walls are covered in mold and graffiti, and the Jail forces Plaintiffs and others to clean their own cells, toilets, and communal showers, without providing proper cleaning supplies. As a result, Plaintiffs and others must use a makeshift mix of soap, shampoo, and toothpaste, often purchased from the Jail's commissary using what little money they have.

   b) In violation of the PBNDS' requirement that the Jail provide a "nutritionally balanced diet," the Jail consistently fails to provide Plaintiffs and other people

detained there enough food. As a result, Plaintiffs and others are often hungry, have lost weight since arriving, and must spend their own money (if they have any) to purchase additional, expensive food from the Jail's commissary.

c) In violation of the PBNDS' requirement that people who are detained by ICE be provided "clean, laundered, indoor/outdoor temperature-appropriate, size appropriate, presentable clothing," the Jail provides Plaintiffs and other people detained by ICE with worn out, stained, tattered clothing that does not keep them warm. As a result, Plaintiffs and others must take desperate measures to stay warm, including cutting open their socks to wear as sleeves.

d) In violation of the PBNDS' requirement that "[a]ll housing units with three or more detainees must have at least two toilets," the Jail crams four, five, or even six people inside a cell with only one toilet. The toilets in the cells are often broken, moreover, for days at a time, forcing multiple cells to share the same toilet.

e) In violation of the PBNDS' requirement that the Jail provide temperature-controlled showers, the Jail's showers only dispense water that is either too cold or too hot for showering. Like the toilets, the showers are often broken—including the only shower in the women's dorm for people with disabilities, such as Plaintiff Xirum. The showers also do not all have working shower heads; as a result, several Plaintiffs have had to cut holes in empty bottles to create makeshift shower heads. Plaintiffs and others also use their tattered bed sheets as privacy screens around the showers and toilets.

f)  In violation of the PBNDS' requirement that requests for medical care be "triaged by appropriate medical personnel within 48 hours," Plaintiffs have all experienced significant delays in receiving care. Medical staff are not available at all on the weekends, and none of the staff speaks fluent Spanish. As a result, bilingual people like Plaintiff Herrera Cardenas have to translate for those who only speak Spanish when they need medical attention.

9.     Because of widespread violations of the PBNDS, in May of 2021, the Jail failed its overall performance evaluation.

10.    This failing grade was remarkable, as ICE employs a lax private inspector called Nakamoto Group, Inc. ("Nakamoto") to conduct inspections. ICE officials have admitted to the DHS Inspector General that Nakamoto inspections are "very, very, very difficult to fail." For example, the DHS Inspector General found that Nakamoto gives facilities advance warning of inspections so they can temporarily modify practices in order to "pass" an inspection. And when Nakamoto does eventually arrive, it fails to carefully evaluate each detention standard by physically inspecting the facility, instead often relying on the word of jail staff or ICE officials. The DHS Inspector General also found that Nakamoto's reports have misrepresented the work performed by Nakamoto or their level of assurance in evaluating the actual conditions of the facility.

11.    Despite these flawed and unreliable procedures, the Jail failed its May 2021 inspection because conditions there are appalling. The Nakamoto inspection team identified *71* deficient components across *18* different detention standards. Among other things, the inspection team found that sanitation levels were inadequate, and the Jail was not providing sufficient toilets. A number of the violations were repeat deficiencies from prior inspections.

12. The Jail's failed inspection created a problem for ICE. In the last few years, many other detention facilities have closed their doors to ICE, limiting ICE's options for detention space in the region and causing ICE to become increasingly dependent on the Jail. If the Jail failed its second overall performance evaluation, ICE would be required to terminate the Agreement and stop detaining people like Plaintiffs at the Jail.

13. Accordingly, ICE and the County worked together to avoid documentation of a second failed overall performance evaluation. For example, according to documents obtained through the Indiana Access to Public Records Act, after the failed May 2021 inspection, ICE Assistant Director for Custody Management, Russell Hott, directed Enrique Lucero, who was then the ICE Chicago Field Office Director, to make sure that the County was notified in advance of upcoming inspections, giving the Jail a chance to temporarily resolve or hide any issues. Not only was the County notified of the next overall performance evaluation ahead of time, but the inspection was delayed by an additional week at the Jail staff's request. In addition, ICE conducted two interim inspections in the lead up to the "official" evaluation. First, in late August and early September 2021, Nakamoto conducted a Technical Assistance Review, to help identify issues that the Jail still had not fixed. Second, in November 2021, ICE's Office of Detention Oversight conducted a fully remote inspection of a subset of PBNDS standards.

14. Finally, in December 2021, Nakamoto conducted the second overall performance evaluation of the Jail. Despite all of ICE's efforts to prepare the Jail, the Nakamoto inspection team still found numerous serious violations of the PBNDS.

15. Among other things, the Nakamoto inspection team found:

Sanitation levels and conditions of confinement were observed to be unacceptable in housing units dedicated to ICE detainees. Housing units do not provide adequate seating for meal service. Detainees were observed eating the lunch meal while seated on the stairs or bed because table seating was not available. Toilet and sink

ratios are not within standard guidelines. Boat beds[1] have been added to all three units housing detainees. Detainees were observed sleeping in boat beds. On day three of the inspection, no less than six detainees were assigned to a boat bed. The boat beds encroach on the unencumbered space in the dayroom. Graffiti was observed on the walls of all housing units. Sheets were observed hanging in front of the toilets in B unit. There are no privacy panels in the toilet area. One bunk is located parallel to the toilets. On day one, eight detainees in B unit complained that "toilets are not working." The maintenance supervisor confirmed that the toilets have "been malfunctioning because detainees have been throwing items in the stool." On day three, the toilets were still malfunctioning.

16.    In total, the December 2021 Nakamoto inspection team identified 21 deficient components across 8 standards.

17.    However, the inspection team failed to report a number of additional violations of ICE's detention standards. For instance, despite observing the conditions described above, the inspection team recommended that the Jail receive an overall rating of "Meets Standard" for environmental health and safety standards. In addition, two of the Nakamoto inspectors— including the inspector responsible for the medical unit—were working entirely remotely and thus were not able to physically inspect the facility or speak with people detained at the Jail. Instead, the inspection team continued Nakamoto's discredited practice of relying on statements from Jail staff and ICE officials to verify compliance.

18.    Based on the conditions at the Jail, including those documented by the Nakamoto inspection team, the Jail should have failed its second overall performance evaluation. This would require ICE to end its Agreement with the County and stop funding detention there.

19.    Instead, despite the clear, numerous, and serious violations of the PBNDS, Nakamoto recommended to ICE that it give the Jail an overall "Meets Standards" rating based on the December 2021 inspection. ICE, in turn, rubber-stamped Nakamoto's recommendation.

---

[1] "Boat beds" are thin, plastic tub-shaped pallets placed on the floor that are meant only for temporary sleeping arrangements, which the Jail uses when a housing unit's bunkbeds are full.

20.     As a result, noncitizens like Plaintiffs continue to be held at the Jail in grossly inadequate conditions.

21.     Plaintiffs seek declaratory and injunctive relief to stop Defendants from continuing this unlawful detention arrangement. First, against Defendants DHS, ICE, and the named DHS and ICE officials (collectively, the "ICE Defendants"), Plaintiffs seek declaratory and injunctive relief under the Administrative Procedure Act, 5 U.S.C. § 706. Second, against Defendants Clay County, the named Clay County government entities, and the named Clay County officials (collectively, the "Clay County Defendants"), Plaintiffs seek declaratory and injunctive relief under the Indiana Uniform Declaratory Judgment Act, Ind. Code §§ 34-14-1-1 *et seq.*, and Indiana Rule of Trial Procedure 57.

22.     Plaintiffs bring this action as a class action under Rule 23(b)(2) of the Federal Rules of Civil Procedure on behalf of all persons who are currently or will be detained by ICE at the Jail (collectively, the "Class").

23.     Declaratory and injunctive relief is necessary to prevent further violations by Defendants, who will otherwise continue to harm Plaintiffs and other members of the Class by detaining them in grossly inadequate conditions at the Jail and misusing federal funds meant to ensure that Class members receive adequate care at a facility that complies with the PBNDS.

## JURISDICTION AND VENUE

24.     This Court has jurisdiction over the claims alleged in this Complaint against the ICE Defendants pursuant to 28 U.S.C. § 1331 (federal question) and 5 U.S.C. § 702 (Administrative Procedure Act). The Court has supplemental jurisdiction over the claim alleged in this Complaint against the Clay County Defendants pursuant to 28 U.S.C. § 1367(a).

25.     The United States' sovereign immunity is waived under 5 U.S.C. §§ 702 and 706.

26.     The Court has the authority to issue a declaratory judgment and grant the requested equitable relief under 5 U.S.C. § 706, 28 U.S.C. §§ 2201–02 (Declaratory Judgment Act), and Federal Rules of Civil Procedure 57 and 65.

27.     Under 28 U.S.C. § 1391(e) and 5 U.S.C. § 703, venue lies properly within the Southern District of Indiana because the Jail where Plaintiffs and the other Class members are being held is located at 611 East Jackson Street, Brazil, Indiana 47834, which is within the District. In addition, a number of Defendants reside in the District, and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred within the District.

## PARTIES

### I.     Plaintiffs

28.     Plaintiffs are noncitizens currently in the custody of ICE at the Jail. Each has been harmed as a result of Defendants' collective failure to properly allocate funds for the care and custody of noncitizens housed at the Jail and their failure to ensure that conditions at the Jail are adequate under the PBNDS. The following paragraphs capture just some of the Jail's deficiencies experienced by each Plaintiff.

### A.     Cristhian Herrera Cardenas

29.     Plaintiff Cristian Herrera Cardenas[2] is a Honduran man who is currently detained by ICE at the Jail. Mr. Herrera Cardenas is seeking protection from deportation to Honduras because gangs in that country have extorted, threatened, and beaten him and other members of his family for their refusal to support gang activities. He came into ICE custody in January 2022 and has been detained at the Jail since then. Prior to that time he was living in Allen County, Indiana, with his wife and son, who are both U.S. citizens.

---

[2] Jail documentation spells Mr. Herrera Cardenas's first name as "Christhian."

30.     While detained at the Jail, Mr. Herrera Cardenas has suffered from poor conditions in the facility. For instance, he received clothing—including underwear—that was old, stained, and had holes in it. He has been provided insufficient bedding and supplies for maintaining personal hygiene. The food has been inadequate; he has had to supplement meals with purchases from the Jail's commissary, even though they can be prohibitively expensive. Mr. Herrera Cardenas also has experienced other poor conditions, including the lack of consistently functioning plumbing in the facility (the toilet in his cell was broken for more than ten days), an absence of outdoor recreation, and an inability to utilize a law library or attend religious services.

31.     Mr. Herrera Cardenas has also experienced overcrowding at the Jail. His housing block contains six four-person cells to accommodate 24 people, but it has often housed between 26 and 28 people, some of whom must sleep in "boat beds" on the floor.

### B.    Maribel Xirum

32.     Plaintiff Maribel Xirum is a Mexican woman who is currently detained by ICE at the Jail. She came to the United States in 1980, when she was about four years old, and she has lived in this country since then, including for over 15 years in Chicago, Illinois. In her immigration case, she is arguing that the conviction that resulted in her transfer to immigration custody does not require her detention and that she should be released on bond.

33.     Ms. Xirum was transferred to the Jail in February 2022 from Illinois state custody, and she immediately noticed that conditions at the Jail are worse than at her prior state facility. For example, the facility is especially dirty, and officials do not provide functional cleaning supplies. The food is insufficient in quantity and commissary items are inadequate substitutes because of the lack of nutritional options and the prohibitive cost. Ms. Xirum also suffers from a number of chronic conditions, including anxiety, diabetes, high blood pressure,

arthritis, asthma, and back pain from a prior injury that sometimes requires her to use a cane. For each of these conditions, she has received delayed or inadequate medical care. Because of the conditions that impact her mobility, Ms. Xirum has also experienced challenges using the bathroom, showering, and moving about the Jail.

34.     Ms. Xirum has also observed discriminatory and derogatory treatment of women detained at the Jail. Ms. Xirum has heard guards tell women that they are "good for the bed" and call them pet names like "beautiful," and she has seen women who feel compelled to flirt with the male guards to receive personal hygiene products and other necessities. Ms. Xirum, who is unwilling to flirt with guards to get what she needs, must buy additional items from the Jail's commissary, even though they are extremely expensive.

**C.    Javier Jaimes Jaimes**

35.     Plaintiff Javier Jaimes Jaimes is a Mexican man who is currently detained by ICE at the Jail. Mr. Jaimes Jaimes was arrested under the name Santos Garcia Jaimes,[3] and therefore, he is detained at the Jail under that name. He was previously removed from the United States but he returned and requested protection from deportation because, following his removal, a cartel in Mexico kidnapped and tortured him. He came into ICE custody in January 2022 and has been detained at the Jail since then. Before his previous removal from the United States, Mr. Jaimes Jaimes was living in Kansas with his partner, with whom he has a six-year-old U.S. citizen daughter.

36.     Mr. Jaimes Jaimes has received inadequate medical care and other poor treatment at the Jail. He takes medication to treat his anxiety and depression and to help him sleep at night.

---

[3] Mr. Jaimes Jaimes is also referred to in documentation as Santos Garcia James; in one instance, he also went by the name Valentin Carvajal.

The guards—not medical staff—provided pills that were of a different color than his prescribed medication. Because there was no medical staff available, Mr. Jaimes Jaimes was unable to confirm what medication he was provided. Further complicating matters, because the Jail lacks fluent Spanish-speaking staff, Mr. Jaimes Jaimes has had to rely on other detained immigrants to translate for him.

37.     Mr. Jaimes Jaimes's four-person cell often has one to two extra people sleeping on the floor in boat beds. He has also had to share a toilet with many more than four people, as the toilet in his cell stopped working and spilled wastewater into his cell for a period. The Jail did not respond to his initial requests to fix the toilet.

**D.     Baijebo Toe**

38.     Plaintiff Baijebo Toe[4] is a Liberian man who is currently detained by ICE at the Jail. He fled from Liberia as a child, and arrived in the United States as a refugee when he was about nine years old. He and his family members became lawful permanent residents, and some of his relatives eventually became U.S. citizens. Soon after his arrival in the United States, both of Mr. Toe's parents passed away, and by 1998, he was in foster care as a ward of the state. Mr. Toe was ordered removed in April 2019 but was not removed at that time. He has been detained at the Jail for nearly five months, since December 2021. He plans to claim that his ongoing detention is unreasonable given his various medical conditions and because his removal from the United States is not reasonably foreseeable given the current state of affairs in Liberia. *See generally Zadvydas v. Davis*, 533 U.S. 678 (2001).

---

[4] On certain documentation, Mr. Toe is referred to as "Biajebo Brown Toe" or "Baijebo Piebo Toe."

39.     Mr. Toe has received limited to no treatment for numerous ailments at the Jail. For example, at one point he became very ill with severe headaches and a loss of appetite. He lost about ten pounds over approximately one week, and he has not fully recovered his weight because of the lack of adequate food. Mr. Toe also suffers from eyes issues, including limited vision in his right eye, cataracts, and glaucoma. When he arrived at the Jail, Mr. Toe notified the nurse that he would require treatment for his eyes, but in the nearly five months he has been detained there, he has not received the care he needs. Mr. Toe's mental health has not been properly treated, either. He reports symptoms of depression, including sleeplessness, which he believes is at least partly caused by the lack of access to outdoor recreation. He requested an appointment with a therapist shortly after his arrival at the Jail, but to date, he has not received an appointment for counseling—only offers of medication, even though Mr. Toe does not want to take medication before attempting to treat his symptoms with therapy.

40.     Mr. Toe regularly must choose between spending his limited money to make expensive calls to his family or to purchase basic necessities to keep him warm and fed from the Jail's commissary. Mr. Toe has also received legal mail two days after it had arrived, and it had been opened outside his presence. The guards told him that they thought it was a book.

## II.    Defendants

41.     Defendants, collectively, are responsible for maintaining and ensuring adequate conditions at the Clay County Jail, where Plaintiffs are currently held, including through the proper use of federal payments made under the Agreement.

### A.    ICE Defendants

42.    Defendant U.S. Department of Homeland Security ("DHS") is part of the Executive Branch of the U.S. government, and is headquartered in Washington, D.C. DHS is responsible for enforcing federal laws governing, *inter alia*, border control and immigration.

43.    Defendant U.S. Immigration and Customs Enforcement ("ICE") is a component of DHS, headquartered in Washington, D.C., and is in charge of enforcing federal immigration laws, including arresting and detaining noncitizens.

44.    Defendant Alejandro Mayorkas is sued in his official capacity as the Secretary of DHS. In this capacity, he directs each of the component agencies within DHS, including ICE. As a result, in his official capacity, Secretary Mayorkas is responsible for the administration and enforcement of the immigration laws, including ICE officers' compliance with applicable statutes and regulations.

45.    Defendant Tae Johnson is the Acting Director of ICE. Acting Director Johnson is responsible for enforcement and removal operations for ICE, including ICE officers' compliance with the requirements of the Agreement and applicable statutes and regulations governing the expenditure of funds to detain noncitizens in county jails.

46.    Defendant Ricardo A. Wong is the ICE Deputy Assistant Director, Oversight Compliance and Acquisition Division. Deputy Assistant Director Wong is responsible for ensuring compliance with the requirements of the Agreement and applicable statutes and regulations, including the Annual DHS Appropriations Act, governing the expenditure of funds to detain noncitizens in county jails. Deputy Assistant Director Wong approved the Jail's certification of compliance with the PBNDS, permitting the continued use of the Jail to detain individuals in ICE custody despite deficient conditions and inspections.

47.     Monica S. Burke is the ICE Acting Assistant Director of Custody Management. Acting Assistant Director Burke is responsible for ensuring compliance with the requirements of the Agreement and applicable statutes and regulations, including the Annual DHS Appropriations Act, governing the expenditure of funds to detain noncitizens in county jails. Acting Assistant Director Burke approved Clay County Jail's compliance with the PBNDS, permitting its continued use to detain individuals in ICE custody despite deficient conditions and inspections.

48.     Defendant Sylvie Renda is the Acting Field Office Director ("FOD") of the ICE Chicago Field Office, which has responsibility for Illinois, Indiana, Wisconsin, Missouri, Kentucky, and Kansas. In her official capacity, Acting FOD Renda is responsible for all enforcement and detention conducted within the Chicago Area of Responsibility.

49.     Defendants Travis Graham, Angelina Ramos, and Virginia Sutter are ICE officers who are responsible for overseeing performance of the Agreement with the County. Officers Graham, Ramos, and Sutter are sued in their official capacities.

**B.    Clay County Defendants**

50.     Defendant Clay County, Indiana, is a county located in the Terre Haute Division of the Southern District of Indiana. The County's seat is in Brazil, Indiana.

51.     Defendant Clay County Council is responsible for the fiscal governance of Clay County. *See* Ind. Code § 36-2-3-2. The County Council sets priorities for the allocation of county funds and expenses. On information and belief, the County Council appropriates public funds, establishes compensation levels for County employees, and approves operating budgets of County government offices and officials.

52.     Defendants Jackie Mitchell, Jason Britton, Jason Thomas, Larry J. Moss, John Nicoson, Dave Amerman, and Patricia Heffner are members of the Clay County Council. The County Council Members are sued in their official capacity.

53.     Defendant Clay County Board of Commissioners is the executive of Clay County and is responsible for the administration of all County business, including furnishing and maintaining the Jail.

54.     Defendants Bryan Allender, Marty Heffner, and Paul Sinders are Clay County Commissioners, and Mr. Sinders is the president. The County Commissioners are sued in their official capacity.

55.     Defendant Clay County Jail (the "Jail") is located at 611 East Jackson Street, Brazil, Indiana 47834. It is sometimes referred to as the "Clay County Justice Center." The Jail is currently used to house people who are in ICE custody.

56.     Defendant Clay County Sheriff's Office is responsible for the care and housing of individuals held in ICE custody at the Jail pursuant to the Agreement. The Sheriff's Office is located at the Jail at 611 East Jackson Street, Brazil, Indiana 47834.

57.     Defendant Paul B. Harden is the Clay County Sheriff, and in that capacity is responsible for the Jail and the care of individuals held there. Sheriff Harden must follow orders of the county fiscal body, when given. Ind. Code § 36-2-3-6(c). Sheriff Harden is sued in his official capacity.

58.     Defendants Elizabeth Hughett, David Parker, and Jase Glassburn are all Clay County Sergeants, and they also serve as ICE Contract Coordinators. They are County employees and are sued in their official capacity.

59.     Defendant Jennifer M. Flater is the Clay County Auditor, and is responsible for directing payments of County funds as directed by the County Council and Ind. Code § 36-2-9-14. Auditor Flater is sued in her official capacity.

60.     Defendant Debra James is the Clay County Treasurer, and is charged with receiving money that the County is owed, including payments from ICE for the detention of Plaintiffs and other Class members. Treasurer James is sued in her official capacity.

## FACTUAL AND LEGAL BACKGROUND

I.    **Clay County Illegally Profits from the Detention of Plaintiffs and Other People Detained by ICE at the Clay County Jail.**

A.    **By Signing the Federal Detention Agreement, the County Agreed to Use Federal Payments Solely to Provide Adequate Care to Plaintiffs and Other People Detained by ICE.**

61.     In 2006, the U.S. Marshals Service ("USMS") entered into the Agreement with the County to house individuals in federal custody at the Jail, including those in immigration custody. *See* Ex. A at 1. The purpose of the Agreement was to provide "for the housing, safekeeping, and subsistence of federal prisoners." *Id*.

62.     Under the Agreement, the USMS agreed to pay the County $45 per person per day to detain people in federal custody. *Id.* The parties stated that the "[p]er diem rates shall be established on the basis of actual and allowable costs associated with the operation of the facility during a recent annual accounting period." *Id.* at 3. The County, in turn, agreed that it would "be required to establish and maintain accounting systems and financial records that accurately account for the funds awarded," and "responsible for complying with OMB Circular A-87 and 28 CFR, Part 66, and the allowability of the costs covered therein." *Id.* at 4.

63.     Since the signing of this Agreement and others like it, DHS has adopted the "Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal

Awards" ("UAR"), codified at 2 C.F.R. Part 200, as having "regulatory effect." 2 C.F.R. §

3002.10; *see id.* § 2800.101 (adoption by Department of Justice). The UAR sets forth mandatory

cost-allowance, accounting, and auditing requirements for federal and state agencies with respect

to entering and maintaining agreements like the one at issue here. These regulations supersede

prior guidance setting forth these various requirements, including those codified at 28 C.F.R.

Part 66 and in the Office of Management and Budget's (OMB) Circular A-87.

64.    Among other things, the regulations in the UAR require that the "Federal

awarding agency must manage and administer the Federal award in a manner so as to ensure that

Federal funding is expended and associated programs are implemented in full accordance with

the U.S. Constitution, Federal Law, and public policy requirements." 2 C.F.R. § 200.300(a).

Similarly, the regulations require the recipient entity to "[e]stablish and maintain effective

internal control over the Federal award that provides reasonable assurance that the non-Federal

entity is managing the Federal award in compliance with Federal statutes, regulations, and the

terms and conditions of the Federal award." *Id.* § 200.303(a).

65.    Importantly, the regulations prohibit a recipient like the County from "earn[ing]

or keep[ing] any profit resulting from Federal financial assistance, unless explicitly authorized

by the terms and conditions of the Federal award." 2 C.F.R. § 200.400(g).

66.    In 2013, ICE issued an addendum to the Agreement to start sending noncitizens to

the Jail. *See* Ex. A at 8. That same year, the facility began detaining people in immigration

custody under the Agreement. In doing so, ICE became bound by the terms of the Agreement

and the requirements of the UAR, which were expressly incorporated into the Agreement. *See*

Ex. A at 4; *see also, e.g.*, *id.* at 3 (providing that ICE would "reimburse" the County at the

specified per diem rate, based on "actual and allowable costs associated with the operation of the facility").

67.    Congress, moreover, has expressly limited ICE's authority to "make payments" under detention agreements like the one at issue here in 8 U.S.C. § 1103(a)(11)(A). Such payments must be "in support of persons in [ICE] administrative detention in non-Federal institutions" and "for necessary clothing, medical care, necessary guard hire, and the housing, care, and security of persons detained by [ICE]." *Id.*; *see also* 18 U.S.C. § 4013(a) (similar requirements for funding appropriated for the U.S. Marshals).

68.    The County was well aware of these limitations on federal payments for the detention of people in ICE custody. In seeking the Agreement, the County was required to submit a Cost Sheet for Detention Services (USM-243), which calculates a fixed per diem rate based on *actual and allowable* costs for each detained person, such as costs for personnel, consultant and contract services, and jail operating costs. *See* USM-243: Cost Sheet for Detention Services, U.S. Marshals Service, https://tinyurl.com/4swbs294. The guidance for completing the USM-243 explains that "[t]he fixed per diem rate will be computed on the basis of actual, allowable, and allocable direct and indirect costs associated with the operation of the facility and that benefit federal prisoners," and emphasizes that "[i]f the costs do not benefit federal prisoners, they cannot be claimed on the Cost Sheet." *Id.*; *see also* 2 C.F.R. §§ 200.403, 200.408, 200.413(b).

69.    In 2015, the USMS and ICE extended the Agreement with the County. *See* Ex. B at 1. Among other things, the parties increased the per diem rate that ICE would pay to $55 per person per day. *Id.* Other than the rate increase and a few other modifications, the parties agreed

that "all terms and conditions of the [Agreement] . . . remain unchanged." *Id.* at 2. Accordingly, ICE and the County continued to be subject to the UAR and 8 U.S.C. § 1103(a)(11)(A).

> **B.    The County Has Treated the Agreement like a Cash Cow, Improperly Using Federal Funds to Pay for County Expenses Unrelated to Caring for Plaintiffs and Other People Detained by ICE.**

70.    As discussed above, federal payments under detention agreements like the Agreement are not blank checks or general operating funds for the recipient state or local government. Rather, by law, these payments must be spent to provide adequate care for people detained by ICE, and not for other, unrelated things.

71.    Instead of using the ICE payments to maintain adequate conditions at the Jail, however, the County is substantially misappropriating the money to pay for unrelated County expenses and discretionary expenditures.

72.    *The Brazil Times* reported, for instance, that in 2020, the County received approximately $1.4 million dollars in ICE payments for the care and custody of noncitizens, of which Clay County spent at least $783,000 (*i.e.*, at least 56% of those payments) on other County budget items. *See* I. Jacobs, *Commissioners Refute Public Claims, Misleading Use of Facts on Jail Expansion*, THE BRAZIL TIMES (Dec. 17, 2021), https://tinyurl.com/3eejchay. For instance, thanks to federal funds provided for the County's detention of noncitizens, "[t]he County Council was able to give county employees a 3% raise [], plus a bonus of 2%," said County Commissioner Allender.

73.    In addition, in 2021, "a new $83,000 chiller in the courthouse was paid for thanks to jail profits." G. Stone, *ICE, Jail on Table at Chamber Luncheon*, THE BRAZIL TIMES (Mar. 25, 2022), https://tinyurl.com/2p9d48e2.

74.     The County openly trumpets that it is profiting off of its detention arrangement with ICE. In 2018, for instance, Sheriff Harden confirmed as much and stated that the Jail was "overbuilt for the county of 26,000, as demonstrated by the many empty and unused beds." A. Modesitt, *Clay County Home to Indiana's Only Detention Center*, TRIBUNE STAR (June 30, 2018), https://tinyurl.com/2685b8w6. "Harden said it's only sensible to use the available space and collect on the opportunity for the county." *Id.* "Revenues are deposited in the county's general fund." *Id.*

75.     In November 2021, Clay County Commissioner President Paul Sinders echoed these sentiments: "Basically, these inmates are going to go someplace. We might as well take advantage of the situation . . . . It is going to increase our income and allow us to do more at the county level. People don't realize, I believe, that with the ICE inmates it helps keep our taxes down. . . . Without the additional income, if there's a shortfall, basically taxes are going to go up, and at this time there is no need for that." J. Morey, *Clay County Considering Expanding Jail to House More ICE Detainees*, The Indiana Lawyer (Nov. 10, 2021), https://tinyurl.com/2p8hmf7d.

76.     Around the same time, County Commissioner Marty Heffner added that if Clay County passes on the opportunity to profit from holding more people detained by ICE, a nearby county "is waiting to scoop it up." Assoc. Press, *Indiana County May Cash in as Illinois Bans Detentions*, Fox 59 (Oct. 16, 2021), https://tinyurl.com/mpfct4ad.

77.     During the December 6, 2021 Clay County Council Meeting, Council Member Larry Moss stated on the record that the Clay County jail is "able to keep [its] cost down" because ICE pays "a profitable fee." *See* WAMB The Breeze, *Clay County, IN County Council Meeting 12-6-21*, at 45:32 (Dec. 6, 2021), https://tinyurl.com/yc7bxty9 ("Clay County Council Meeting").

78.    Council Member Moss acknowledged that the arrangement with ICE "basically put [all of the Jail's costs] on the ICE side," *i.e.*, including costs associated with detaining people in state and local custody, creating a "net value" for the County. *Id.* at 45:40–45:55.

79.    Council Member Jason Thomas chimed in that "ICE is paying us a lot of money," and that those payments are a "major item" in the county budget. *Id.* at 56:13.

80.    When confronted by a member of the public about the federal limitations on the use of ICE payments meant for the care of detained noncitizens, the Council Members denied that the County was limited in how it could use the ICE payments. *Id.* at 56:23–56:45.

81.    Rather, Council Member Thomas and Council Member Jason Britton freely admitted that the County uses the ICE funding to pay for numerous unrelated services, including roads, County employee salaries, and attorney costs. *Id.* at 56:45.

82.    Council Member Britton further emphasized that the ICE revenue is not just used for the ICE program but to sustain the County. *Id.* at 56:59. "It helps to keep our taxes down," Council Member Moss reiterated. *Id.* at 57:05.

83.    When a member of the public specifically raised that 8 U.S.C. § 1103(a)(11) limits the ICE payments to the care and custody of people detained by ICE, Council Member Moss again rejected this concern, declaring that once ICE pays the money, "they can't tell us what to do with it." *Id.* at 57:33–58:06.

84.    The Agreement has proven so profitable for the County that, on April 4, 2022, the County Commissioners voted to expand the Jail, which would increase its capacity to hold people detained by ICE. *See* G. Stone, *County Commission OKs Jail Study*, THE BRAZIL TIMES (Apr. 5, 2022), https://tinyurl.com/2rpcdhrv.

85.    In justifying the expansion, the Commissioners reiterated that "[t]he funding was used to cover the cost of salaries for jail staff and other costs associated with the jail," and "offset the local budget to help pay for operational expenses throughout the county." I. Jacobs, *Commissioners Refute Public Claims, Misleading Use of Facts on Jail Expansion*, THE BRAZIL TIMES (Dec. 17, 2021), https://tinyurl.com/3eejchay. "Because of the ICE money generated in recent years, the county has been able to use it along with county funds to purchase new facilities like [the] Clay County Health Department, Clay Community Corrections, and the Clay County Sheriff's Department storage building." *Id.*

86.    "Without the ICE program funds offsetting the county budget, these projects would not have been possible without an additional tax being imposed by the County Council," said Commissioner Heffner. *Id.*

87.    The Commissioners even indicated that they would seek a rate *increase* for detaining people for ICE, which according to Commissioner Heffner, would "significantly increase the amount of money we have coming in." *Id.* Records produced in response to an Indiana Access to Public Records Act (APRA) request reveal that the County anticipates receiving up to $7 million per year with the planned expansion of the Jail.

88.    As County Commissioners President Sinders put it, "The big question is – do you want the County Council to raise our taxes? Or do you want to generate ICE funds to help subsidize the county budget?" *Id.*

II.    **While the County Diverts Federal Payments Elsewhere, Plaintiffs and Other People Detained by ICE Suffer in Grossly Inadequate Conditions at the Jail.**

A.    **As a Facility Holding Individuals for ICE, the Jail Must Meet Federal Standards of Care Known as the Performance-Based National Detention Standards ("PBNDS").**

89.    Facilities that detain people for ICE, including the Jail, must comply with ICE's detention standards. In 2008, ICE issued its Performance-Based National Detention Standards to govern the "safety, security and conditions of confinement for detainees." U.S. ICE, *ICE Detention Standards* (Nov. 9, 2021), https://tinyurl.com/2xu5fckm.

90.    In 2011, ICE "further revised its detention standards . . . to tailor the conditions of immigration detention to its unique purpose while maintaining a safe and secure detention environment for staff and detainees." *Id.* The 2011 PBNDS were updated in 2016, but are still referred to as the 2011 PBNDS. *See id.*

91.    Compliance with the PBNDS has been mandated by law since 2009. In the spring of 2008, ICE came under public scrutiny because of serious concerns about the inadequacy of medical care in its detention system. *See, e.g.*, D. Priest & A. Goldstein, *System of Neglect: As Tighter Immigration Policies Strain Federal Agencies, The Detainees in Their Care Often Pay a Heavy Cost*, Wash. Post (May 11, 2008), https://tinyurl.com/3xjvrbhx. In response, Congress held hearings to investigate detention conditions and the circumstances of medical care for immigrants. *See Problems with Immigration Detainee Medical Care: Hearing before the H. Judiciary Comm., Subcomm. on Immigration, Citizenship, Refugees, Border Security, and International Law*, 110th Cong., 2d Sess. (June 4, 2008). Following these hearings, Congress restricted ICE's expenditure of federally appropriated detention funds in the DHS Appropriations Act of 2009.

92.     In particular Congress mandated:

[N]one of the funds provided under this heading may be used to continue any contract for the provision of detention services if the two most recent overall performance evaluations received by the contracted facility are less than "adequate" or the equivalent median score in any subsequent performance evaluation system.

Consolidated Security, Disaster Assistance, and Continuing Appropriations Act of 2009, Pub. L. No. 110-329, Div. D, Tit. II (Sept. 30, 2008), 122 Stat. 3574.

93.     This requirement, hereinafter referred to as the "DHS Appropriations Inspection Mandate," remains in effect. *See, e.g.*, DHS Appropriations Act of 2010, Pub. L. No. 111-83, Tit. II (Oct. 28, 2009), 123 Stat. 2149; Consolidated Appropriations Act of 2012, Pub. L. No. 112-74, Div. D, Tit. II (Dec. 23, 2011), 125 Stat. 950; Consolidated and Further Continuing Appropriations Act of 2013, Pub. L. No. 113-6, Div. D, Tit. II (Mar. 26, 2013), 127 Stat. 347; Consolidated Appropriations Act of 2017, Pub. L. No. 115-31, Div. F, Tit. II, § 211 (May 5, 2017), 131 Stat. 412; Consolidated Appropriations Act of 2021, Pub. L. No. 116-260, Div. F, Tit. II, § 215(a) (Dec. 27, 2020), 134 Stat. 1457.

94.     As the most recent set of standards, the 2011 PBNDS (as revised in 2016) are the relevant detention standards for the current "performance evaluation system" for assessing an immigration detention facility's compliance with the DHS Appropriations Inspection Mandate.

95.     Nevertheless, ICE still evaluates a handful of facilities under the outdated 2008 PBNDS, including the Jail. ICE has never required the Jail to comply with the 2011 PBNDS, and has never provided an explanation for evaluating the Jail under the older standard.

**B.    Conditions at the Jail Are Grossly Inadequate under the PBNDS.**

96.     Conditions at the Jail are grossly inadequate under any iteration of the PBNDS, including the 2008 version, in a wide variety of ways.

### i.    Environmental Health and Safety Standards

97.    Each of the plaintiffs has experienced a Jail environment that falls well below the level required by the PBNDS and that threatens their health and safety.

98.    Under the standards for "Environmental Health and Safety," the PBNDS declare that their purpose is to "protect[] detainees, staff, volunteers, and contractors from injury and illness by maintaining high facility standards of cleanliness and sanitation, safe work practices, and control of hazardous substances and equipment." 2008 PBNDS, *Environmental Health and Safety*, at 1 (Dec. 2, 2008), https://tinyurl.com/mwmm7m86. The standards set forth several expected outcomes and practices, including that "[f]acility cleanliness and sanitation will be maintained at the highest level," and at levels satisfying recognized standards of hygiene set by the American Correctional Association, the Occupational Safety and Health Administration, and other organizations. *Id.* at 1–2. To ensure such standards, the PBNDS require regular sanitation efforts such as cleaning horizontal surfaces with approved germicidal solutions, daily cleaning of furniture and fixtures, and daily mopping with "a hospital disinfectant-detergent solution mixed according to the manufacturer[']s directions," and a "clean mop head . . . each time." *Id.* at 3–4.

99.    The Jail meets none of these standards. Jail staff rarely, if ever, clean the parts of the Jail in which Plaintiffs and other people detained by ICE are held. As a result, the Jail is filthy. There is green and black mold on the walls of the shower that is slippery to the touch and that smells. In some places, there is graffiti on the walls, including gang signs. There is also dirt and mold on the walls and on tables.

100.    The PBNDS provide that people detained at facilities like the Jail are responsible for only four basic "personal housekeeping" tasks: making their beds daily, stacking loose papers, keeping the floor free of debris and dividers free of clutter, and not hanging things from

beds and other furniture and fixtures. *See* 2008 PBNDS, *Voluntary Work Program*, at 2–3 (Dec. 2, 2008), https://tinyurl.com/2sfzdanv. Otherwise, the PBNDS mandate that all other "[w]ork assignments are voluntary." *Id.*

101.    The Jail, however, leaves all cleaning and sanitation responsibilities to Plaintiffs and other people detained at the Jail. The Jail gives the detained noncitizens a small amount of unmarked cleaning solution for them to use themselves. Whatever the solution is, it is ineffective, and seems to be composed mostly of water. As a result, Plaintiffs and the others have had no choice but to create their own solution by mixing together toothpaste, shampoo, body soap, and any other cleaning products they are able to afford from the Jail's commissary using their personal funds.

102.    The Jail provides a filthy, old mop for Plaintiffs and the others to use; once in a while, they are given a scrub brush. Aside from these tools, they are forced to use old clothes or toilet paper for cleaning. They are never given gloves, even to clean the toilets in their cells.

### ii.    Personal Hygiene Standards

103.    Under the standards for "Personal Hygiene," the PBNDS declare that their purpose is to ensure "that each detainee is able to maintain acceptable personal hygiene practices through the provision of adequate bathing facilities and the issuance and exchange of clean clothing, bedding, linens, towels, and personal hygiene items." 2008 PBNDS, *Personal Hygiene*, at 1 (Dec. 2, 2008), https://tinyurl.com/yrb973jt. The standards set forth several expected outcomes, including that "[e]ach detainee will have suitable, clean bedding, linens, blankets, and towels," "[e]ach detainee will have sufficient clean clothing that is properly fitted, climatically suitable, durable, and presentable," and "[d]etainees, including those with disabilities, will be able to maintain acceptable personal hygiene practices." *Id.*

104.    To ensure these outcomes, the PBNDS mandate that the Jail provide "clean, indoor/outdoor temperature-appropriate, size appropriate, presentable clothing" at "no cost." *Id.* at 2.

105.    Plaintiffs and other people detained for ICE at the Jail received clothing that is old, torn, and tattered. The underwear, in particular, is used and often has holes in it. Plaintiff Jaimes Jaimes, for example, has repeatedly requested underwear without holes in it since he arrived at the Jail, but has never received any. He and others are also given bed sheets that are ripped and dirty, sometimes with visible blood stains and other discolorations. They also receive blankets that are in poor condition.

106.    In addition, the clothes that the Jail provides are not warm enough. Plaintiffs Herrera Cardenas, Jaimes Jaimes, and Toe, and others held in the men's cell blocks are always cold, and they have to resort to extreme measures to stay warm. Some walk around wrapped in their blankets; others cut holes in their socks so that they can wear them on their arms like sleeves. Although several have asked, they are not provided with sweaters or sweatshirts by the Jail. People in the men's cellblocks are so cold that they sometimes try to plug up the air vents with toilet paper to block cold air.

107.    The PBNDS also require that the Jail must provide for a "daily change of socks and undergarments," with "[a]n additional exchange . . . if necessary for health or sanitation reasons." *Id.* at 4. But the Jail does not allow detained people to exchange sock and undergarments every day. Instead, each person is given two or three sets of socks, underwear, t-shirts, and pants, and they are allowed to do laundry only on Monday, Wednesday, and Saturday. This means that people regularly have to wear dirty clothes on laundry day or use their commissary funds to purchase additional underwear from the County.

108.    Sometimes clothes that the Jail takes to be laundered return even dirtier than before. The clothes smell and have become discolored. Accordingly, people have taken to washing their own clothes in the showers.

109.    In addition, the PBNDS require that people detained by ICE must receive "personal hygiene items appropriate for their gender," and which must be adequately "replenish[ed] . . . as needed." *Id.* at 2. The standards emphasize that "[t]he distribution of hygiene items shall not be used as reward or punishment." *Id.*

110.    The Jail passes out new hygiene products only two times per week, and each time, Plaintiffs and other detained people are not given enough soap, shampoo, toothpaste, toilet paper, and other hygiene items. The packets of toothpaste and shampoo they receive, for example, run out within a day or two.

111.    Moreover, Plaintiff Xirum and others held in the women's dorm of the Jail cannot get sanitary items as needed. Rather, they must wait until the Jail's twice-weekly distribution of personal hygiene items, even if they unexpectedly begin menstruation earlier in the week. Some women feel they must flirt with the male guards in order to get them to bring additional hygiene items beyond those regularly allotted. For women who use tampons instead of pads, they must buy those from the Jail's commissary at the expensive price of approximately $1 per tampon.

112.    The PBNDS also require that, 24 hours per day, "[a]ll housing units with three or more detainees must have at least two toilets." *Id.* at 3.

113.    In fact, the cells in the men's housing units at the Jail are permanently configured to hold four beds and one toilet, meaning that people are regularly forced to share one toilet among four people—if the toilet is working. Sometimes, the Jail places up to six people in a cell at once, putting thin, portable plastic pallets called "boat beds" on the floor. Plaintiff Jaimes

Jaimes, for instance, is detained in a block with six cells, and four of the cells each have five or six people in them.

114.    Toilets at the jail are often broken for days. The toilet in Plaintiff Herrera Cardenas's cell, for instance, was broken for more than ten days. When a toilet malfunctions, as many as 10 or 12 people from neighboring cells must share a single toilet, making it extremely difficult to find an available toilet when it is needed.

115.    The PBNDS also require that, 24 hours per day, people detained by ICE must have access to washbasins "with temperature controlled hot and cold water." *Id.*

116.    The hot water taps in many sinks at the Jail do not work and hot water is not provided throughout the day. As a result, people who need hot drinking water during the day often must get it from the shower—the same place that is riddled with mold, and where people wash their bodies and some wash their clothes.

117.    The PBNDS also require that the Jail provide "[o]perable" showers that must be "thermostatically controlled to temperatures between 100 and 120 degrees Fahrenheit." *Id.*

118.    The showers at the Jail are not properly temperature controlled: Detained people cannot adjust the temperature, and must instead either press a button for cold water or a button for hot water. Neither is suitable for showering: The cold water is too cold, and the hot water is burning hot.

119.    The showers also do not all have working showerheads. As a result, Plaintiffs and others have taken to cutting holes in empty bottles of shampoo or hot sauce to create makeshift showerheads.

120.    The PBNDS further require that the Jail provide people detained by ICE "with a reasonably private environment in accordance with safety and security needs." *Id.* at 4.

29

"Detainees with disabilities shall be provided the facilities and support needed for self-care and personal hygiene in a reasonably private environment in which the individual can maintain dignity." *Id.* The PBNDS require that people with disabilities receive support "by individuals who are trained and qualified to understand problems and challenges faced" by such persons. *Id.*

121.    In fact, none of the toilets in the men's housing units have privacy screens. People sometimes hang their own bed sheets around the toilets to create privacy, either "sacrificing" those sheets or bringing them back to use as bedsheets after going to the bathroom.

122.    Plaintiff Xirum suffers from back problems that sometimes require her to use a cane and limit her ability to move around the women's dorm. She also cannot remain seated for long periods of time. She has never received assistance from the Jail staff or anyone qualified to assist a person with disabilities. There is one shower for people with disabilities in the women's dorm, but it has been broken since Plaintiff Xirum arrived. As a result, she is forced to use the regular showers, which do not have hand rails or a bench.

### iii.    Food Service Standards

123.    Under the standards for "Food Service," the PBNDS state that their purpose is to ensure "that detainees are provided a nutritionally balanced diet." 2008 PBNDS, *Food Service*, at 1 (Dec. 2, 2008), https://tinyurl.com/26jz58u7. All people detained by ICE at the Jail must be "provided nutritionally balanced diets that are reviewed at least quarterly by food service personnel and at least annually by a qualified nutritionist or dietitian." *Id.*

124.    In fact, the Jail provides only small amounts of food at each meal. One noncitizen compared the portion size to that of a McDonald's kid's meal. As a result, Plaintiffs and other noncitizens are often hungry and must spend their own money (if they have any) to purchase additional, expensive food from the Jail's commissary. Sometimes, people who can afford to

purchase food do not have access to the kiosk that people use to order items. For example, Plaintiffs Herrera Cardenas, Jaimes Jaimes, and Toe were in a housing unit where the kiosk was broken for at least 10 days. The same machine is used to allow people to see their families during video visits, which are unavailable when the kiosk is broken.

125. Plaintiff Toe lost 10 to 15 pounds after arriving at the Jail. When he first arrived, he became sick with headaches and stomachaches. Even after recovering from these ailments, he remains about 10 pounds lighter than when he first arrived.

126. PBNDS requires that the Jail must "provide sufficient space and time . . . to eat meals in a relatively relaxed, unregimented atmosphere." *Id.* at 1. The Jail's dining area "must facilitate free seating, ease of movement, and ready supervision." *Id.* at 6.

127. In fact, the men's units have become so overcrowded that people are forced to eat while standing up, sitting on stairs, or in their beds because there is not enough space.

### iv. Medical Care Standards

128. The PBNDS that relate to medical care are designed to ensure that the "health care needs" of people detained by ICE "are met in a timely and efficient manner." 2008 PBNDS, *Medical Care*, at 1 (Dec. 2, 2008), https://tinyurl.com/yk6bpnva. The PBNDS lay out several expected outcomes, including that "[h]ealth care needs will be met in a timely and efficient manner," "[d]etainees will be able to initiate requests for health services on a daily basis," and "[a] detainee who needs health care beyond facility resources will be transferred in a timely manner to an appropriate facility where care is available." *Id.*

129. Despite these requirements, Plaintiffs Toe, Xirum, and Jaimes Jaimes have received delayed treatment for known conditions. Each of the named Plaintiffs, moreover, has received inadequate treatment.

130.    For instance, the PBNDS require that a physician be "on call or available 24 hours per day," and "[h]ealth care personnel are on duty 24 hours per day when patients are present." *Id.* at 9. The PBNDS also require "[a]n on-call physician, dentist, and mental health professional, or designee, that are available 24 hours per day" for emergency services. *Id.* at 17.

131.    In fact, a nurse is present at the Jail only five days per week, and not on the weekends. The Jail's physician, meanwhile, comes to the Jail once a week. Plaintiff Xirum has never seen the doctor in person; she has only been able to speak with him remotely. Plaintiff Xirum suffered from a cracked tooth shortly after her arrival to the Jail, and when she asked to see a dentist, she was told that Brazil, Indiana, is a "small town" and that the local dentist did not answer emails from ICE. It took three weeks before officials finally took Ms. Xirum to a dentist in Indianapolis, who pulled her tooth, which had become infected.

132.    Plaintiff Xirum also requires regular assistance in administering insulin because she does not know how to inject herself. On the weekends, she must ask one of the guards or another person detained at the Jail because no medical staff is available.

133.    The PBNDS require that "[n]on-English speaking detainees . . . will be provided interpretation/translation services or other assistance as needed for medical care activities." *Id.* at 3.

134.    At the Jail, none of the guards or medical staff is fluent in Spanish or capable of translating. Only one person on the medical staff speaks some basic Spanish. As a result, Plaintiff Herrera Cardenas sometimes has to translate for other noncitizens who need medical assistance. Plaintiff Jaimes Jaimes has had to rely on such assistance, as he only speaks Spanish.

135.    The PBNDS require medical screening of each new arrival to the Jail "within 12 hours of arrival by a health care provider or a detention officer specifically trained to perform

this function." *Id.* at 11. The screening must inquire into, among other things, "[d]ental problems," "[u]se of alcohol or other drugs," "[h]istory of suicide attempts," and "past or recent sexual victimization." *Id.* at 11–12. In fact, the Jail's initial screening is cursory and does not address many of these required issues. Plaintiffs Xirum and Jaimes Jaimes, for example, did not receive a full physical examination when they entered the Jail.

136.    The PBNDS require "[a]n initial dental screening exam" within 14 days of a noncitizen's arrival, which must be conducted by a dentist, physician, physician assistant, nurse practitioner, registered dental hygienist, or registered nurse. *Id.* at 16.

137.    No such screening occurs at the Jail. Indeed, as mentioned above, Plaintiff Xirum, waited three weeks before being treated for a cracked tooth.

138.    The PBNDS require that "[e]ach facility shall have an in-house or contractual mental health program, approved by the appropriate medical authority." *Id.* at 13.

139.    In fact, mental health counseling and other services are not consistently provided. Plaintiff Toe, for instance, asked to see a psychiatrist or other mental health therapist, but was simply offered medication. Plaintiff Jaimes Jaimes similarly has never seen a therapist or mental health professional, even though he suffers from severe anxiety and is receiving medication for these conditions. Relatedly, Plaintiff Xirum arrived at the facility with a prescription for Cymbalta, which is taken to address some of her physical and psychological health issues, and yet the Jail delayed by more than a week in providing this treatment.

140.    The PBNDS require "a sick call procedure that allows detainees the unrestricted opportunity to freely request health services (including mental health and dental services)," and further require that "all sick call requests are received and triaged by appropriate medical personnel within 48 hours after the detainee submits the request." *Id.* at 16.

141.    Medical staff at the Jail regularly fail to respond to requests for medical care for days, and sometimes a week or more. Plaintiffs have all experienced delays in the receipt of medical care. For instance, Plaintiff Toe suffers from debilitating headaches due to an injury he sustained to his eye years ago, but the Jail frequently refuses to provide him with appropriate care.

142.    Plaintiff Xirum requested an extra mattress pad to help treat her back issues, but she was told there are no more pads available, and has been waiting for more than a month.

143.    Recently, one nurse announced to all of the women in Plaintiff Xirum's housing unit that he would no longer provide ibuprofen because he believed it was being abused. Instead, detained individuals would be required to buy it—at the cost of $3.56 for a two-pill packet— from the Jail's commissary. Plaintiff Xirum has been purchasing two or more packets per week using her own money.

144.    The PBNDS require that "[d]istribution of medication shall be in accordance with specific instructions and procedures established by the administrative health authority." *Id.* at 18. The PBNDS provide that "[i]f medication must be delivered at a specific time when medical staff is not on duty, it may be distributed by detention officers who have received proper training by the administrative health authority." *Id.*

145.    The Jail's guards dispense medication on the weekends because there is no medical staff at the Jail on the weekends. Multiple people detained by ICE at the Jail have received medication from guards who were not properly trained, and as a result, who may have dispensed the wrong medication. One person, for instance, was prescribed antibiotics in capsule form for a tooth issue, but was given pills that were not capsules by the guards. Plaintiff Jaimes Jaimes was once given pink pills instead of the correct medications he takes for his anxiety,

which are white and green. Plaintiff Jaimes Jaimes has also observed another person being given the wrong medications. As described above, Plaintiff Xirum cannot always rely on the guards to properly administer insulin.

### v.    Correspondence and Other Mail Standards

146.    The PBNDS require that "Legal Mail may only be opened in the detainee's presence, and may be inspected for contraband, but not read." 2008 PBNDS, *Correspondence and Other Mail*, at 3 (Dec. 2, 2008), https://tinyurl.com/3m4y9zyf. "Staff shall neither read nor copy . . . Legal Mail." *Id.* at 5.

147.    In fact, Plaintiff Toe received legal mail two days after it had arrived, and it had been opened outside his presence. The guards told him that they thought it was a book. On information and belief, the guards had read the mail before bringing it to Plaintiff Toe.

### vi.    Recreation Standards

148.    Under the standards for "Recreation," the PBNDS require that "every ICE/DRO detainee will be placed in a facility that provides indoor and outdoor recreation." 2008 PBNDS, *Recreation*, at 2 (Dec. 2, 2008), https://tinyurl.com/5awvryus. The standards provide that "in exceptional circumstances, a facility lacking outdoor recreation or any recreation area may be used to provide short-term housing." *Id.*

149.    The Jail does not provide any outdoor recreation. This is not because of "exceptional circumstances," but rather because the Jail simply does not have such a space. As a result, noncitizens held at the Jail, including those detained for lengthy periods of time, never get to go outside. Plaintiff Toe—who has been at the Jail for nearly five months now—suffers from depression, which has been exacerbated by the lack of access to sunlight or the ability to

exercise. Plaintiff Xirum, who suffers from asthma, sometimes feels like she cannot catch her breath inside the Jail.

150.    The PBNDS further require that people detained by ICE have access to recreation "for at least one hour daily." *Id.*

151.    In fact, people detained at the Jail are only given access to indoor recreation on an irregular schedule. Often times, they receive recreation time only a few days per week, and other times it is offered at unusual hours, including late at night, when people are already sleeping. The Jail also uses the indoor recreation space at times to house extra people.

### vii.    Religious Practices Standards

152.    Under the standards for "Religious Practices," the PBNDS declare that their purpose is to "ensure[] that detainees of different religious beliefs are provided reasonable and equitable opportunities to participate in the practices of their respective faiths." 2008 PBNDS, *Religious Practices*, at 1 (Dec. 2, 2008), https://tinyurl.com/22v9k73u. The PBNDS state that people detained by ICE should "have opportunities to participate in practices of their religious faith that are deemed essential by that faith, limited only by a documented showing of threat to the safety of persons involved in such activity itself, or disruption of order in the facility," and "[a]dequate space, equipment and staff (including security and clerical) will be provided for conducting and administering religious programs." *Id.*

153.    To ensure these outcomes, the PBNDS require that the Jail maintain a "facility chaplain" or other person designated "to manage and coordinate religious activities" for noncitizens. *Id.* at 3. This person must have "basic knowledge of different religions and shall ensure equal status and protection for all religions." *Id.* This person must also "have physical access to all areas of the facility to minister to detainees and staff." *Id.*

154.    The PBNDS further require that people detained by ICE "shall have opportunities to engage in practices of their religious faith that are deemed essential by that faith consistent with the safety, security and the orderly operation of the facility." *Id.* at 2.

155.    In Plaintiffs' collective experience, there have been virtually no options for individualized ministry or services for different denominations. For example, Plaintiff Xirum is Catholic and has not been able to attend Catholic services. In addition, according to Plaintiff Herrera Cardenas, any religious services are held only in English, not Spanish. Although the Jail held services on Easter in 2022, it was not clear whether people detained by ICE could attend, or only those held in state and local custody.

156.    Though not Muslim, Plaintiff Toe also has also fasted alongside those observing Ramadan in April 2022, but sometimes when his food is delivered after sunset, it is served cold because the Jail places the food of anyone fasting in the refrigerator, and only one corrections officer is sometimes willing to warm it up again when people who are fasting break the fast.

### viii.    Telephone Access Standards

157.    The Jail has failed to provide adequate telephone access to each of the Plaintiffs. Under the standards for "Telephone Access," the PBNDS declare that their purpose is to "ensure[] that detainees may maintain ties with their families and others in the community, legal representatives, consulates, courts, and governmental agencies by providing them reasonable and equitable access to telephone services." 2008 PBNDS, *Telephone Access* at 1 (Dec. 2, 2008), https://tinyurl.com/54dubmbx.

158.    The PBNDS require that the Jail "shall ensure that detainees have access to reasonably priced telephone services." *Id.* at 2. "Contracts for such services shall . . . be based on

rates and surcharges commensurate with those charged to the general public. Any variations shall reflect actual costs associated with the provision of services in a detention setting." *Id.*

159.    Domestic calls at the Jail cost about $0.21 per minute, plus taxes and fees. As a result, a fifteen-minute call to Plaintiff Toe's family in Ohio costs him about $4, well above the rates charged to the general public, and well above the actual cost of making such a call from the Jail.

160.    The PBNDS require that the Jail "provide the broadest range of calling options including, but not limited to, international calling . . . determined by the facility administrator to be consistent with the requirements of sound detention facility management." *Id.*

161.    Jail staff do not explain to people detained by ICE how to contact their families abroad, and as a result, international calling is not commonly accessible at the Jail absent extraordinary circumstances. Noncitizens generally cannot contact their families abroad from the Jail, except by calling someone in the United States who then initiates a three-way call, which is prohibited by the Jail's disciplinary rules and can result in punishment.

162.    The PBNDS also require that the Jail "permit detainees to make direct or free calls" to "[i]mmediate family or others for detainees in personal or family emergencies or who otherwise demonstrate a compelling need (to be interpreted liberally)." *Id.* at 4–5.

163.    Noncitizens at the Jail are never permitted to make direct or free calls to family, no matter the compelling need or justification. If they cannot afford to pay for the call at the Jail's exorbitant rates, they are not allowed to make it.

### ix.    Special Management Unit Standards

164.    Under the standards for "Special Management Units" ("SMUs"), the PBNDS require that "[c]ells and rooms used for purposes of segregation must be well ventilated,

adequately lit, appropriately heated, and maintained in a sanitary condition at all times." 2008 PBNDS, *Special Management Units*, at 5 (Dec. 2, 2008), https://tinyurl.com/2p983avp.

165.    Plaintiff Herrera Cardenas was placed in a special management unit for about five days after he was attacked at the Jail. The cell was freezing; as cold as an icebox. Plaintiff Herrera Cardenas requested an additional blanket but was told the Jail did not have enough.

166.    The PBNDS require that "detainees in SMUs may shave and shower at least three times weekly." *Id.* at 6.

167.    In fact, Plaintiff Herrera Cardenas spent nearly his entire time in this unit without access to a shower. He showered on his first night there, after being returned to the Jail from the hospital following the attack he suffered, but he was not permitted to shower again until he returned to his general housing unit five days later. At one point he asked for a shower and was told he would be able to get one, but the Jail staff never took him, and when he asked again, he was told he could not shower.

### x.    Use of Force and Restraints Standards

168.    Under the standards for "Use of Force and Restraints," the PBNDS require that "[a]n employee will submit a written report no later than the end of his or her shift when force was used on any detainee for any reason, or if any detainee remains in any type of restraints at the end of that shift." 2008 PBNDS, *Use of Force and Restraints*, at 2 (Dec. 2, 2008), https://tinyurl.com/2p8hx6cf. "Detainees subjected to use of force shall be seen by medical staff as soon as possible." *Id.* at 3. In addition, "[s]taff shall use only that amount of force necessary and reasonable to gain control of a detainee." *Id.*

169.    One person observed Jail guards push a noncitizen to the floor and kick him several times. The noncitizen suffered bruises and a broken finger. On information and belief,

this level of force was greater than necessary or reasonable to gain control of the situation, and the Jail failed to properly document and report this incident or provide prompt and adequate medical treatment for the noncitizen afterwards.

### xi. Sexual Abuse and Assault Prevention and Intervention Standards

170.    Under the standards for "Sexual Abuse and Assault Prevention and Intervention," the PBNDS provide that "[s]exual conduct between detainees and staff, volunteers, or contract personnel, regardless of consensual status, is prohibited and subject to administrative, disciplinary and criminal sanctions." 2008 PBNDS, *Sexual Abuse and Assault Prevention and Intervention*, at 5 (Dec. 2, 2008), https://tinyurl.com/2v5bc2td.

171.    Plaintiff Xirum observed multiple violations of this requirement. For example, she has witnessed male guards flirting with the women held in the women's dorm and making degrading, sexualized comments, such as telling the women that they are "beautiful" and "good for the bed." According to Plaintiff Xirum, some women feel compelled to flirt with the guards in order to persuade the guards to provide needed personal hygiene items. Plaintiff Xirum also observed a woman being held at the Jail expose her body to a man in criminal custody whom the Jail allows to work in a position that affords him access to the women's housing unit.

### xii. Law Libraries and Legal Materials Standards

172.    Under the standards for "Law Libraries and Legal Material," the PBNDS require that the Jail "provide a properly equipped law library in a designated, well-lit room that is reasonably isolated from noisy areas and large enough to provide reasonable access to all detainees who request its use." 2008 PBNDS, *Law Libraries and Legal Materials*, at 2 (Dec. 2, 2008), https://tinyurl.com/2p828n6x. The PBNDS further require that people detained by ICE

"shall be permitted to use the law library for a minimum of five hours per week and may not be forced to forego his or her minimal recreation time to use the law library." *Id.* at 3.

173.    Plaintiff Jaimes Jaimes has never been to the law library, and when he asked for access, he was told "No." Plaintiff Toe has observed that noncitizens are often unable to access the law library space because the Jail uses it for remote court appearances and some phone calls.

174.    The PBNDS also require that the Jail permit people detained by ICE "to retain all personal legal material upon admittance to the general population or Administrative Segregation or Disciplinary Segregation units, unless this would create a safety, security or sanitation hazard." *Id.* at 6. The PBNDS further provide that "for a detainee with a large amount of personal legal material," the Jail "may place some of it in a personal property storage area, with access permitted during designated hours," and "shall grant requests for access as soon as feasible, but not later than 24 hours after receipt of the request, unless documented security concerns preclude action within that time frame." *Id.* at 7.

175.    Not only is the Jail in violation of these standards, but the Jail's policies have prevented Plaintiff Xirum from accessing legal documents that she needs for her upcoming immigration hearing. The Jail has been holding some of her legal documents in a bag in the ICE area of the Jail that Plaintiff Xirum does not have access to without approval. The week before her immigration hearing, she requested the documents from ICE, but received no response. Two days later, when counsel asked Jail staff for the documents, they responded that it takes two ICE officers to approve opening the bag, and no one could reach the ICE office because it was after 5pm.

**III.    For Years, ICE Has Turned a Blind Eye to the Conditions at the Jail Because It Depends on the Jail to Support Its Detention Operations.**

176.    Despite these appalling and grossly inadequate conditions, ICE has turned a blind eye and sought to expand its reliance on the Jail to detain noncitizens like Plaintiffs.

177.    ICE depends on the Agreement and others like it to support ICE's massive detention efforts. ICE has consistently received funding from Congress to maintain bed space for 34,000 noncitizens every day, and at times numbers have far exceeded even that amount. In 2019, for instance, ICE processed nearly 511,000 people for detention, detaining 50,000 individuals or more in over 200 facilities on a daily basis. But while ICE maintains the largest civil detention system in the United States, the agency does not own or operate most of the facilities it uses. Instead, ICE outsources almost all of its detention to private prison companies or state or local governments, including the County.

178.    As ICE's detention operations have grown in the past two decades, so too has its annual detention budget. In 2021, ICE received roughly $4.1 billion from Congress to fund its custody operations.

179.    In recent years, however, ICE has lost access to several detention facilities in the Midwest. For instance, in March 2020 a facility in Kenosha County, Wisconsin, closed its doors to ICE.

180.    In addition, facilities throughout Illinois closed their doors to ICE following the passage of a state law called the Illinois Way Forward Act in 2021. *See* E. Malagón, *Immigration Detention Ends in Illinois After ICE Transfers Those Awaiting Deportation to Out-of-State Jails*, CHI. SUN TIMES (Feb. 15, 2022), https://tinyurl.com/bddj8t5k. As a result, ICE lost its ability to utilize three jails in Illinois.

181.    In April 2021, Tashi Tillman, the ICE Facility Compliance Officer assigned to the Jail, lamented to Clay County Sheriff Harden that ICE had already lost the use of three other Indiana facilities. That development, along with the impending closures in Illinois and the failure of an ICE effort to get a private prison company to build an immigration detention center in Indiana, made the Clay County Jail the only remaining option in Indiana, and one of the increasingly limited options for ICE in the entire region. *See* C. Bauer, *CoreCivic Pulls Plan for Elkhart County Immigration Detention Center*, SOUTH BEND TRIBUNE (Jan. 23, 2018), https://tinyurl.com/5n6jjefm; Assoc. Press, *Indiana County May Cash in as Illinois Bans Detentions*, FOX 59 (Oct. 16, 2021), https://tinyurl.com/mpfct4ad.

182.    Tillman specifically told Harden that ICE was looking for the County to expand its capacity to accommodate ICE's ever-increasing detention efforts. Tillman assured Harden that ICE had a good partnership with the County. On information and belief, this reflected Tillman's motivation to ensure that ICE did not lose its Agreement with the Jail.

**IV.    Federal Law Requires that ICE Terminate the Agreement and End Its Payments for Detention at the Jail Because It Failed Its Overall Performance Evaluation in May 2021 and Should Not Have Been Certified as Passing in December 2021 Based on Nakamoto's Flawed Inspection.**

183.    The most significant legal threat to ICE's significant, and increasing, reliance on the Jail for the detention of noncitizens is the prospect of failing two consecutive "overall performance evaluations." Under the DHS Appropriations Inspection Mandate, two failed inspections would force ICE to terminate the Agreement with the Jail.

**A.    It Is Extremely Difficult for a Facility to Fail Its Overall Performance Evaluation Because ICE Employs a Private Inspector, Nakamoto, Whose Methods Are Flawed and Unreliable.**

184.    In the past, one of the ways ICE has avoided terminating agreements under the DHS Appropriations Inspection Mandate is by having its facilities inspected by a private

company called Nakamoto. Since 2007, ICE has contracted with Nakamoto to inspect facilities that hold immigrants for longer than 72 hours.

185.    Nakamoto's process for inspecting facilities is deeply flawed. In June 2018, DHS's Office of Inspector General (OIG) documented numerous flaws in ICE's inspection system, and specifically in Nakamoto's procedures and practices. *See* DHS OIG, *ICE's Inspections and Monitoring of Detention Facilities Do Not Lead to Sustained Compliance or Systematic Improvements* (2018), https://tinyurl.com/3h5zk6zx ("DHS OIG Report").

186.    For instance, "[s]everal ICE employees in the field and managers at ICE [Enforcement and Removal Operations (ERO)] headquarters commented that Nakamoto inspectors 'breeze by the [PBNDS] standards' and do not 'have enough time to see if the [facility] is actually implementing these policies.'" *Id.* at 7 n.12. These officials also "described Nakamoto inspections as being 'very, very, very difficult to fail.'" *Id.* "One ICE ERO official suggested these inspections are 'useless.'" *Id.*

187.    DHS's OIG identified other concerns with Nakamoto inspection procedures, including the announcement of inspections in advance, the failure to verify representations by ICE and detention facility officials, the failure to conduct proper interviews with detained individuals, and ICE's practice of granting waivers to facilities with deficient conditions. Among other things, by providing advance notice of inspections to detention facilities, Nakamoto—according to ICE's own field staff—"allows facility management to temporarily modify practices to 'pass' an inspection." *Id.* at 10.

188.    The OIG also found that ICE does not give Nakamoto clear procedures for evaluating detention conditions, and that Nakamoto's inspection practices "fell short of the

[Statement of Work (SOW)] requirements." *Id.* at 6.[5] Specifically, the SOW requires that inspectors observe and validate "the actual conditions at the facility." *Id.* The OIG found that some Nakamoto inspectors merely "relied on brief answers from facility staff and merely reviewed written policies and procedures instead of observing and evaluating facility conditions." *Id.* at 6–7.  The OIG reported that "[s]ome inspectors did not consistently look at documentation to substantiate responses from staff or ensure the facility was actually implementing the policies and procedures." *Id.* at 7.

189.    The SOW also requires Nakamoto inspectors to interview detained individuals who do not speak English, but the OIG did not observe any interviews Nakamoto inspectors conducted in a language other than English, nor any interviews in which inspectors used translation services. In fact, the OIG observed that inspectors selected people for interviews by first asking whether they spoke English. *See id.* at 8.

190.    The SOW also requires that interviews include "private conversations with individual detainees (in a confidential area)," but the OIG did not observe any interviews taking place in private settings. *See id.* Inspectors had "brief, mostly group conversations with detainees in their detention dorms or in common areas in the presence of detention facility personnel, generally asking four or five basic questions about treatment, food, medical needs, and opportunities for recreation." *Id.* The OIG found that these limited group discussions are not consistent with the SOW requirements.

191.    The OIG also "identified inaccuracies in Nakamoto's summary reports and checklists," and determined that "[i]n some instances, Nakamoto's reports misrepresented the

---

[5] ICE's Statement of Work with Nakamoto is an agreement setting forth Nakamoto's responsibilities in inspecting ICE detention facilities.

level of assurance or the work performed in evaluating the actual conditions of the facility and the information in the reports was inconsistent with what [OIG] observed during inspections." *Id.* at 9.

192.    In September 2020, the House Homeland Security Committee made similar findings, warning that Nakamoto "has demonstrated a lack of credibility and competence" and is "ill-equipped" for its oversight work. *See* U.S. House of Rep. Comm. on Homeland Security, *ICE Detention Facilities: Failing to Meet Basic Standards of Care* at 7–8 (Sept. 21, 2020), https://tinyurl.com/2p8der7w ("House Report"). Among other things, "Nakamoto's inspections . . . are too broad and too brief to effectively examine the conditions at detention facilities." *Id.* at 7. The report also described "a pattern of Nakamoto inspectors relying on what they are told by ICE officials and facility contractors rather than examining the evidence themselves." *Id.* at 9.

193.    The House Report also recounted testimony by Nakamoto officials acknowledging that Nakamoto has no process in place to ensure that a fluent Spanish speaker is on each inspection team to interview monolingual Spanish speakers. *See id.* at 9. Shockingly, "[w]hen asked how they ascertain that an employee is fluent in Spanish, Nakamoto's Chief Operating Officer responded that he knows [an employee] is fluent by his or her ethnicity and last name." *Id.*

194.    All inspection reports generated by Nakamoto, moreover, are treated as "drafts" which are submitted to ICE for final approval.

195.    These and other deficiencies make Nakamoto's determination that a facility is compliant with the PBNDS highly unreliable. For this reason, the 2021 Appropriations Act now requires that ICE itself conduct inspections of its detention facilities. *See* Consolidated

Appropriations Act of 2021, Pub. L. No. 116-260, Div. F, Tit. II, § 215(b), 134 Stat. 1457

("Beginning not later than January 1, 2021, the performance evaluations referenced in subsection

(a) shall be conducted by the U.S. Immigration and Customs Enforcement Office of Professional

Responsibility.").

196.    Nevertheless, ICE continues to rely on Nakamoto to conduct its overall

performance evaluations of ICE's detention facilities. ICE's Office of Professional

Responsibility ("OPR"), in contrast, conducts only *ad hoc* inspections of a handful of facilities

each year through its Office of Detention Oversight ("ODO"), evaluating compliance with only a

subset of requirements of the PBNDS. In addition, since at least 2020, OPR's inspections have

been entirely remote, such that no physical inspection of the facilities occurs by ODO.

197.    Nakamoto conducted what ICE considered to be the required overall performance

evaluations of the Jail in 2021, as discussed below, which were plagued by the same

investigative flaws and procedural deficiencies described above.

**B.    Despite Nakamoto's Flawed Inspection Process, the Jail Failed Its Overall Performance Evaluation in May 2021 Because of Its Grossly Inadequate Conditions.**

198.    Notwithstanding that Nakamoto inspections are "very, very, very difficult to fail"

according to ICE, the Jail managed to do it in May 2021. The Jail failed this overall performance

evaluation because conditions at it are grossly and obviously inadequate under the PBNDS.

199.    From May 18 to May 20, 2021, Nakamoto performed a "hybrid" inspection

assessing the Jail's compliance under the 2008 PBNDS. A "hybrid" evaluation means that not all

of the inspectors personally observed the practices and procedures within the facility; at least one

inspector conducted the inspection remotely and relied solely on "photographs and/or videos" to

assess compliance within the Jail. *See* The Nakamoto Group, Inc., *Annual Detention Inspection*

*of the Clay County Justice Center*, at 3 (May 20, 2021), https://tinyurl.com/2ts4b8vw ("May 2021 Inspection Cover Letter").

200.     Even with their limited access to the facility, the inspection team identified 71 deficient components across 18 different standards. *Id.* at 2. These violations included numerous "priority components," which are "those PBNDS requirements that ICE deems of critical importance for ensuring adequate conditions of confinement and the safety and security of detainees and staff at all ICE authorized detention facilities." DHS ICE, *ICE Performance-Based National Detention Standards 2008 Inspection Worksheet for Over 72 Hour Facilities with 2011 SAAPI*, at 4 (May 18–20, 2021) ("May 2021 Inspection Report"). Among other things, the Jail violated Environmental Health and Safety standards (8, including a priority component), Sexual Abuse and Assault Prevention and Intervention standards (2, including a priority component), Food Service standards (7), Medical Care standards (13, including 7 priority components), Personal Hygiene standards (1, which was a repeat deficiency from a prior inspection), Recreation standards (1, which was a repeat deficiency), and Religious Practices standards (2). *See* May 2021 Inspection Cover Letter, at 2.

201.     For instance, in terms of Environmental Health and Safety standards, Nakamoto found (among other things) a violation of the requirement that "[e]nvironmental health conditions shall be maintained at a level that meets recognized standards of hygiene." 2008 PBNDS, *Environmental Health and Safety*, at 2 (Dec. 2, 2008), https://tinyurl.com/mwmm7m86. Nakamoto determined that "sanitation levels were not consistent [i]n some areas;" that "[t]he captain, who is charged with overseeing the safety program at this facility, stated there is no formalized housekeeping plan," and that "shower and bathroom areas were not clean and free of clutter." May 2021 Inspection Report, at 10. Even the medical area of the Jail "appeared to be in

need of routine cleaning and organizing." *Id.* at 14. Nakamoto also observed that "hazardous materials were observed in the facility," and that the facility's compliance with the priority component for fire and safety inspections was "not supported by personal observations of the facility's cleanliness and sanitation, nor the reviews of operational practices during this inspection." *Id.* at 10–11.

202.    In terms of Personal Hygiene standards, Nakamoto found a violation of the standard requiring "an adequate number of toilets 24 hours per day that can be used without staff assistance when detainees are confined to their cells or sleeping areas." 2008 PBNDS, *Personal Hygiene*, at 3 (Dec. 2, 2008), https://tinyurl.com/yrb973jt. Specifically, Nakamoto determined that several housing units "have four individuals to a cell with only one toilet," even though the standard requires at least two toilets for housing units with three or more people. May 2021 Inspection Report, at 117; *see id.* at 118 ("These units contain four-person cells with only one toilet, and the standard requires two toilets."). Nakamoto noted that "[t]his is a repeat deficiency that was found to be deficient for a third time." *Id.* at 117.

203.    Because of the numerous deficiencies identified during the inspection, the lead compliance inspector recommended that the facility receive an overall rating of "Does Not Meet Standards" under the 2008 PBNDS. May 2021 Inspection Cover Letter, at 5. ICE accepted that recommendation and certified that the Jail had failed its May 2021 inspection.

204.    Given the lax nature of Nakamoto's inspection procedures, the fact that the Jail still managed to fail its inspection signifies that the violations at the Jail were egregious.

**C.    Following the May 2021 Inspection, ICE and the County Scrambled to Avoid Documentation of a Second Failure and Thereby Avert a Mandatory Termination of the Agreement.**

205.    Under the DHS Appropriations Inspection Mandate, if the Jail failed a second consecutive inspection, ICE would be required by law to immediately terminate its Agreement with the County.  As such, the prospect of a second failure threatened to cut off ICE's access to the Jail, as well as the County's access to federal funds.

206.    Accordingly, after the failed May 2021 inspection, ICE and the County immediately began working to ensure that no subsequent failure was ever documented.

207.    In a memorandum from Russell Hott, the ICE Assistant Director for Custody Management at the time, to Enrique Lucero, the ICE Chicago Field Office Director at the time, Assistant Director Hott informed Director Lucero that the Jail failed its May 2021 inspection.

208.    Assistant Director Hott emphasized that, "should the facility receive a subsequent rating of Does Not Meet Standards" on its follow-up inspection, "ICE will have no choice but to immediately discontinue use of the facility and remove all detainees within 5 days of notification." He reiterated that "since 2009, the language in the congressional appropriations bills for DHS prohibits ICE from using appropriated funds for detention services at any facility that has had two consecutive overall deficient ratings."

209.    To address this concern, Assistant Director Hott explained that Nakamoto would conduct a "Technical Assistance Review (TAR) in August 2021" to identify any "outstanding deficiencies" the Jail would need to fix before the follow-up inspection. Assistant Director Hott noted that "[t]he TAR is an assistance/assessment review and will not result in a facility rating." Rather, later that year, Nakamoto would conduct a second overall performance evaluation to reassess the Jail's compliance with the PBNDS.

210.     Assistant Director Hott specifically stated to Director Lucero: "Please ensure the CLAY COUNTY JAIL Sheriff is notified of the upcoming inspections (specific dates still to be determined)." In other words, ICE officials gave the Jail advance notice of its inspection, continuing the practice of providing facilities with ample opportunity to "temporarily modify practices to 'pass' an inspection.'" DHS OIG Report 10.

211.     From August 31 to September 2, 2021, Nakamoto performed the TAR to aid the Jail in identifying outstanding deficiencies. As Assistant Director Hott instructed, Nakamoto did not give the Jail an overall facility rating; only narrative remarks were given with respect to the facility's compliance since the May inspection. The narrative remarks indicated that, of the components that had received a "Does Not Meet Standard" rating in May 2021, at least 25 remained non-compliant. Among the repeat findings were 6 previously deficient Environmental Health and Safety components. And Nakamoto again found that the Jail failed to provide "an adequate number of toilets" because the Jail "accommodate[s] four detainees in a cell with one toilet in each cell," contrary to the PBNDS' requirement of at least two toilets. Nakamoto noted that, according to the Jail's own compliance sergeant, "this requirement cannot be met because the cells are permanently configured as described."

212.     In addition, from November 15 to 18, 2021, ICE conducted its own review of the Jail through its Office of Detention Oversight (ODO). The inspection team "was unable to conduct an on-site inspection," however, "and instead, conducted a remote inspection." Thus, ODO was unable to properly evaluate the Jail for compliance with the PBNDS. Instead, the team relied on interviews with facility staff, ICE staff, and individuals held at the Jail, as well as "files and detention records."

213.    As a result, ODO missed clear and obvious violations of the PBNDS. To take just two examples, ODO's remote inspectors found zero violations of the Environmental Health and Safety standards despite the Jail's repeatedly deficient sanitation conditions, and zero violations of the Personal Hygiene Standards, despite indisputable violations of the standards requiring at least two toilets in housing units with three or more people. As noted, Nakamoto had found the Jail to be incurably non-compliant with the latter requirement due to the permanent configuration of its cells.

214.    Based on its limited review, ODO identified five deficiencies and inexplicably rated the facility as "superior." Among other things, ODO found that the Jail failed to maintain documentation verifying that legal mail was opened only in the intended recipient's presence. ODO also found that "[o]ne detainee stated that he has only a cover and two bed linens and lacks sweaters and extra blankets for the cold weather." In response the Jail issued that individual a blanket.

215.    Nakamoto then scheduled the second overall performance evaluation of the Jail to take place from November 30 to December 2, 2021.

216.    Consistent with its usual practice, Nakamoto notified the Jail of the inspection in advance of the scheduled inspection date.

217.    Despite having received advance notice of the inspection, on November 28, 2021, Captain Brandon Crowley, Jail Commander at the Jail, emailed ICE officials and Nakamoto to request that the inspection be rescheduled to a later date.

218.    On November 28, 2021, Tommy Henry, Management and Program Analyst at ICE in the Detention Standards & Compliance Unit, responded that ICE would reschedule the inspection and confirmed that "all notifications are sent 30 days prior to any inspection." ICE

noted that the new dates would be "nonnegotiable because of Clay [C]ounty's current inspection status," *i.e.*, having failed its prior May 2021 inspection and being subject to potential termination under the DHS Appropriations Inspection Mandate.

219.    The second inspection was ultimately rescheduled for December 7 to 9, 2021.

### D.    Despite Continuing Violations of the PBNDS, ICE Arbitrarily and Capriciously Certified that the Jail Passed Its Overall Performance Evaluation in December 2021.

220.    As described above, conditions at the Jail violate the PBNDS in a wide variety of ways. *See supra* § II.B. These appalling conditions existed at the Jail when the Nakamoto inspection team arrived in December 2021.

221.    As it did for the May 2021 inspection, Nakamoto conducted a "hybrid" inspection of the Jail in December 2021. "Two inspectors worked remotely and were unable to personally observe practices and procedures within the facility." The Nakamoto Group, Inc., *180 Day Follow-Up/Annual Inspection of the Clay County Justice Center*, at 3 (Dec. 9, 2021) ("December 2021 Inspection Cover Letter"). In addition, as discussed above, Nakamoto employs a flawed and unreliable inspection process that makes it prone to overlooking violations of the PBNDS. *See supra* § IV.A. These same deficiencies affected Nakamoto's inspection in December 2021.

222.    Even with their flawed and unreliable procedures and the fact that two inspectors did not physically inspect the Jail, the Nakamoto inspection team identified 21 deficient components across 8 standards. *See* December 2021 Inspection Cover Letter, at 2. Of those 21, 18 were repeat deficiency findings from the May inspection. *See id.* These violations included violations of Environmental Health and Safety standards (2, both repeat deficiencies), Food Service standards (1), Personal Hygiene standards (2, including one repeat deficiency), and Recreation standards (1, which was a repeat deficiency).

223.    Nakamoto described the conditions at the Jail in unambiguous terms:

Sanitation levels and conditions of confinement were observed to be unacceptable in housing units dedicated to ICE detainees. Housing units do not provide adequate seating for meal service. Detainees were observed eating the lunch meal while seated on the stairs or bed because table seating was not available. Toilet and sink ratios are not within standard guidelines. Boat beds have been added to all three units housing detainees. Detainees were observed sleeping in boat beds. On day three of the inspection, no less than six detainees were assigned to a boat bed. The boat beds encroach on the unencumbered space in the dayroom. Graffiti was observed on the walls of all housing units. Sheets were observed hanging in front of the toilets in B unit. There are no privacy panels in the toilet area. One bunk is located parallel to the toilets. On day one, eight detainees in B unit complained that "toilets are not working." The maintenance supervisor confirmed that the toilets have "been malfunctioning because detainees have been throwing items in the stool." On day three, the toilets were still malfunctioning.

*Id.* at 3.

224.    Among other things, the December Nakamoto inspection team found clear violations of Environmental Health and Safety standards, including that sanitation in the housing unit used by ICE was "below average," and that "[t]he showers and bathroom areas were not clean," and an overall assessment that "[e]nvironmental health and safety conditions are not always maintained at a level consistent with the recognized safety and hygiene standards." DHS ICE, *ICE Performance-Based National Detention Standards 2008 Inspection Worksheet for Over 72 Hour Facilities with 2011 SAAPI*, at 17 (Dec. 7–9, 2021) ("December 2021 Inspection Report").

225.    Nevertheless, the December Nakamoto inspection team inexplicably recommended that the Jail receive an overall rating of "Meets Standard" for Environmental Health and Safety. *See id.*

226.    The inspection team also found clear violations of Personal Hygiene standards, including the requirement of adequate toilets and washbasins: "There is an inadequate number of toilets in housing. Two units contain four-person cells with only one toilet, and the standard

requires two toilets. Additional detainees are also housed in these areas on bed boats. An adequate number of washbasins with temperature controlled hot and cold running water are not available 24 hours per day, due to detainees living in housing units on bed boats." *Id.* at 129.

227.    But again, the December Nakamoto inspection team recommended that the Jail receive an overall rating of "Meets Standard" for Personal Hygiene. *See id.*

228.    The inspection team also found clear violations of Recreation standards, including the complete failure to offer any outdoor recreation. December 2021 Inspection Cover Letter at 2.

229.    The inspection team did not find a single violation of Medical Care standards, despite finding 13 such violations in May (including 7 priority components). This was not because there were no violations: Rather, the two inspectors who participated remotely were assigned to review key aspects of the PBNDS, including Medical Care standards. December 2021 Inspection Report at 126. As a result, "an inspection of the housing units, medical unit, and the facility overall was not conducted" by the assigned inspector. *Id.* Instead, the inspector relied only on written materials (such as policies, procedures, medical records, and photographs) provided by the Jail, and telephone interviews with jail staff and ICE officer Tillman. *Id.* In doing so, Nakamoto continued the flawed practice identified by the DHS OIG and House Homeland Security Committee of simply relying on what its inspectors were told by the Jail, rather than actually verifying practices and conditions in the facility.

230.    For instance, the Nakamoto inspection team treated a repeat violation from May 2021 with respect to sick call procedures differently in December 2021. In May, Nakamoto found that the Jail was violating the standard requiring "a sick call procedure that allows detainees the unrestricted opportunity to freely request health care services (including mental

health and dental services) provided by a physician or other qualified medical staff in a clinical setting," and further requiring that sick call requests be "received and triaged by appropriate medical personnel within 48 hours after the detainee submits the request." May 2021 Inspection Report at 106. The May 2021 inspection team found that "medical personnel are only on site Monday through Friday and, as a result, cannot ensure that all sick call requests are received and triaged within 48-hours after a detainee submits a request." *Id.*

231.    In December, Nakamoto found the same thing: "Medical personnel collect the requests Monday through Friday" only. December 2021 Inspection Report at 117. But based on the assurances from the Jail staff and ICE officer Tillman (who were motivated to ensure that the Jail did not fail its inspection), Nakamoto reversed its prior conclusion, determining that all such requests were "triaged by medical staff within 48 hours after the request is received." *Id.*

232.    In fact, this conclusion is incorrect: People detained at the Jail often wait much longer than 48 hours for their medical requests to be answered—even weeks at times.

233.    In these and other ways, Nakamoto's December 2021 inspection revealed overwhelming evidence that conditions at the Jail were still grossly inadequate under the 2008 PBNDS.

234.    In addition, it was obvious that other key deficiencies identified in May still existed, but Nakamoto turned a blind eye to them, including in parts of the PBNDS that Nakamoto assessed using remote-only inspectors. Plaintiff Toe arrived at the Jail the same month as Nakamoto's inspection, in December 2021; Plaintiffs Herrera Cardenas and Jaimes Jaimes arrived shortly after in January 2022, and Plaintiff Xirum arrived in February 2022. They all observed widespread violations of the PBNDS. *See supra* § II.B. The conditions they have

observed to this day were substantially the same as those that existed during Nakamoto's inspection.

235.   Directly contrary to the evidence Nakamoto found and the actual conditions in the Jail, Nakamoto recommended to ICE that it give the Jail a "Meets Standards" rating for its December 2021 overall performance evaluation. *See* December 2021 Inspection Cover Letter at 4.

236.   ICE rubber-stamped Nakamoto's recommendation without any meaningful review or analysis of the December 2021 inspection report.

237.   Accordingly, ICE did not discontinue the Agreement with the Jail, as the DHS Appropriations Inspection Mandate required.

238.   As a result, noncitizens like Plaintiffs continue to be held at the Jail.

## CLASS ACTION ALLEGATIONS

239.   Plaintiffs bring this action as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure on behalf of all persons who are currently or will be detained by ICE at the Jail (collectively, the "Class").

240.   Pursuant to Rule 23(a)(1), the members of the Class are so numerous that joinder of all members is impracticable. At the time of the December 2021 inspection, Nakamoto reported that there were 64 noncitizens held by ICE at the Jail. December 2021 Inspection Cover Letter at 2. "[A] forty-member class is often regarded as sufficient to meet the numerosity requirement." *Orr v. Shicker*, 953 F.3d 490, 498 (7th Cir. 2020). In addition, joinder is especially impracticable because the Class changes regularly as additional noncitizens are transferred into and others are transferred out of the Jail.

241.   Pursuant to Rule 23(a)(2), there are questions of law or fact common to the Class, including:

a) Whether the Jail should have failed, and in fact constructively did fail, its December 2021 inspection by Nakamoto because conditions at the Jail violate the 2008 PBNDS in fundamental ways;

b) Whether ICE's certification of the Jail in December 2021 as compliant with the PBNDS and the resulting decision to continue detaining noncitizens at the Jail was arbitrary and capricious and contrary to law;

c) Whether ICE's use of Nakamoto to conduct the May and December 2021 overall performance evaluations, and not ICE's own OPR, was arbitrary and capricious and contrary to law;

d) Whether ICE's continued payments of federal funds appropriated for the detention of noncitizens at the Jail violates federal law, including 8 U.S.C. § 1103(a)(11)(A) and the UAR, 2 C.F.R. Part 200;

e) Whether the Clay County Defendants' misuse of federal payments intended for the custody and care of the Class for unrelated County services, expenses, and projects violates the rights, status, or other legal relations of the Class, including under the Agreement and federal law incorporated therein; and

f) Whether Clay County Defendants' misuse of ICE payments intended for the custody and care of the Class detained pursuant to the Agreement for unrelated County services, expenses and projects violates 8 U.S.C. § 1103(a)(11)(A), the UAR, 2 C.F.R. Part 200, and the terms of the Agreement.

242.    Pursuant to Rule 23(a)(3), Plaintiffs' claims are typical of the claims of the Class because Plaintiffs and the Class have suffered harm from Defendants' uniform policies and

practices with regard to faulty inspections of the Jail and the misuse of federal payments intended for the care and custody of noncitizens detained by ICE at the Jail.

243.    Pursuant to Rule 23(a)(4), Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel from the National Immigrant Justice Center and Sidley Austin LLP, who are experienced in federal and class action litigation. Plaintiffs have no interests that conflict with those of the Class.

244.    Pursuant to Rule 23(b)(2), Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

**CLAIMS FOR RELIEF**

**COUNT I**
**Against ICE Defendants**
**Administrative Procedures Act (APA), 5 U.S.C. § 706(2)**

**ICE's Certification of the Jail as Compliant with the PBNDS**

245.    Plaintiffs reallege and incorporate the allegations of all the preceding paragraphs.

246.    ICE is a component of DHS and constitutes an "agency" under the APA, 5 U.S.C. § 551(a).

247.    The APA provides that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The APA also requires agency actions be set aside when they are "short of statutory right" or "without observance of a procedure required by law." *Id.* § 706(2)(C), (D).

248.    ICE's certification of the Jail as compliant with the 2008 PBNDS in December 2021, in order to continue its Agreement with the County, constitutes a final agency action that is reviewable under 5 U.S.C. § 704.

59

249.    Since 2009, including in the Consolidated Appropriations Act of 2021, Congress

has prohibited ICE from "continu[ing] any contract for the provision of detention services if the

two most recent overall performance evaluations received by the contracted facility are less than

'adequate' or the equivalent median score in any subsequent performance evaluation system."

Consolidated Appropriations Act of 2021, Pub. L. No. 116-260, Div. F, Tit. II, § 215(a) (Dec.

27, 2020), 134 Stat. 1457. In addition, the Consolidated Appropriations Act of 2021 requires

ICE's own Office of Professional Responsibility ("OPR") to conduct the performance

evaluations of ICE's detention facilities. *See id.* § 215(b).

250.    The Jail's "two most recent overall performance evaluations" occurred in May

2021 and December 2021, and were conducted not by OPR but instead by Nakamoto. The Jail

failed its May 2021 evaluation, and ICE recognized that a subsequent failure would require

termination of the Agreement.

251.    Conditions at the Jail violate the PBNDS in numerous ways. The May 2021

Nakamoto inspection team identified 71 deficient components across 18 different detention

standards. Similar widespread violations have persisted to the present day, as Plaintiffs observed

when they arrived at the Jail in December 2021 and January and February 2022. *See supra* ¶ 234.

252.    In December 2021, Nakamoto identified 21 deficiencies across 8 standards,

including 18 repeat deficient findings in critical areas. Despite these problems and other

problems that Nakamoto failed to document, ICE concluded that the Jail had passed its

December 2021 inspection and therefore continued its Agreement to detain noncitizens like

Plaintiffs at the Jail.

253.    This final agency action—the issuance of a passing score and the resulting

continuation of the Agreement—was contrary to law because conditions at the Jail were grossly

inadequate under the PBNDS (as only partly documented by the December 2021 inspection report), such that the Jail should have been rated "Does Not Meet Standards" for the second consecutive time, requiring termination of the Agreement under the DHS Appropriations Inspection Mandate. Moreover, Nakamoto and not OPR completed the inspection, in violation of Congress' mandate in the Consolidated Appropriations Act of 2021.

254.    This agency action was also "arbitrary, capricious, [and] an abuse of discretion," 5 U.S.C. § 706(2)(A), because ICE "offered an explanation for its decision that runs counter to the evidence." *Motor Vehicle Mfrs. Assn. of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Among other things, ICE determined that the Jail passed its inspection even though the Nakamoto inspection team found that:

a)  "Sanitation levels and conditions of confinement were observed to be *unacceptable* in housing units dedicated to ICE detainees";

b)  "Toilet and sink ratios are not within standard guidelines";

c)  Multiple detained noncitizens were sleeping in boat beds, which "encroach[ed] on the unencumbered space in the dayroom";

d)  "Graffiti was observed on the walls of all housing units"; and

e)  "Sheets were observed hanging in front of the toilets" in one housing unit because "[t]here are no privacy panels in the toilet area" and "[o]ne bunk is located parallel to the toilets."

December 2021 Inspection Cover Letter at 3 (emphasis added); *see supra* § IV.D.

255.    These and other deficiencies from the December 2021 inspection were repeat findings from the May 2021 inspection. Some of these repeat deficiencies, moreover, are things that ICE knew or should have known could not have been remedied from May to December

because they were structural, such as the Jail's failure to provide sufficient toilets in the housing units.

256.    Despite finding the same types of violations of the PBNDS that warranted failing the Jail in May 2021, ICE chose to pass the Jail in December 2021. This sort of unexplained and unreasonable change in final rating from one inspection to the next is a hallmark of arbitrary and capricious decision making. *See, e.g.*, *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125–26 (2016) (an "unexplained inconsistency" or failure to explain a change can reflect arbitrary and capricious decision making).

257.    ICE also acted arbitrarily and capriciously and abused its discretion by relying on an inspection based in part on two fully remote, inspectors who never set foot inside the Jail or interviewed detained individuals. The lack of a fully in-person inspection and failure to consult with detained individuals was particularly problematic given that some of the items inspected remotely included the provision of medical care and other aspects of daily living in a jail that cannot be evaluated remotely. *See supra* ¶¶ 229–32.

258.    The Jail's violations identified in the May 2021 inspection were so significant that a robust, fully in-person examination in December 2021 was necessary to yield reasonable agency action. For example, the Jail failed its May 2021 inspection in part because of 13 violations of Medical Care standards, 7 of which were priority components. Yet in December 2021, an inspector assigned the Jail a passing score for all issues relating to medical care without speaking to a single detained person, without visiting the facility, and without any inspection of the medical unit.

259.    Overall, Nakamoto relied almost entirely on the word of Jail and ICE officials and documents they provided to give the Jail a passing score. But these officials had ulterior

motivations in providing information to Nakamoto. ICE officer Tillman, for example, knew that other detention centers in the region, including all jails in Illinois, the largest one in Wisconsin, and short-term detention facilities in Indiana, had recently stopped accepting individuals detained by ICE. ICE Defendants also knew that ICE would lose access to the Jail, as well, if it failed its December 2021 inspection. *See supra* ¶¶ 207–08. And the County for its part had and continues to have a significant financial interest in the continuation of the Agreement. *See supra* § I.B. Given these ulterior motives, it was arbitrary and capricious to assign the Jail a passing grade without a thorough inspection of the actual conditions at the Jail.

260.    Finally, ICE acted arbitrarily and capriciously by continuing to rely on Nakamoto's deeply flawed inspection practices. *See supra* § IV.A. For instance, Nakamoto preannounced the inspection, giving the Jail time to prepare by temporarily adjusting practices, and then even with that notice, the Jail got an additional extension of the inspection timeline. Nakamoto's extensive deficiencies have been well documented, and the inspection regime has been routinely criticized by government oversight bodies. *See supra* § IV.A. But ICE continues to rely on Nakamoto's evaluations to rubberstamp clearly deficient facilities like the Jail for the detention of noncitizens.

261.    As explained throughout this Complaint, Defendants failed to address the grossly inadequate conditions at the Jail, and ICE has continued to use the facility to detain individuals like Plaintiffs. For these and other reasons, ICE's certification that the Jail complied with the 2008 PBNDS in December 2021 violated the APA because it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(A). For the same reasons, ICE's decision was also "short of statutory right" or "without observance of a procedure required by law." *Id.* §§ 706(2)(C), (D).

262.    Plaintiffs continue to suffer from ICE Defendants' violation of the APA, and the declaratory and injunctive relief sought is necessary to prevent continued and future irreparable harm to themselves and others similarly situated.

## COUNT II
### Against ICE Defendants
### Administrative Procedures Act (APA), 5 U.S.C. §§ 706(2)

### ICE's Continuation of Payments under the Agreement
### Despite the County's Misuse of the Funds

263.    Plaintiffs reallege and incorporate the allegations of all the preceding paragraphs.

264.    ICE is a component of DHS and constitutes an "agency" under the APA, 5 U.S.C. § 551(a).

265.    The APA provides that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The APA also requires agency actions be set aside when they are "short of statutory right" or "without observance of a procedure required by law." *Id.* § 706(2)(C), (D).

266.    ICE's decision to continue making payments under the Agreement, despite knowing that the County is misusing the funds to pay for County expenses and discretionary expenditures unrelated to the care of people detained by ICE at the Jail, constitutes a final agency action that is reviewable under 5 U.S.C. § 704.

267.    ICE's decision violates the APA because it is contrary to the Immigration and Nationality Act ("INA"), which authorizes ICE only to "make payments" "in support of persons in [ICE] administrative detention in non-Federal institutions . . .  for necessary clothing, medical care, necessary guard hire, and the housing, care, and security of persons detained by [ICE] . . . under an agreement with a State or political subdivision of a State." 8 U.S.C. § 1103(a)(11)(A).

268.    In addition, ICE's conduct violates applicable regulations contained in the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, 2 C.F.R. Part 200 ("UAR"). ICE adopted these regulations as having "regulatory effect" for agreements like the one at issue here. 2 C.F.R. § 3002.10; *see also id.* § 2800.101. The UAR "establishes uniform administrative requirements, cost principles, and audit requirements" applicable in this context. 2 C.F.R. § 200.100(a).

269.    Among other things, the provisions of the UAR forbid the County or any of its component parts, including the Jail, from keeping profits or funds in excess of necessary and allowable costs, unless expressly authorized. *See* 2 C.F.R. § 200.400(g). These limitations are consistent with those imposed by 8 U.S.C. § 1103(a)(11)(A).

270.    Far from authorizing the County to earn a profit, the Agreement makes clear that ICE's per diem payments were designed to "reimburse" the County for "actual and allowable costs associated with the operation of the facility" to detain people in ICE custody. Ex. A at 3. In addition, the Agreement expressly bound ICE and the County to follow the requirements of 28 C.F.R. Part 66 and OMB Circular A-87, which have been incorporated into the UAR. Ex. A at 3–4.

271.    The UAR further dictates that ICE:

- "[M]ust manage and administer" its Agreement with the County in a manner that "ensure[s] that Federal funding is expended and associated programs are implemented in full accordance with the U.S. Constitution, Federal Law, and public policy requirements." 2 C.F.R. § 200.300(a).

- Is required to "[e]nsure that audits are completed and reports are received in a timely manner" and that appropriate measures are taken when necessary "to ensure that the recipient takes appropriate and timely corrective action." 2 C.F.R. § 200.513(c).

272.    Despite explicit limits in the INA and the UAR, the County has used and continues to use payments from ICE for impermissible purposes. Among other things, the County has used ICE funds: to pay for roadwork in the County, to install an air conditioning system in the County courthouse (a building that is not used for any immigration-related purposes), and to give County employees pay raises and bonuses. *See supra* § I.B. Indeed, in 2020, the County treated $783,000, more than half of its overall earnings from ICE, as profit and directed the money to items other than the care and custody of detained immigrants. *See supra* ¶ 72.

273.    Despite this conduct, ICE has continued to make payments to the County for the use of the Jail. These payments violate the INA and the UAR, as does ICE's failure to properly monitor, audit, and oversee the use of its payments to the County. For the same reasons, ICE's actions are "short of statutory right" or "without observance of a procedure required by law." 5 U.S.C. § 706(2)(C), (D).

274.    Finally, ICE's actions are arbitrary and capricious and an abuse of discretion. 5 U.S.C. § 706(2)(A). ICE has repeatedly been put on notice of the widespread misuse of its payments under the Agreement, including through the County's public statements about its profits, and yet has failed to take any corrective action or otherwise ensure compliance with federal law. In doing so, ICE has either knowingly ignored or turned a blind eye to the County's conduct out of a desire to keep the Jail as an option for detaining people like Plaintiffs. Indeed, ICE officer Tillman encouraged the County to *expand* its detention bed capacity even though the County has repeatedly misused funds paid to it by ICE.

275.     Plaintiffs continue to suffer from these violations, and the declaratory and injunctive relief sought is necessary to prevent continued and future irreparable harm to themselves and others similarly situated.

**COUNT III**
**Against Clay County Defendants**
**Indiana Uniform Declaratory Judgment Act, Ind. Code §§ 34-14-1-1 *et seq.*, and Indiana Rule of Trial Procedure 57**

**Clay County's Misuse of Federal Payments**

276.     Plaintiffs reallege and incorporate the allegations of all the preceding paragraphs.

277.     Under the Indiana Uniform Declaratory Judgment Act, Ind. Code §§ 34-14-1-1 *et seq.*, "[a]ny person interested under a . . . written contract, or other writings constituting a contract, or whose rights, status, or other legal relations are affected by a . . . contract . . . may have determined any question of construction or validity arising under the . . . contract . . . and obtain a declaration of rights, status, or other legal relations thereunder." Ind. Code § 34-14-1-2. Moreover, "[f]urther relief based on a declaratory judgment or decree may be granted whenever necessary or proper." Ind. Code § 34-14-1-8.

278.     Under Rule 57 of the Indiana Rules of Trial Procedure, "[t]he existence of another adequate remedy does not preclude a judgment for declaratory relief in cases where it is appropriate," and "[a]ffirmative relief shall be allowed under such remedy when the right thereto is established." Ind. R. Trial P. 57; *see Trustees of Ind. Univ. v. Curry*, 918 F.3d 537, 541 (7th Cir. 2019) ("Declaratory judgments are available in Indiana under Ind. Trial Rule 57 and Ind. Code § 34-14-1-1.").

279.     Plaintiffs and the other Class members are persons interested under the Agreement, and persons whose rights, status, or other legal relations are affected by the Agreement. The conditions of the Class's confinement at the Jail are directly determined by the

funding paid pursuant to the Agreement and the Clay County Defendants' decisions with respect to how that funding is used. The purpose of the Agreement, moreover, is to ensure that the Class members are detained in conditions that satisfy the PBNDS, and that federal funds are spent in accordance with the applicable federal statutory and regulatory requirements, including those expressly referenced in the Agreement.

280.    Plaintiffs are entitled to a declaration of their rights, status, or other legal relations under the Agreement, including:

a)  Any federal funds paid to the County pursuant to the Agreement are required by law and the terms of the Agreement to be used for Plaintiffs' custody and care;

b)  The failure of the Clay County Defendants to use all of the federal payments for proper purposes has prevented the Jail from providing adequate conditions under the PBNDS, and thereby violates the Agreement and federal law incorporated therein; and

c)  The Clay County Defendants' use of substantial portions of the federal funds paid under the Agreement for expenses and discretionary expenditures unrelated to the care and custody of Plaintiffs and the other Class members violates the Agreement and federal law incorporated therein.

281.    As a direct and proximate result of the Clay County Defendants' misappropriation of ICE per diem payments under the detention agreement, Plaintiffs are suffering and will continue to suffer irreparable injury with no adequate remedy at law.

282.    Accordingly, Plaintiffs are entitled to "[f]urther relief" based on the foregoing declarations of rights, including injunctive relief. Ind. Code § 34-14-1-8; *see* Ind. R. Trial P. 57. Such relief is necessary and proper to prevent the Clay County Defendants from continuing to

violate the Agreement and their federal obligations under the Agreement. Absent such relief, the

Clay County Defendants will continue to misappropriate significant portions of ICE's per diem

payments for unrelated County services, instead of using the funds to maintain adequate levels of

care for Plaintiffs and the other Class members.

## PRAYER FOR RELIEF

Plaintiffs request that the Court:

A.      Assume jurisdiction over this matter;

B.      Issue an order certifying this action to proceed as a class action pursuant to

Federal Rule of Civil Procedure 23;

C.      Appoint the undersigned as class counsel pursuant to Rule 23(g);

D.      Declare that the ICE Defendants' use of Nakamoto to conduct the May and

December 2021 inspections was arbitrary, capricious, an abuse of discretion, or otherwise

contrary to law in violation of the APA;

E.      Declare that conditions at the Jail were not adequate under the PBNDS in May or

December 2021, and remain inadequate under those standards;

F.      Declare that the ICE Defendants' certification of the Jail as "Meet[ing]

Standards" and compliant with the PBNDS in December 2021 was arbitrary, capricious, an

abuse of discretion, or otherwise contrary to law in violation of the APA;

G.      Declare that the ICE Defendants' corresponding decision to continue using the

Jail after what should have been two consecutive failed overall performance evaluations, was

arbitrary, capricious, an abuse of discretion, or otherwise contrary to law in violation of the APA;

H.      Declare that the ICE Defendants have violated and continue to violate 8 U.S.C.

§ 1103(a)(11)(A), 2 C.F.R. Part 200, and the APA by knowingly making payments to the County

that are not used solely to provide for the custody and care of Plaintiffs and Class members held pursuant to the Agreement;

I.     Declare that the Clay County Defendants have violated and continue to violate Plaintiffs' rights, status, and/or legal relations under the Agreement by misallocating ICE payments intended for the custody and care of Plaintiffs and Class members for other, unrelated County expenses and discretionary expenditures;

J.     Declare that the Clay County Defendants have violated and continue to violate 8 U.S.C. § 1103(a)(11)(A), 2 C.F.R. Part 200, and other federal laws incorporated into the Agreement by misallocating ICE payments intended for the custody and care of Plaintiffs and Class members for other, unrelated County expenses and discretionary expenditures;

K.     Enjoin the ICE Defendants from using federal funds to pay for detention at the Jail;

L.     Enjoin the ICE Defendants from continuing to detain Plaintiffs and other Class members at the Jail;

M.     Enjoin the ICE Defendants from making any future payments to the County without complying with ICE's federal statutory and regulatory duties related to the proper use of federal funds and ensuring that the payments are directed for the care and custody of Plaintiffs and other Class members held under the Agreement;

N.     Enjoin the Clay County Defendants from using federal funds paid under the Agreement for County expenses and discretionary expenditures unrelated to the care and custody of Plaintiffs and other Class members;

O.    Award reasonable attorneys' fees and costs pursuant to the Equal Access to

Justice Act, 28 U.S.C. § 2412(d), Ind. Code § 34-14-1-10, or any other applicable federal or state

law; and

P.    Grant any other relief the Court deems equitable, just, and proper.


Dated: April 25, 2022                    By: */s/ John M. Skakun III*
                                         John M. Skakun III
                                         Robert N. Hochman*
                                         Gregory Cui*
                                         Gina R. Bohannon*
                                         SIDLEY AUSTIN LLP
                                         One South Dearborn
                                         Chicago, Illinois 60603
                                         Telephone: (312) 853-7000
                                         Facsimile: (312) 853-7036
                                         Email: rhochman@sidley.com
                                              jskakun@sidley.com
                                              gcui@sidley.com
                                              gbohannon@sidley.com

                                         Mark Feldman*
                                         Mark Fleming*
                                         Mary Georgevich*
                                         Keren Zwick*
                                         NATIONAL IMMIGRANT JUSTICE CENTER
                                         224 South Michigan Avenue, Suite 600
                                         Chicago, Illinois 60604
                                         Telephone: (312) 660-1370
                                         Facsimile: (312) 660-1505
                                         Email:  mfeldman@heartlandalliance.org
                                              mfleming@heartlandalliance.org
                                              mgeorgevich@heartlandalliance.org
                                              kzwick@heartlandalliance.org

                                         * *Application for Pro Hac Vice Admission*
                                         *Forthcoming*


                                         *Attorneys for Plaintiffs*