# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

MARIBEL XIRUM,                 )
JAVIER JAIMES JAIMES,      )
BAIJEBO TOE,               )
                          )
            Plaintiffs,      )
                          )
            v.            )     Case No. 1:22-cv-00801-TWP-KMB
                          )
U.S. IMMIGRATION AND CUSTOMS    )
ENFORCEMENT (ICE),       )
U.S. DEPARTMENT OF HOMELAND    )
SECURITY (DHS),         )
ALEJANDRO MAYORKAS under the title of  )
Secretary of DHS,         )
TAE JOHNSON under the title of Acting Director  )
of ICE,               )
MONICA S. BURKE under the title of ICE Acting  )
Assistant Director of Custody Management;,   )
RICARDO A. WONG under the title of ICE   )
Deputy Assistant Director, Oversight Compliance  )
and Acquisition Division,      )
SYLVIE RENDA under the title of Acting Field  )
Office Director of the ICE Chicago Field Office,  )
TRAVIS GRAHAM under the title of ICE Officer,  )
ANGELINA RAMOS under the title of ICE   )
Officer,               )
VIRGINIA SUTTER under the title of ICE   )
Officer,               )
CLAY COUNTY, INDIANA,     )
CLAY COUNTY COUNCIL,      )
CLAY COUNTY SHERIFF'S OFFICE,   )
PAUL B. HARDEN under the title of Clay County  )
Sheriff,              )
JACKIE MITCHELL under the title of Clay   )
County Council Member,      )
JASON BRITTON under the title of Clay County  )
Council Member,         )
JASON THOMAS under the title of Clay County  )
Council Member,         )
LARRY J. MOSS under the title of Clay County  )
Council Member,         )

JOHN NICOSON under the title of Clay County         )
Council Member,                                     )
DAVID AMERMAN under the title of Clay               )
County Council Member,                              )
PATRICIA HEFFNER under the title of Clay            )
County Council Member,                              )
BRYAN ALLENDER under the title of Clay              )
County Commissioner,                                )
MARTY HEFFNER under the title of Clay               )
County Commissioner,                                )
PAUL SINDERS under the title of President of the    )
Clay County Board of Commissioner,                  )
ELIZABETH HUGHETT under the title of Clay           )
County Sergeants and ICE Contract Coordinator,      )
DAVID PARKER under the title of Clay County         )
Sergeants and ICE Contract Coordinator,             )
JASE GLASSBURN under the title of Clay              )
County Sergeants and ICE Contract Coordinator,      )
JENNIFER M. FLATNER under the title of Clay         )
County Auditor,                                     )
DEBRA JAMES under the title of Clay County          )
Treasurer,                                          )
                                                    )
                        Defendants.                 )

_____

## ORDER GRANTING IN PART AND DENYING IN PART
## THE DEFENDANTS' MOTIONS TO DISMISS

This matter is before the Court on Motions to Dismiss filed pursuant to Federal Rules of

Civil Procedure 12(b)(1) and 12(b)(6) by Defendants U.S. Immigration and Customs Enforcement

("ICE") (Filing No. 60), and by the nineteen Defendants who work for or otherwise represent Clay

County, Indiana ("Clay County") (together, "Defendants") (Filing No. 56).  Plaintiffs Maribel

Xirum, Javier Jaimes, and Baijebo Toe (together, "Plaintiffs") are  noncitizens who are or were

detained at the Clay County Jail in Brazil, Indiana (the "Jail") pursuant to an Intergovernmental

Service Agreement (the "Agreement") between ICE and Clay County. Plaintiffs initiated this

action challenging ICE's authority to continue detaining them at the Jail pursuant to the Agreement,

ICE's authority to continue paying federal funds to Clay County for the detention of noncitizens, and Clay County's discretion to use the federal funds for purposes other than the care and safekeeping of noncitizens. Plaintiffs filed a Class Action Complaint seeking a variety of declaratory and injunctive relief that all serve to stop ICE from continuing to house detainees at the Jail and to prevent ICE from paying any more federal detention funds to Clay County. For the following reasons, the Court **grants in part and denies in part** ICE's Motion to Dismiss and **grants** Clay County's Motion to Dismiss.

## I.     BACKGROUND

The following facts are not necessarily objectively true, but, as required when reviewing a motion to dismiss, the Court accepts as true all factual allegations in the Amended Complaint and draws all inferences in favor of Plaintiffs as the non-moving parties.[1]  *See Bielanski v. County of Kane*, 550 F.3d 632, 633 (7th Cir. 2008).

### A.     The Agreement

In 2006, the United States Marshals Service (the "Marshals Service") entered into the Agreement with Clay County to house individuals in federal custody at the Jail (Filing No. 1 at ¶ 61). Under the Agreement, Clay County would receive a per diem payment based on the number of housed individuals. *Id.* at ¶ 62. In 2013, ICE issued an addendum to the Agreement that allowed it to send, and Clay County to detain, noncitizens at the Jail. The Jail began housing noncitizen detainees that same year *Id.* at ¶ 66. ICE pays Clay County more than one million dollars each year to detain noncitizens like the Plaintiffs. *Id.* at ¶ 4.

---

[1] Plaintiffs contend Defendants have conceded several allegations in the Complaint by not challenging those allegations in their Motions to Dismiss (*see, e.g.*, Filing No. 68 at 10–11). At this stage, all facts alleged in the Complaint must be assumed to be true, and Defendants have not admitted any facts by declining to challenge the veracity of Plaintiffs' allegations in their Motions to Dismiss.

The first page of the Agreement states that the Agreement "is for the housing, safekeeping, and subsistence of federal prisoners, including guard/transportation services to medical facility and U.S. Courthouse, in accordance with the contents set forth herein" (Filing No. 1-1 at 2). Article I, titled "PURPOSE AND SECURITY PROVIDED," states:

> [t]he purpose of this Intergovernmental Service Agreement (IGA) is to establish a formal binding relationship between the United States Marshals Service (USMS) and other federal user agencies (the Federal Government) and Clay County Justice Center (the Local Government) for the detention of persons charged with or convicted of violations of federal law or held as material witnesses (federal prisoners) at the Clay County Justice Center (the facility).

(Filing No. 75-2 at 3, Art. I).  Under Article I, Clay County agreed "to accept and provide for the secure custody, care and safekeeping of federal prisoners in accordance with federal, state, and local law, standards, policies, procedures, or court orders". *Id.*

The Agreement contains provisions regarding the receiving, discharge, and transportation of detainees and the calculation, billing, and payment of funds to Clay County. It also requires that Clay County provide detainees certain "mandatory minimum conditions of confinement," which include: adequately trained staff; surveillance of detainees; three meals per day; twenty-four-hour emergency medical care; adequate access to prescription medications; smoke and fire detection systems; and water supply and waste disposal programs  *Id.* at 8, Art. XIII.

The Agreement incorporates laws and regulations limiting the purpose for which ICE may enter into detention contracts and limiting the use of federal funds paid pursuant to those contracts. The incorporated laws and regulations at issue here are the Immigration and Nationality Act, 8 U.S.C. §§ 1101–1557 ("INA"), the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, 2 C.F.R., Part 200 ("UAR"),[2] ICE's Performance-Based National Detention Standards ("PBNDS"), and the "Two Strikes Mandate".

---

[2] The Agreement incorporates 28 C.F.R. Part 66, which has since been superseded by the UAR.

1.     <u>**The Immigration and Nationality Act (INA)**</u>

The INA permits ICE to enter into detention contracts with non-federal entities, such as the Agreement with Clay County, and to make payments to cooperating entities under those contracts. The INA restricts both the purpose of the detention contracts and the use of federal funds paid under the contracts. ICE may only enter into detention contracts "for the necessary construction, physical renovation, acquisition of equipment, supplies or materials required to establish acceptable conditions of confinement and detention services." 8 U.S.C. § 1103(a)(11)(B). And ICE may only "make payments" from federal funds allocated to ICE "for necessary clothing, medical care, necessary guard hire, and the housing, care, and security of persons detained" under one of ICE's detention contracts. *Id.* at § (a)(11)(A).

2.     <u>**The Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards (UAR)**</u>

As described by Plaintiffs, "[t]he UAR sets forth mandatory cost-allowance, accounting, and auditing requirements for federal and state agencies with respect to entering and maintaining agreements" ([Filing No. 1 at ¶ 63](#)). The UAR requires federal agencies paying federal funds to non-federal entities to "manage and administer the Federal award in a manner so as to ensure that Federal funding is expended and associated programs are implemented in full accordance with the U.S. Constitution, Federal Law, and public policy requirements." 2. C.F.R. §§ 200.1, 200.300(a).

The UAR also requires federal funding recipients to "[e]stablish and maintain effective internal control over the Federal award that provides reasonable assurance that the non-Federal entity is managing the Federal award in compliance with Federal statutes, regulations, and the terms and conditions of the Federal award." *Id.* § 200.303(a).

### 3.      The Performance-Based National Detention Standards (PBNDS)

Non-federal entities that enter into detention contracts with ICE are required to comply with ICE's PBNDS, which set forth several categories of detention standards, each with component parts used to measure compliance (Filing No. 1 at ¶ 89). The PBNDS includes, for example, standards for: Environmental Health and Safety, Personal Hygiene, Food Service, Medical Care, Correspondence and Other Mail, Recreation, Religious Practices, Telephone Access, Special Management Units, the Use of Force and Restraints, Sexual Abuse and Assault Prevention and Intervention, and Law Libraries and Legal Materials. These standards are described in greater detail in the Complaint. *Id.* at ¶¶ 97–175.

### 4.      The Two Strikes Mandate

As part of the Consolidated Security, Disaster Assistance, and Continuing Appropriations Act, 2009 ("Appropriations Act"), Congress restricted ICE's expenditure of federal detention funds to ensure that contracted facilities comply with the PBNDS.  Pub. L. No. 110-329, Div. D, Tit. II (Sep. 30, 2008), 122 Stat. 3574.  Congress provided that no federal detention funds "may be used to continue any contract for the provision of detention services if the *two most recent overall performance evaluations* received by the contracted facility are less than 'adequate' or the equivalent median score in any subsequent performance evaluation system." *Id.* (emphasis added). The parties call this restriction the "Two Strikes Mandate".  In 2021, Congress added that starting January 1, 2021, the overall performance evaluations required under the Two Strikes Mandate must be conducted by ICE's Office of Professional Responsibility" ("OPR"). Pub. L. No. 116-260, Div. F, Tit. II, § 215(b) (Dec. 27, 2020), 134 Stat. 1457.

**B.**    **Clay County's Misuse of Federal Detention Funds**

For several years, Clay County has used the Agreement as a "cash cow" at the expense of federal detainees (Filing No. 1 at ¶ 5). Clay County has taken federal funds meant for detainees' benefit and used those funds for unrelated, discretionary expenditures. *Id.* at ¶ 71. In particular, in 2020, Clay County received roughly $1.4 million from ICE and spent more than half of that amount on County "budget items" including employee raises and bonuses. *Id.* at ¶ 72.  In 2021, Clay County used federal funds to purchase "a new $83,000 chiller" for the Clay County courthouse. *Id.* at ¶ 73. Clay County "openly trumpets" that it profits from the Agreement and is able to "keep … taxes down" for residents by misusing federal detention funds. *Id.* at ¶¶ 74–78, 88.  When met with public scrutiny over its use of federal detention funds, Clay County rejected the idea that it is required to use funds for any particular purpose, with one Clay County Council Member stating that ICE "can't tell us what to do with [the funds]." *Id.* at ¶ 83.

**C.**    **The Jail Conditions**

As a result of Clay County's diversion of federal detention funds, the conditions in the Jail grossly violate the PBNDS. *Id.* at ¶ 96.  The Jail is filthy.  It is covered in mold and graffiti, and detainees are forced to clean their cells, toilets, and showers using "makeshift" supplies like soap, shampoo, and toothpaste, which detainees purchase at their own expense from the Jail commissary. *Id.* at ¶¶ 99–102. The Jail's toilets and showers, in addition to being dirty, are often broken.  The Jail improperly houses four to six detainees in a cell with only one toilet, so if one toilet breaks, detainees from multiple cells must share one toilet.  Some of the showers do not have working shower heads, so detainees create shower heads with used plastic bottles. *Id.* at ¶¶ 113–20. The toilets and showers also offer no privacy, so detainees must use their bed sheets as screens, and

the shower water is not temperature controlled, so it is always either too cold or too hot for showering. *Id.* at ¶¶ 118, 121.

The quality of detainees' clothing and the availability of hygiene products is also inadequate. The Jail gives detainees "worn out, stained, tattered clothing that does not keep them warm," and blankets and bed sheets that are "ripped and dirty, sometimes with visible blood stains." *Id.* at ¶¶ 105. Detainees are not given sufficient hygiene products, like soap, shampoo, toothpaste, toilet paper, and menstruation products, so they must sometimes buy additional hygiene products from the Jail commissary. *Id.* at ¶ 110–111. Detainees are not given enough food, causing them to lose weight or requiring them to buy food from the commissary. *Id.* at ¶ 124-25. The Jail does not provide enough room for detainees to sit and eat, so many of them eat while standing, sitting on stairs, or sitting on their beds. *Id.* at ¶ 127.

More concerning, detainees have experienced delayed or inadequate medical care. A nurse is available only on weekdays, and a physician only visits the Jail once per week. *Id.* at ¶ 130-31. Out of necessity, guards or other detainees are sometimes required to perform medical tasks, like distributing prescription medications or assisting with insulin injections. *Id.* ¶¶ 132, 145. The Jail's medical staff also "regularly fail to respond to requests for medical care for days, and sometimes a week or more." *Id.* at ¶ 141. None of the medical staff is fluent in Spanish, and only one knows basic Spanish, so bilingual detainees must translate for Spanish-speaking detainees if they need medical care. *Id.* at ¶ 134.

In addition, the Jail fails to provide detainees with adequate indoor recreation or any outdoor recreation; reasonable and equitable opportunities to participate in their respective faiths; adequate telephone access; or access to the Jail's law library and other legal documents. *Id.* at ¶¶ 148–63, 172–75. Plaintiffs have observed or experienced the Jail's violations of applicable

8

detention standards regarding the use of force, use of restraints, and sexual abuse and assault prevention and intervention.  *Id.* at ¶¶ 168–71.

**D.     ICE's Performance Evaluations of the Jail**

Plaintiffs allege that ICE has turned a "blind eye" to the Jail's inadequate conditions because "ICE depends on the Agreement and others like it to support ICE's massive detention effort."  *Id.* at ¶ 176, 177.  While ICE "maintains the largest civil detention system in the United States, the agency does not own or operate most of the facilities it uses."  *Id.*  at ¶ 177. Recently, several facilities in the Midwest have stopped working with ICE, making ICE increasingly reliant on cooperating facilities "to accommodate ICE's ever-increasing detention efforts." *Id.* at ¶¶ 179–82. To avoid losing access to remaining facilities under the Two Strikes Mandate, ICE works to ensure those facilities do not fail two consecutive overall performance evaluations.

Since 2007, ICE has used a private company called The Nakamoto Group, Inc. ("Nakamoto") to inspect detention facilities and ensure their compliance with the PBNDS. *Id.* at ¶¶ 10, 185. Inspection reports generated by Nakamoto are submitted to ICE for final approval. *Id.* at ¶ 194. Plaintiffs describe Nakamoto's inspections as "deeply flawed." *Id.* at ¶ 185. Nakamoto's inspectors "breeze by the [PBNDS] standards" and do not check if the facilities are actually implementing required policies. *Id.* at ¶ 186. Nakamoto also gives facilities advance notice of inspections so the facilities can "temporarily modify practices in order to 'pass' an inspection." *Id.* at ¶ 10. Additionally, Nakamoto inspectors do not always physically inspect facilities, do not interview detainees in private, do not interview non-English-speaking detainees, and do not verify statements from facility staff or ICE officials on which Nakamoto relies. *Id.* at ¶¶ 187–90. ICE officials have described Nakamoto's inspections as "very, very, very difficult to fail." *Id.* at ¶ 186.

ICE has been aware of the deficiencies in Nakamoto's inspections. In June 2018, the Department of Homeland Security's Office of Inspector General documented these deficiencies in a public report. *Id.* at ¶ 184–91. In September 2020, the House Homeland Security Committee issued findings stating Nakamoto "'has demonstrated a lack of credibility and competence' and is 'ill-equipped' for its oversight work.'" *Id.* at ¶ 192 (citation omitted). The deficiencies in Nakamoto's inspections are why Congress began requiring ICE's OPR to inspect facilities beginning in 2021. Pub. L. No. 116-260, Div. F, Tit. II, § 215(b) (Dec. 27, 2020), 134 Stat. 1457.

Nonetheless, "ICE continues to rely on Nakamoto to conduct its overall performance evaluations." ([Filing No. 1 at ¶ 196.](#)) The OPR only conducts remote, "*ad hoc* inspections of a handful of facilities each year through its Office of Detention Oversight ('ODO'), evaluating compliance with only a subset of requirements of the PBNDS." *Id.* Plaintiffs' claims challenge Nakamoto's May and December 2021 inspections and ICE's overall performance evaluations.

1.   **May 2021 Inspection and Evaluation**

From May 18 to May 20, 2021, Nakamoto conducted a "hybrid" inspection of the Jail, which meant that some inspectors inspected the Jail remotely. *Id.* at ¶ 199. Despite Nakamoto's allegedly "flawed and unreliable procedures" that make its inspections "very, very, very difficult to fail," the Jail failed the May 2021 inspection. *Id.* at ¶¶ 11, 198. Nakamoto's report identified seventy-one deficient components across eighteen detention standards, several of which were "priority components." *Id.* at ¶ 200. "Priority components" are "PBNDS requirements that ICE deems of critical importance for ensuring adequate conditions of confinement and the safety and security of detainees and staff at all ICE authorized detention facilities." *Id.* Some of the identified deficiencies had been identified during prior inspections but not corrected. *Id.* at ¶ 202. Nakamoto

recommended that the Jail receive a "Does Not Meet Standards" rating under the PBNDS, and ICE accepted that recommendation for its overall performance evaluation of the Jail. *Id.* at ¶ 203.

Under the Two Strikes Mandate, if the Jail failed its next overall performance evaluation, ICE would be prohibited from detaining noncitizens there. To avoid this possibility, "ICE and the County immediately began working to ensure that no subsequent failure was ever documented." *Id.* at ¶ 206. ICE had Nakamoto conduct a "Technical Assistance Review," which would not result in a facility rating and would only identify "outstanding deficiencies" the Jail would need to resolve before the overall performance evaluation. *Id.* at ¶ 209. ICE ensured that Clay County would receive advance notice of the technical review. *Id.* at ¶ 210. Nakamoto conducted the review between August 31 and September 2, 2021. It found that of the seventy-one deficient components identified in May 2021, at least twenty-five remained deficient. *Id.* at ¶ 211. Six of those repeat deficiencies related to the PBNDS's Environmental Health and Safety standards. *Id.*

ICE also conducted a remote review of the Jail through its Office of Detention Oversight ("ODO") in November 2021. *Id.* at ¶ 212. The ODO's review relied on interviews with Jail staff, ICE staff, detainees, and "files and detention records." *Id.* Plaintiffs allege that because the ODO's review was entirely remote, it "missed clear and obvious violations of the PBNDS," particularly with respect to Environmental Health and Safety standards and Personal Hygiene standards. *Id.* at ¶ 213. The ODO's November 2021 review identified only five deficiencies and "inexplicably" rated the Jail as "superior." *Id.* at ¶ 214.

### 2.  **December 2021 Inspection and Evaluation**

Nakamoto scheduled the Jail's second inspection for November 30 to December 2, 2021. *Id.* at ¶ 215. Nakamoto notified the Jail in advance of the inspection, but two days before it was set to begin, the Jail requested that it be rescheduled. Nakamoto complied and rescheduled the

inspection for December 7 to 9, 2021. *Id.* at ¶¶ 216–18. Nakamoto again conducted a "hybrid" inspection and used its same "flawed and unreliable inspection process." *Id.* at ¶ 221.

The December 2021 inspection identified twenty-one deficient components across eight detention standards, including unacceptable sanitation levels, inadequate seating for meals, the use of "boat beds,"[3] the presence of graffiti, a lack of privacy panels in toilet areas, and malfunctioning toilets. *Id.* at ¶¶ 222–24. Yet Nakamoto recommended the Jail receive a "Meets Standard" rating for Environmental Health and Safety standards and Personal Hygiene standards. *Id.* at ¶ 224–27. Nakamoto identified no violations of the PBNDS's Medical Care standards, but that was because the inspector assigned to review compliance with those standards did not personally inspect the Jail. He instead relied entirely on unverified written materials and statements from Jail staff and an ICE officer. *Id.* at ¶¶ 229–31.

Nakamoto's December 2021 inspection "revealed overwhelming evidence that conditions at the Jail were still grossly inadequate under the 2008 PBNDS." *Id.* at ¶¶ 233. Plaintiffs report that "other key deficiencies" still existed in the Jail, which Nakamoto "turned a blind eye to," including deficiencies in parts of the Jail that no one physically inspected. *Id.* at ¶ 234. Because the conditions in the Jail in fact fell well below the PBNDS, the Jail should have failed its December 2021 overall performance evaluation. Nevertheless, Nakamoto recommended that the Jail receive a "Meets Standards" rating. ICE "rubber-stamped Nakamoto's recommendation without any meaningful review or analysis of the December 2021 inspection report." *Id.* at 236. As a result, ICE was not forced to terminate the Agreement, and "noncitizens like Plaintiffs continue to be held at the Jail in grossly inadequate conditions." *Id.* at ¶ 20.

---

[3] "Boat beds" are thin, plastic tub-shaped pallets placed on the floor and intended for use as temporary sleeping arrangements (Filing No. 1. at ¶ 15).

## II.   <u>LEGAL STANDARD</u>

### E.   <u>Dismissal Under Rule 12(b)(1)</u>

A motion to dismiss under Rule 12(b)(1) challenges the court's subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1).  The burden of proof is on the plaintiff, the party asserting jurisdiction. *United Phosphorus, Ltd. v. Angus Chem. Co.*, 322 F.3d 942, 946 (7th Cir. 2003), *overruled on other grounds by Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845 (7th Cir. 2012) (en banc). "The plaintiff has the burden of supporting the jurisdictional allegations of the complaint by competent proof." *Int'l Harvester Co. v. Deere & Co.*, 623 F.2d 1207, 1210 (7th Cir. 1980).  "In deciding whether the plaintiff has carried this burden, the court must look to the state of affairs as of the filing of the complaint; a justiciable controversy must have existed at that time." *Id.*

"When ruling on a motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), the district court must accept as true all well-pleaded factual allegations, and draw reasonable inferences in favor of the plaintiff." *Ezekiel v. Michel*, 66 F.3d 894, 897 (7th Cir. 1995) (citation omitted). Further, "[t]he district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Id.* (citation and quotation marks omitted).

### B.   <u>Dismissal under Rule 12(b)(6)</u>

Similarly, Rule 12(b)(6) allows a defendant to move to dismiss a complaint that has failed to "state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When deciding a motion to dismiss under Rule 12(b)(6), the court accepts as true all factual allegations in the complaint and draws all inferences in favor of the plaintiff. *Bielanski*, 550 F.3d at 633. However,

courts "are not obliged to accept as true legal conclusions or unsupported conclusions of fact." *Hickey v. O'Bannon*, 287 F.3d 656, 658 (7th Cir. 2002).

The complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In *Bell Atlantic Corp. v. Twombly*, the United States Supreme Court explained that the complaint must allege facts that are "enough to raise a right to relief above the speculative level." 550 U.S. 544, 555 (2007). Although "detailed factual allegations" are not required, mere "labels," "conclusions," or "formulaic recitation[s] of the elements of a cause of action" are insufficient. *Id.*; *see also Bissessur v. Indiana Univ. Bd. of Trs.*, 581 F.3d 599, 603 (7th Cir. 2009) ("[I]t is not enough to give a threadbare recitation of the elements of a claim without factual support"). The allegations must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. Stated differently, the complaint must include "enough facts to state a claim to relief that is plausible on its face." *Hecker v. Deere & Co.*, 556 F.3d 575, 580 (7th Cir. 2009) (citation and quotation marks omitted). To be facially plausible, the complaint must allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

### III.   DISCUSSION

Plaintiffs initiated this action alleging that ICE regularly enters into detention contracts with non-federal entities, like the Agreement with Clay County, and provides federal funds to those non-federal entities for the "necessary clothing, medical care, necessary guard hire, and the housing, care, and security" of detainees. 8 U.S.C. §§ 1103(a)(11)(A)–(B). Federal regulations require ICE to manage and administer the detention funds. ICE is also required to periodically inspect and evaluate the facilities with which it contracts to ensure they comply with ICE's

detention standards. Congress has mandated that if a detention facility fails two consecutive evaluations, ICE must end its detention contract with that facility.

Plaintiffs allege that for years, Clay County has used federal detention funds from ICE for improper, unrelated expenditures, and not for the benefit of detainees. As a result, the Jail's conditions fall well below ICE's detention standards. The Jail failed its evaluation in May 2021 due to its horrendous conditions described above. Plaintiffs allege that the conditions did not improve after May 2021, and the Jail should have failed its next evaluation in December 2021. A second failed evaluation would have required ICE to end its Agreement with Clay County. To avoid that possibility, ICE improperly gave the Jail a "passing" evaluation in December 2021. ICE allegedly continues using the Jail despite its inadequate conditions, and it continues paying federal funds to Clay County despite knowing that Clay County misuses those funds.

Count I and II of the Complaint assert claims against ICE for violations of the Administrative Procedure Act, 5 U.S.C. § 706(2) (the "APA"), and Count III asserts claims against Clay County for violations of the Indiana Declaratory Judgment Act, Ind. Code §§ 34-14-1-1–16, and Indiana Rule of Trial Procedure 57. These claims challenge, respectively: (Count I) ICE's decision that the Jail "passed" its December 2021 evaluation; (Count II) ICE's decision to continue paying federal funds to Clay County despite knowing about Clay County's misuse of those funds; and (Count III) Clay County's misuse of the funds (Filing No. 1 at ¶¶ 245–82). Plaintiffs seek a variety of declaratory and injunctive relief that all serve to stop ICE from continuing to house detainees at the Jail and to prevent ICE from paying any more federal detention funds to Clay County. All Defendants have moved to dismiss Plaintiffs' claims. The Court will first address Plaintiffs' claims against ICE before turning to their claim against Clay County.

**A.      <u>Counts I and II Against ICE</u>**

Counts I and II are against ICE under the APA. The APA governs judicial review of agency actions and waives federal sovereign immunity in some circumstances to allow for equitable relief from agency action or inaction. 5 U.S.C. § 702. Under the APA, a court may "hold unlawful and set aside agency action" that is found to be "arbitrary, capricious, an abuse of discretion," "short of statutory right," or "without observance of procedure required by law." *Id.* § 706(2)(A), (C)–(D). ICE moves to dismiss both claims for lack of standing and on the merits.

### 1.    <u>Count I – ICE's Certification of the Jail as Compliant with PBNDS</u>

Count I challenges ICE's certification of the Jail as compliant with the PBNDS in December 2021, ICE's use of Nakamoto to conduct the December 2021 inspection, and ICE's reliance on Nakamoto's "deeply flawed" inspection (<u>Filing No. 1 at ¶ 185</u>). Plaintiffs allege that these actions were arbitrary, capricious, and an abuse of discretion. *Id.* at ¶¶ 245–62. ICE argues Plaintiffs lack standing to assert this claim because their alleged injuries are not redressable under the APA (<u>Filing No. 61 at 10</u>). ICE also argues that Count I is unreviewable under the APA because it does not challenge a "final agency action." *Id.* at 16. Before proceeding to the merits of Count I the Court will first address ICE's standing arguments.

#### a.    <u>Standing</u>

Article III of the Constitution limits judicial power to actual cases and controversies. U.S. Const. Art. III, § 2. To establish Article III standing, a plaintiff must show (1) an injury in fact that is (2) caused by the defendant's conduct and (3) redressable by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). As the party invoking federal jurisdiction, Plaintiffs bear the burden of establishing each element of standing. *Id.* at 561. ICE contends Plaintiffs fail to satisfy the third element—redressability. "'[I]n reviewing the standing question, the court must

be careful not to decide the questions on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims.'" *Sierra Club v. EPA*, 774 F.3d 383, 389 (2014) (quoting *City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003)) (alteration in original).

ICE argues that Plaintiffs lack standing as to Count I because they cannot obtain relief under the APA that would redress their injuries. ICE describes Plaintiffs' injuries as arising from the Jail's deplorable conditions and their continued detention there. Under the APA, the Court may, at most, vacate and remand ICE's overall performance evaluation of the Jail, and vacatur would not improve the Jail's conditions or cause Plaintiffs' release from the Jail (Filing No. 61 at 11–12).

Plaintiffs respond that their requested relief would plainly redress their injuries. A declaration "that the conditions at the Jail were not adequate under the PBNDS in May or December 2021," for example, would force ICE to terminate the Agreement under the Two Strikes Mandate (Filing No. 68 at 23; Filing No. 1 at p. 73 (E)). Alternatively, even vacatur would remedy their alleged injuries because, if Plaintiffs' allegations are true, the Jail would almost certainly fail an inspection by OPR on remand. *Id*. at 25.

On reply, ICE repeats its argument that the Court may not grant the declaratory and injunctive relief requested by Plaintiffs. This argument, however, speaks to the merits of Plaintiffs' claim. The Seventh Circuit rejected a similar argument and clarified the distinction between standing and the merits in *Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Norton* ("*Lac du Flambeau*"). 422 F.3d 490 (7th Cir. 2005). In that case, the Lac du Flambeau Band of Lake Superior Chippewa Indians ("LDF") filed an APA claim alleging that the Secretary of the Interior (the "Secretary") exceeded her authority under the Indian Gaming Regulatory Act by

approving a compact with the Ho-Chunk Nation. The compact permitted the Ho-Chunk Nation to operate casinos in Wisconsin but disadvantaged other tribes, including the LDF, who might later seek to operate casinos there. *Id.* at 492–93. The LDF sought, among other remedies, an order declaring a part of the compact void. *Id.* at 494. The Ho-Chunk Nation moved to dismiss, arguing that the LDF failed to show redressability because the declaratory order was "not a remedy that the [statute] affords and, because it cannot be granted, will not redress the alleged injury." *Id.* at 501. The Ho-Chunk Nation, like ICE, argued the statute only authorized vacatur and remand to the Secretary, who "inevitably would reapprove the compact, affording LDF no relief." *Id.*

> The Seventh Circuit rejected the Ho-Chunk Nation's argument because it
>
> confuse[d] standing with the merits. . . . '[T]he Article III requirement of remediable injury in fact . . . has nothing to do with the text of the statute relied upon.' . . . *Redressability thus depends upon the relief requested, not the relief LDF could prove it was entitled to on the merits.*

*Id.* at 501–02 (emphasis added) (citation omitted) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 97 n.2 (1998)).

ICE's "standing" argument relies on its interpretation of the APA, but redressability does not depend on "the text of the statute relied upon." *Id.* at 501–02. In deciding whether Plaintiffs have standing, the Court need only determine whether there is a "substantial likelihood" that the relief Plaintiffs have requested would alleviate their harm. *Id.* The Court concludes there is.

A declaration that the Jail should have failed its December 2021 evaluation would require ICE to cease detaining Plaintiffs and other noncitizens at the Jail under the Two Strikes Mandate. *See Matushkina v. Nielsen*, 877 F.3d 289, 292 (7th Cir. 2017) (challenging the denial of a visa application; "At least in theory, a court order . . . could remove the obstacle to her visa application. The fact that the Consulate could still deny [plaintiff's] visa application on some other ground does not defeat standing."). The Court also agrees with Plaintiffs that mere vacatur would create a

substantial likelihood that Plaintiffs' injuries would be redressed because, taking the allegations as true, the Jail would fail a proper evaluation on remand.

ICE contends that even if the Court could declare that the Jail should have failed its December 2021 evaluation, that evaluation would not trigger the Two Strikes Mandate because in November 2021, the ODO rated the Jail "superior." A failing evaluation in December 2021 would therefore not have been a second "consecutive" overall performance evaluation (Filing No. 61 at 12). Plaintiffs respond that the November 2021 review was "*ad hoc* and not an overall performance evaluation" (Filing No. 68 at 18). The Court again agrees with Plaintiffs. The Complaint describes the November 2021 review as an "*ad hoc* inspection[]" that evaluated compliance "with only a subset of requirements of the PBNDS," It was not conducted as part of a "subsequent performance evaluation system" and did not result in ICE issuing an overall performance evaluation rating (Filing No. 1 at ¶¶ 196, 212). Drawing all inferences in Plaintiffs' favor, the Court cannot conclude that the November 2021 review constituted an "overall performance evaluation" under the Appropriations Act. The November 2021 review therefore does not preclude redressability of Plaintiffs' claims. Moreover, the requested injunctive relief requiring ICE to cease funding the Jail and cease detaining Plaintiffs, if successful on the merits, would redress Plaintiffs' injuries notwithstanding an intervening passing inspection (Filing No. 1 at p. 74 § (L)).

ICE lastly argues that Plaintiffs' claim is not redressable because ICE lacks control over Clay County and the Jail's conditions. ICE contends that "it has no supervisory control over the Jail," despite the "fiscal leverage" it can admittedly exert over Clay County, so it cannot improve the Jail's conditions and thus cannot remedy Plaintiffs' injuries (Filing No. 61 at 13). However, Plaintiffs' Complaint does not request an order compelling ICE to direct improvements to the Jail's

conditions. The Complaint seeks to terminate ICE's relationship with the Jail altogether (*see* Filing No. 1 at pp. 73–74). ICE's inability to direct specific improvements to the Jail is no bar to standing.

Plaintiffs have demonstrated Article III standing as to Count I.

### b.   Available Relief Under APA

Although Plaintiffs have standing to assert Count I, ICE's arguments about the availability of relief under the APA are well taken as to the merits. *Matushkina*, 877 F.3d at 292 ("The line between a lack of standing and a failure to state a claim for relief on the merits can be a fine one . . . .") (dismissing APA claim on the merits because consular non-reviewability barred relief, despite plaintiff having standing). ICE argues that under the APA, the Court may at most vacate and remand ICE's decisions and may not, as Plaintiffs request, decide what decisions ICE should make on remand. Plaintiffs respond that the Court has authority to award all the requested relief because the APA permits courts to "decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706; (Filing No. 68 at 23–24 (quoting 5 U.S.C. § 706)); (Filing No. 68 at 23–24).

Plaintiffs interpret the APA too broadly. The statute only permits a court to determine whether an agency decision was adequately founded, not what the agency's decision should have been. The court "may not substitute [its] judgment for that of the [agency], but instead must confine [itself] to ensuring that [the agency] remained 'within the bounds of reasoned decisionmaking.'" *Department of Com. v. New York*, 139 S. Ct. 2551, 2569 (2019) (internal citation omitted) (quoting *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87 (1983)). "It is a 'foundational principle of administrative law' that judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.'" *Department of Homeland Sec. v.*

*Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1907–08 (2020) (quoting *Michigan v. Environmental Protection Agency*, 576 U.S. 743, 758 (2015)). If those grounds are inadequate, then a court may only remand the decision to the agency to either "offer 'a fuller explanation of the agency's reasoning *at the time of the agency action*'" or "'deal with the problem afresh' by taking *new* agency action." *Id.* at 1908 (emphasis in original) (quoting *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 654 (1990) and *SEC v. Chenery Corp.*, 332 U.S. 194, 201 (1947)).

Here, the Court may at most hold that ICE lacked adequate grounds for the December 2021 evaluation, vacate the decision, and remand it back to ICE for a fuller explanation or a new decision. The Court may not substitute its judgment for ICE's and hold that the Jail in fact does not comply with the PBNDS or that the Jail should have failed its December 2021 evaluation. Plaintiffs' Prayers for Relief (E) and (G) must therefore be **dismissed** (Filing No. 1 at 73 §§ (E), (G))[4]. And for the same reason, Prayers for Relief (K) and (L) must be **dismissed as premature**.[5] *Id.* at 74. The Court cannot enjoin ICE from detaining Plaintiffs at the Jail or funding the Jail until and unless ICE determines that the Jail has failed two consecutive evaluations.

### c.   Final Agency Action

ICE argues that Count I should also be dismissed because it does not challenge a "final agency action" (Filing No. 61 at 16). The APA "allow[s] any person 'adversely affected or

---

[4] Prayer for relief (E.) asks the Court to declare that conditions at the Jail were not adequate under the PBNDS in May or December 2021, and remain inadequate under those standards; prayer for relief (G) asks to declare that the ICE Defendants' corresponding decision to continue using the Jail after what should have been two consecutive failed overall performance evaluations, was arbitrary, capricious, an abuse of discretion, or otherwise contrary to law in violation of the APA. (Filing No. 1 at 73).

[5] Prayer for relief (K.) asks the Court to enjoin the ICE Defendants from using federal funds to pay for detention at the Jail; prayer for relief (L.) asks to enjoin the ICE Defendants from continuing to detain Plaintiffs and other Class members at the Jail. (Filing No. 1 at 73). Because Plaintiffs' requested injunctive relief as to ICE is dismissed as premature, the Court need not and thus does not reach ICE's argument that the requested injunctive relief is barred by 8 U.S.C. § 1252(f)(1) (Filing No. 61 at 15).

aggrieved' by agency action to obtain judicial review thereof, so long as the decision challenged represents a 'final agency action' for which there is no other adequate remedy in a court." *Webster v. Doe*, 486 U.S. 592, 599 (1988) (quoting 5 U.S.C. §§ 701–06).

The APA defines an "agency action" as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). The Supreme Court has explained that the "rule, order, license, sanction, [or] relief" at issue must "involve circumscribed, discrete agency actions." *Norton v. Southern Utah Wilderness All.*, 542 U.S. 55, 62 (2004). This "discreteness" requirement "precludes a broad programmatic attack" on agency operations and "rules out judicial direction of even discrete agency action that is not demanded by law." *Id.* at 64. For an "agency action" to be "final," two conditions must be satisfied. "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citation omitted).

The agency action at issue in Count I is "ICE's certification of the Jail as compliant with the 2008 PBNDS in December 2021" (Filing No. 1 at ¶ 248). ICE describes this certification as "an ordinary, day-to-day activity pursuant to program operations and contract performance," and argues that the certification is therefore not a discrete "agency action." ICE also argues that no rights or obligations flow from the certification, so it is not a "final" agency action (Filing No. 61 at 18). Plaintiffs respond by clarifying that they do not challenge "ICE's inspections" of the Jail, but rather its December 2021 "*certification* of the Jail" as compliant with the PBNDS (Filing No. 68 at 30 (emphasis in original)). Plaintiffs argue the December 2021 certification is a "final agency action" because it marked the completion of ICE's "statutorily required annual review of the Jail's

compliance with the PBNDS" and allowed ICE to continue using the Jail for detentions under the Two Strikes Mandate. *Id.* at 31. On reply, ICE argues that Plaintiffs fail to sufficiently identify the "purported 'certification'" they challenge and instead challenge "day-to-day program operations in the form of periodic ICE inspections." (Filing No. 72 at 10).

The Court concludes that the December 2021 "certification" of the Jail has been adequately defined by Plaintiffs and constitutes a final agency action. Under the Appropriations Act, ICE is required to conduct regular "overall performance evaluations" of its contracted detention facilities. Each of these overall performance evaluations, unlike the "interim" or "*ad hoc*" inspections performed by the ODO[6] results a circumscribed and discrete decision by ICE as to whether a facility is compliant with the PBNDS. The December 2021 overall performance evaluation (*i.e.*, the "certification") is therefore a discrete "agency action" under the APA.

The December 2021 evaluation was also "final" and not "merely tentative or interlocutory." *Bennett*, 520 U.S. at 177–78. It marked the consummation of ICE's decisionmaking as to whether the Jail complied with the PBNDS. The December 2021 evaluation also resulted in legal consequences. The federal funding permitted by the Appropriations Act hinged on the Jail's December 2021 overall performance evaluation. A failing evaluation would have required ICE to cease holding noncitizens at the Jail under the Two Strikes Mandate. Conversely, the passing evaluation allowed ICE to continue funding and using the Jail until the Jail failed two future consecutive evaluations. *See U.S. Army Corps of Eng'rs v. Hawkers Co., Inc.*, 578 U.S. 590, 599 (2016) (describing the legal consequences of a "negative" Army Corps of Engineers jurisdictional

---

[6] In its Reply, ICE conflates these inspections with the overall performance evaluations required under the Appropriations Act (Filing No. 72). When Plaintiffs argued in their response brief that "it is irrelevant" whether "'ICE's inspections' are 'ordinary, day-to-day activities,'" Plaintiffs were distinguishing ICE's periodic *ad hoc* inspections of the Jail from its overall performance evaluations under the Appropriations Act (Filing No. 68 at 30).

determination ("JD") and stating that "[i]t follows that affirmative JDs have legal consequences as well: They represent the denial of the safe harbor provisions that negative JDs afford.").  ICE's December 2021 overall performance evaluation of the Jail was a final agency action.

Count I, excluding Prayers for Relief (E), (G), (K)–(L), shall **proceed** against ICE.

### 2.   <u>Count II – ICE's Continued Payments to Clay County Despite Misuse</u>

Count II alleges that ICE's decision to continue providing federal funds to Clay County, despite knowing Clay County misuses those funds, violates ICE's duties under the INA and UAR and is therefore short of a statutory right and without observance of procedure required by law. ICE argues that Count II should be dismissed because Plaintiffs lack standing, because Count II does not challenge a "final agency action," and because any alleged "final agency action" is an unreviewable discretionary enforcement decision. The Court will first discuss ICE's standing arguments and then address whether the challenged agency action is an unreviewable enforcement decision, as the Court finds that the enforcement issue is dispositive.

### a.   <u>Standing</u>

ICE argues Plaintiffs lack standing as to Count II for the same reasons as Count I. ICE contends that Plaintiffs cannot obtain any of the requested relief beyond vacatur and remand, so their injuries are not redressable (<u>Filing No. 61 at 12</u>–13).  For the reasons discussed above, the Court may consider the merits of Count II in determining standing.  There is a substantial likelihood that the relief Plaintiffs request would redress their injuries, so Plaintiffs have standing.

### b.   <u>Discretionary Enforcement Decision</u>

ICE contends Count II must be dismissed on the merits because the decision to continue paying federal funds to Clay County despite its misuse of those funds is, in substance, a decision not to enforce the Agreement, and enforcement decisions are not reviewable under the APA.

"The APA establishes a 'basic presumption of judicial review [for] one '"suffering legal wrong because of agency action."'" *Regents of the Univ. of Cal.*, 140 S. Ct. at 1905 (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 140 (1967) (quoting 5 U.S.C. § 702)) (alteration in original). Section 701(a)(2) of the APA precludes judicial review of agency actions "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). "To 'honor the [APA's] presumption of review,'" the Supreme Court has "'read the exception in § 701(a)(2) quite narrowly,' confining it to those rare 'administrative decision[s] traditionally left to agency discretion.' This limited category of unreviewable actions includes an agency's decision not to institute enforcement proceedings." *Regents of the Univ. of Cal.*, 140 S. Ct. at 1905 (internal citations omitted) (quoting *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 370 (2018) and *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993)). Agency enforcement decisions are often unsuitable for judicial review because they "involve[] a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise." *Heckler v. Chaney*, 470 U.S. 821, 831 (1985).

ICE argues that a decision to terminate its payments to Clay County due to misuse of funds would constitute an unreviewable, discretionary enforcement decision, so ICE's inverse decision to *continue* making payments is an unreviewable *non*enforcement decision (Filing No. 61 at 21; Filing No. 72 at 13). Plaintiffs respond that Count II "has nothing to do with ICE's authority to enforce or punish past violations," and instead seeks an order stopping ICE from "*committing their own violations of federal law* by making unlawful payments" (Filing No. 68 at 34, 37 (emphasis in original) ("Plaintiffs are not asking that this Court compel the Federal Defendants to recover any funds it has already paid . . . ."). Plaintiffs argue that each payment from ICE to Clay County violates the INA, which authorizes ICE to make payments "for necessary clothing, medical care, necessary guard hire, and the housing, care, and security of persons detained by [ICE]" under an

intergovernmental agreement, and the UAR, which requires ICE to "manage and administer" federal awards. 8 U.S.C. § 1103(a)(11)(A); 2 C.F.R. §§ 200.300(a), 200.513(c).

The crux of the parties' dispute, it seems, is how the Court should characterize ICE's payments to Clay County—as affirmative actions that violate the INA and UAR, or as failures to ensure Clay County complies with the INA and UAR. Under either characterization, Count II cannot withstand dismissal.

Even if each of ICE's payments to Clay County is a final agency action, the Complaint contains no factual allegations indicating the payments themselves are unlawful.[7]  Plaintiffs cite several cases in which an agency's payment of federal funds was subject to judicial review under the APA, (Filing No. 68 at 37), but the issue in those cases was whether the awarding agency— not the award recipient—had allocated federal funds for purposes beyond its statutory authority. *Center for Biological Diversity v. Trump*, 453 F. Supp. 3d 11, 38–39 (D.D.C. 2020) (reviewing whether the Treasury Secretary could use federal funds allocated under the Treasury Forfeiture Fund for use "'in connection with the law enforcement activities of any Federal agency," for the construction of a border wall); *Policy & Research, LLC v. U.S. Dep't of Health & Human Servs.*, 313 F. Supp. 3d 62 (D.D.C. 2018) (focusing on statutory restrictions on "an agency's decision regarding how *it* will spend funds from a lump-sum appropriation" (emphasis added)).

Here, in contrast, Plaintiffs do not allege that ICE paid federal detention funds to Clay County for any purpose other than "clothing, medical care, necessary guard hire, and the housing, care, and security" of detainees. 8 U.S.C. § 1103(a)(11)(A); (Filing No. 68 at 39). The Complaint does not allege, for example, that ICE made payments to Clay County simply to ensure Clay County would continue cooperating with ICE. Plaintiffs do not allege a sufficient basis for

---

[7] Plaintiffs' legal conclusion that ICE's "payments violate the INA and UAR" is insufficient (Filing No. 1 at ¶ 273).

concluding that ICE acted short of statutory right or without observance of procedure required by law by simply making payments to Clay County. ICE's refusal to ensure the funds were ultimately used for their intended purpose by their recipient is the true focus of Count III.

The Complaint alleges ICE violated the INA and UAR by continuing to make payments to Clay County despite knowing it would later misuse those funds. In other words, Plaintiffs allege ICE unlawfully failed to enforce the INA and UAR against Clay County. (Filing No. 1 at ¶ 2 ("Plaintiffs bring this suit because *Clay County* . . . is unlawfully diverting federal funds intended for the care of Plaintiffs . . . while ICE *turns a blind eye* to the *County's diversion of funds* and the *Jail's blatant violations* of ICE's own detention standards." (emphasis added)); *id.* ¶ 71 ("Instead of using the ICE payments to maintain adequate conditions at the Jail, however, *the County is substantially misappropriating* the money . . . ."); *id.* ¶ 272 ("Despite explicit limits in the INA and UAR, *the County* has used and continues to use payments from ICE for impermissible purposes." (emphasis added)); *id.* at p. 73, ¶ (H) ("Declare that the ICE Defendants have violated and continue to violate 8 U.S.C. § 1103(a)(11)(A), 2 C.F.R., Part 200, and the APA by knowingly making payments to the County that are not *used* solely to provide for the custody and care of Plaintiffs . . . ." (emphasis added))).

Plaintiffs have not cited any meaningful standard against which the Court may judge ICE's enforcement discretion under the INA and UAR. This standard, if any, would be distinct from the standards governing ICE's own compliance with the INA and UAR. *See American Disabled for Attendant Programs Today v. U.S. Dep't of Housing & Urban Dev.*, 170 F.3d 381, 385 (3d Cir. 1999) (affirming dismissal of challenge to agency's refusal to investigate misallocation of federal funds as an unreviewable enforcement decision; "[Plaintiff] confuses the existence of a standard restricting federal funding recipients with the existence of a standard by which to judge HUD's

conduct. In this case, the [recipient funding restriction] is not adequate 'law to apply' to help us discern guidelines to apply to HUD's enforcement and investigation decisions."). Absent a standard applicable to ICE's enforcement discretion, the Court cannot review ICE's decisions not to enforce the INA and UAR against Clay County.

Plaintiffs point out that their Complaint does not challenge an enforcement (or nonenforcement) decision because it "has nothing to do with ICE's authority to enforce or punish past violations" (Filing No. 68 at 37). But punishment of past violations is only one type of enforcement action. "Enforcement" also includes actions that compel future compliance. *See Enforcement*, Black's Law Dictionary (11th ed. 2019) ("The act or process of compelling compliance with a law, mandate, command, decree, or agreement."). As ICE notes, 2 C.F.R. § 200.339 expressly permits ICE to withhold or temporarily suspend payments of federal funds to remedy an award recipient's noncompliance with federal statutes, regulations, or terms and conditions of a federal award. 2 C.F.R. § 200.339(a)–(f). If ICE decided to stop making payments because it knew Clay County would misuse the funds, that would constitute an enforcement action under 2 C.F.R. § 200.339.  It follows that each time ICE decides to make a payment (*i.e.*, decides not to suspend payments), ICE makes a nonenforcement decision, which the Court has no discretion to review.[8]

The Complaint does not allege that ICE's payments to Clay County were themselves unlawful under the INA or UAR, and because ICE's decision not to suspend payments to Clay

---

[8] ICE's alleged inaction might fall within a potential exception to the general rule of nonreviewability for agency enforcement decisions, which applies where "it could justifiably be found that the agency has 'consciously and expressly adopted a general policy' that is so extreme as to amount to an abdication of its statutory responsibilities." *Heckler v. Chaney*, 470 U.S. 821, 833 n.4 (1985) (internal citation omitted) (citing *Adams v. Richardson*, 480 F.2d 1159 (D.C. Cir. 1973) (en banc)); *see id.* at 839 (Brennan, J., concurring). However, the Court does not consider whether the Complaint sufficiently alleges a policy of nonenforcement or a singular decision not to enforce the PBNDS as to the Jail because Plaintiffs do not raise those arguments in their brief and, to the contrary, clarify that they are not alleging that ICE's conduct constitutes an enforcement action under *Chaney* (Filing No. 68 at 38, n. 8).

County is an unreviewable nonenforcement decision, Plaintiffs' Count II must be dismissed.  The Court need not and will not address the parties' arguments as to whether ICE's payments to Clay County constitute final agency actions.  ICE's Motion to Dismiss is **granted** as to Count II.

**B.      Count III Against Clay County**

Plaintiffs assert a claim against Clay County under the Indiana Uniform Declaratory Judgment Act and Indiana Rule of Trial Procedure 57 (Filing No. 1 at ¶¶ 267–82). Plaintiffs seek declarations that Clay County has violated and continues to violate Plaintiffs' rights, status, and/or legal relations under the Agreement by misusing federal detention funds, and request an injunction prohibiting Clay County from using the funds for discretionary expenditures. *Id.* at 70, ¶¶ (I)–(J). Clay County responds that Count III should be dismissed because: 1). Plaintiffs lack standing; 2.) Count III is duplicative as to certain Defendants who are not parties to the Agreement; and 3.) Clay County is not required by law to expend federal funds in any particular manner (Filing No. 57 at 6, 10, 22).  The Court discusses only the standing argument, which is dispositive of Count III. Before deciding whether Plaintiffs have standing, the Court must briefly resolve a dispute as to whether Indiana law or federal common law applies.[9]

**1.      Applicable Law**

Clay County contends that federal common law, and not Indiana state law, governs Count III because a federal contract is at issue (Filing No. 57 at 11).  Plaintiffs respond that the Court need not decide whether federal common law or Indiana state law applies because they are materially similar with respect to third-party beneficiaries (Filing No. 68 at 47–48).

---

[9] Plaintiffs and Clay County also dispute whether the Indiana Uniform Declaratory Judgment Act, Ind. Code §§ 34-14-1-1–16, or the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201–02, governs Count III. The Court need not decide which declaratory judgment statute governs Count III because, for the reasons discussed below, Plaintiffs lack standing to sue to enforce the Agreement under either statute.

Federal common law typically governs the interpretation of a government contract like the Agreement. *See, e.g.*, *United States v. Seckinger*, 397 U.S. 203, 209–10 (1970) ("[F]ederal law controls the interpretation of [a] contract . . . entered into pursuant to authority conferred by federal statute and, ultimately, by the Constitution."); *Funeral Fin. Sys. v. United States*, 234 F.3d 1015, 1018 (7th Cir. 2000) ("Interpreting the meaning of a provision in a federal government contract is a matter of federal common law . . . ."). However, the Supreme Court has held that federal common law does not apply when the issue is "whether petitioners as third-party beneficiaries of the contracts [between a county and a government agency] have standing to sue [the county]." *Miree v. DeKalb County*, 433 U.S. 25, 29 (1977). When a breach of contract claim has "no direct effect upon the United States or its Treasury," state law may apply. *Id.* Because the present issue in Count III is whether Plaintiffs have standing under the Agreement to sue Clay County, Indiana law would apply.

Regardless, the Court agrees with Plaintiff that there is no material difference between Indiana law and federal common law regarding third-party beneficiary status, so the Court's conclusion would be the same under either body of law. The Court will cite to both Indiana law and federal common law throughout its decision.

**2.    Third-Party Beneficiary Status**

Clay County argues Plaintiffs lack standing to sue under the Agreement because they are neither parties nor third-party beneficiaries to the Agreement (Filing No. 57 at 14). Plaintiffs respond that they are "being detained at the very Jail" that is the subject of the Agreement and are entitled to benefits under the Agreement, so they are third-party beneficiaries (Filing No. 68 at 47). Clay County replies that Plaintiffs have not sufficiently alleged that the parties to the Agreement intended to grant detainees third-party beneficiary rights and that any benefits detainees receive under the Agreement are incidental (Filing No. 71 at 70–71). The Court agrees with Clay County.

To establish rights as third-party beneficiaries, Plaintiffs must show that the parties to the Agreement—the Marshals Service, ICE, and Clay County—intended to directly benefit detainees. "The intent necessary to the third-party's right to sue is not a desire or purpose to confer a particular benefit upon the third-party nor a desire to advance his interest or promote his welfare, but an intent that the promising party or parties shall assume a direct obligation to him." *Centennial Mortg., Inc. v. Blumenfeld*, 745 N.E.2d 268, 276 (Ind. Ct. App. 2001); *see Corrugated Paper Products, Inc. v. Longview Fibre Co.*, 868 F.2d 908, 911–12 (7th Cir. 1989) ("The plaintiff must show that the benefit to plaintiff was a consequence which the parties affirmatively sought . . . ."); *D'Amato v. Wisconsin Gas Co.*, 760 F.2d 1474, 1479 (7th Cir. 1985) ("The question is not whether the contracts would benefit the [third party], but whether the parties intended to confer an actionable right on the [third party]."). "If the agreement was not intended to benefit the third party, . . . he is viewed as an 'incidental' beneficiary, having no legally cognizable rights under the contract." *Holbrook v. Pitt*, 643 F.2d 1261, 1270 (7th Cir. 1981) (citations omitted). "The intent of the parties to the contract is therefore the cornerstone of a claim for third-party beneficiary status. Proof of the requisite intent is no small matter, for the Supreme Court has recognized the exceptional privilege that third-party beneficiary status imparts. The privilege should not be granted liberally." *Flexlab, L.L.C. v. United States*, 424 F.3d 1254, 1259 (Fed. Cir. 2005) (internal citations omitted) (citing *German All. Ins. Co. v. Home Water Supply Co.*, 226 U.S. 220, 230 (1912)); *OEC-Diagnostics, Inc. v. Major*, 674 N.E.2d 1312, 1314–15 (Ind. 1996) ("The intent of the contracting parties to bestow rights upon a third party 'must affirmatively appear from the language of the instrument when properly interpreted and construed.'" (quoting *Freigy v. Gargaro Co.*, 60 N.E.2d 288, 291 (Ind. 1945)).

Plaintiffs argue that several provisions in the Agreement show an intent to bestow third-party beneficiary rights on detainees.  For example, the first page of the Agreement states that it "is for the housing, safekeeping, and subsistence of federal prisoners, including guard/transportation services to medical facility and U.S. Courthouse, in accordance with the contents set forth herein" (Filing No. 68 at 48). Plaintiffs also point to the Agreement's provisions requiring the Jail to provide "minimum conditions of confinement," including twenty-four-hour medical care and adequate access to prescription medications, and to purchase recreational equipment for detainees (Filing No. 68 at 48). Plaintiffs also cite to the fact that "the per diem rate that the County is paid under the contract is tied specifically to expenses 'that benefit federal prisoners" and that Clay County "was warned that if its claimed costs 'do not benefit federal prisoners, they cannot be claimed'" (Filing No. 68 at 49). However, the Complaint makes clear that this information comes from a Cost Sheet for Detention Services, not the Agreement (Filing No. 1 at ¶ 68). The Cost Sheet is parol evidence, which the Court may not consider in determining the contracting parties' intent. *Sunstream Jet Express, Inc. v. Int'l Air Serv. Co., Ltd.*, 734 F.2d 1258, 1266 (7th Cir. 1984).

Clay County contends that these provisions create only incidental benefits to detainees and do not show that the contracting parties' intended to directly benefit detainees. As pled, the Court agrees.  Even though the contracting parties might have known that detainees would benefit from these provisions, "there is an important difference between *knowledge* that a certain outcome will occur, and an *intent* to bring about that result." *Corrugated Paper Products, Inc.*, 868 F.2d at 912 (emphasis in original). A plaintiff cannot establish intent by showing only that the contracting parties knew the plaintiff would derive benefit from the agreement. "[T]he benefit to plaintiff must have been, to some extent, a motivating factor in the parties' decision to enter into the contract."

*Id.* at 912. The Agreement provisions identified by Plaintiffs do not show that the contracting parties were motivated to enter into the Agreement by an intention to benefit detainees. The provisions, at most, show that the contracting parties knew that detainees would derive some incidental benefits from the Agreement.

Other provisions in the Agreement indicate that its primary purpose is to confine detainees, not benefit them. Article I of the Agreement, most notably, states that its purpose is to establish a contractual relationship "for the detention of persons charged with or convicted of violations of federal law or held as material witnesses" (Filing No. 75-2).[10] The Agreement also contains several provisions regarding the receiving, discharge, and transportation of detainees, which do not benefit detainees and serve only to further their secure detention (Filing No. 75-2 at 4, 9–10, Arts. IV, XV–XVI). Plaintiffs next argue that "the lack of any express clause prohibiting third-party beneficiaries" supports their claim (Filing No. 68 at 54 (arguing "the parties chose *not to express* such an intent" (emphasis in original))). The absence of a provision prohibiting third-party beneficiaries is not dispositive. *See Penrod v. Quality Corr. Care LLC*, No. 18 CV 219, 2020 WL 564163, at *4 (N.D. Ind. Feb. 5, 2020) (citing cases rejecting third-party beneficiary claims "even where the contract at issue did not have a clause denying the existence of third-party beneficiaries"). But more importantly, Plaintiffs overlook several provisions that do show that the contracting parties intended to prohibit third-party beneficiaries.

For one, Article XII, titled "MODIFICATIONS / DISPUTES," states that "[d]isputes, questions, or concerns pertaining to this agreement will be resolved between the [Marshals

---

[10] Consistent with the Court's Order on Clay County's Motion to Strike Argument (Filing No. 83), the Court has not considered any argument offered by Plaintiffs or Clay County in their briefing on Clay County's Motion to Strike (Filing No. 75; Filing No. 77). The Court has independently analyzed the Agreement provisions submitted in Plaintiffs' supplemental filing (Filing No. 75-2).

Service] and the appropriate Local Government official" ([Filing No. 1-1 at 7](), Art. XII ¶ 2). This Article provides that only the contracting parties may resolve disputes concerning the Agreement, leaving no room for third-party beneficiaries to raise such disputes. *See Clifton v. Suburban Cable TV Co., Inc.*, 642 A.2d 512, 515 (Pa. 1994), *appeal denied*, 649 A.2d 667 (Pa. 1994), *cert. denied*, 513 U.S. 1173 (1995) (concluding Commonwealth did not intend for inmates to be third-party beneficiaries to prison cable contract because "the opening paragraph of the agreement names [the cable provider] and the Commonwealth as the parties to the agreement…. and more important, the contract states that only the Commonwealth and [cable provider] may enforce the terms of the agreement").

Another provision states that only the Government may enforce breaches "that result[] in a debt owed to the Federal Government," which confirms that the contracting parties intended to resolve disputes arising from the Agreement between themselves ([Filing No. 1-1 at 6](), Art. X). The Agreement also refers to third-party liability in context of indemnity for certain types of claims, showing that the contracting parties anticipated the possibility of third-party liability related to the Agreement yet declined to create third-party beneficiary rights. ([Filing No. 75-2 at 9]()–10, Art. VX ¶ 4, Art. XVI ¶ 5); *see Cash v. United States*, No. 14-510C, 2015 WL 194353, at *3 n.2 (Fed. Cl. Jan. 13, 2015) ("Indeed, where the parties intended to do so, the agreement does specifically discuss third-party liability."); *cf. Oldham v. Nova Mud, Inc.*, No. 2:20-cv-1166, 2021 WL 4066691 (D.N.M. Sept. 7, 2021) ("Looking at the document as a whole, it is clear that [the contracting party] had no issue referring to third parties where it wished. Thus, the Court finds that the omission in the arbitration provision was likely purposeful."). The Agreement as a whole indicates the contracting parties did not intend to create third-party beneficiaries.

Other federal courts have addressed third-party beneficiary claims similar to the one asserted by Plaintiffs. The Court of Federal Claims, in *Cash v. United States*, dismissed a federal inmate's claim for breach of an intergovernmental agreement, which, as best the Court can tell, is identical to the Agreement in this case. 2015 WL 194353, at *1. The plaintiff Cash sued the United States for the alleged breach of an agreement between the Marshals Service and the Oklahoma County Criminal Justice Authority (the "County Authority"). *Id.* Cash alleged the Marshals Service failed to inspect the jail and investigate prior inmate assaults, which led to him being assaulted by other inmates. *Id.* The United States moved to dismiss Cash's complaint because he was neither a party nor third-party beneficiary to the agreement. In response, Cash argued "he is a third-party beneficiary of the agreement at issue because the 'care and safekeeping' of federal prisoners was among the stated purposes of the agreement." *Id.*

The Court of Federal Claims rejected Cash's argument and stated that "[a] review of the agreement . . . demonstrates that it was entered into to provide housing to federal prisoners and did not give prisoners any special rights." *Id.* at *3. "In particular," the *Cash* court noted, the agreement stated that its purpose was to provide for the "'detention of persons charged with or convicted of violations of federal law or held as material witnesses,'" just like the Agreement in this case. *Id.* (alteration in original). The *Cash* court also drew attention to a provision stating that the Marshals Service "considers all federal prisoners medimn/maximum [sic] security-type prisoners that are housed within the confines of the facility, at a level appropriate for prisoners considered a risk of flight, a danger to the community, or wanted by other jurisdictions.'" *Id.* (alteration in original). Based on its review of the agreement, the *Cash* court concluded that "while the agreement does provide certain minimum standards for the confinement of the prisoners—which do not include protection of prisoners from other prisoners—it is clear that the principal intent of the agreement

is to house the prisoners in a way that keeps the public safe and that the minimum standards are designed for this purpose." *Id.*

Plaintiffs argue *Cash* is distinguishable because the court's analysis "relied heavily on the fact that the agreement's provisions did not require the type of 'protection of prisoners from other prisoners' that was the basis for the plaintiff's claim," and the *Cash* court therefore "failed to discuss any specific obligations under the contract that would be performed directly to the detained individual" (Filing No. 68 at 52). Plaintiffs' claim, "in contrast, . . . directly relate[s] to contractual requirements that benefit them and others like them, such as providing adequate access to prescription medications and 24-hour medical care, and complying with the PBNDS" *Id.* However, the *Cash* court's decision was plainly based on a review of the entire agreement, not just the provisions identified by Cash. The court's holistic review of the agreement revealed that its "principal intent" was to house prisoners, despite also providing "minimum standards for the confinement of the prisoners." *Cash*, 2015 WL 194353, at *3. By noting that those "minimum standards" did not even include the protection of prisoners from other prisoners, the court merely illustrated the futility of Cash's claims. *Id. Cash* is therefore applicable and highly persuasive due to the similarities between the contract in *Cash* and the Agreement here.

The District Court for the Eastern District of California recently reached the same conclusion in *Hand v. Management & Training Corp.* and dismissed a private prison inmate's third-party beneficiary claim at the screening stage. No. 20-cv-819, 2022 WL 432862 (E.D. Cal. Feb. 11, 2022). The plaintiff in that case, Hand, sued a private prison operator, Management and Training Corp. ("MTC"), to enforce a private contract between MTC and the Bureau of Prisons ("BOP"). Hand argued he was a third-party beneficiary to the contract because it contained several provisions providing benefits to detainees, and because it delegated to MTC certain constitutional,

statutory, and other duties owed by the BOP to prisoners, including a duty to provide "'safekeeping, care, and subsistence" of inmates. *Id.* at *2, 7. Hand claimed MTC breached the contract by failing to satisfy the duties delegated in the contract.

The district court held that Hand did not meet the "'exceptional' burden" of proving that he was a third-party beneficiary to the contract. *Id.* at *7 (citation omitted). Hand did not "identify any specific provision in the contract that indicates he is a third-party beneficiary [or] that the BOP or MTC entered into the contract intending to confer a benefit directly upon Plaintiff," despite having identified several incidental benefits. The court held that "INMATES are not direct beneficiaries in circumstances as set forth here, rather they are merely subjects of the contract." *Id.* The *Hand* court added that as a matter of policy, the BOP would not have intended to grant third-party beneficiary status to inmates:

> [I]t is not hard to imagine that the intent behind the underlying statutory scheme which authorizes contracts between the BOP and private contractors to house federal prisoners, would not be greatly frustrated if third party beneficiary status were allowed to run to the direct benefit of prisoners housed at such facilities. Moreover, it would logically act as a substantial deterrence to the ability of the BOP to obtain private contractors to enter into contracts for the housing of federal prisoners if as a result of doing so they would necessarily and immediately make themselves directly available to potentially hundreds of lawsuits brought by prisoners under their control.

*Id.* at *8 (internal citations omitted).

This case is strikingly similar to *Cash* and analogous to *Hand.* Nothing in the Agreement indicates the Marshals Service, ICE, or Clay County intended to directly benefit detainees. Plaintiffs have not identified any provisions showing anything more than incidental benefits similar to the benefits identified in *Cash* and *Hand.* The Agreement here, like the agreement in *Cash*, expressly states that its purpose is "*the detention of persons* charged with or convicted of violations of federal law or held as material witnesses" (Filing No. 75-2 at 3 (emphasis added));

*see also* 8 U.S.C. § 1103(a)(11)(B) (stating purpose of detention contracts with DHS is establishment of acceptable conditions of confinement and detention services). The policy consideration described in *Hand* provides further support for the conclusion that ICE did not intend to make detainees third-party beneficiaries. 2022 WL 432862 at *8. If third-party beneficiary status ran to every ICE detainee, it would frustrate the purpose of the INA provisions authorizing ICE to enter into detention contracts and would substantially deter the ever-decreasing number of non-federal entities that still agree to work with ICE, particularly because ICE detainees comprise "the largest civil detention system in the United States" (Filing No. 1 at ¶ 177). A review of the entire Agreement shows it is primarily intended to provide for detainees' confinement, and that any benefits provided to detainees under the Agreement are merely incidental.

Plaintiffs attempt to analogize this case with *Holbrook v. Pitt*, 643 F.2d 1261 (7th Cir. 1981). In *Holbrook*, the Seventh Circuit determined that housing-project tenants were third-party beneficiaries to housing assistance contracts entered into by the United States Department of Housing and Urban Development ("HUD") under Section 8 of the United States Housing Act of 1937 ("Section 8"). Pursuant to Section 8, HUD contracts with housing project owners and makes rental assistance payments on behalf of low-income tenants. *Id.* at 1271–72. The *Holbrook* court explained that Section 8 was "designed primarily to benefit low-income families," so Section 8 contracts are "intended primarily to benefit needy tenants." *Id.* at 1272. The court also identified several provisions showing the Section 8 contracts were intended to directly benefit tenants, including provisions requiring the government to make housing assistance payments on their behalf; requiring decent, safe, and sanitary housing; requiring affirmative action by landlords in marketing units and selecting tenants; restricting landlords' discretion as to security deposits; and restricting landlords' eviction rights. *Id.* at 1272–73. Based on the purposes of Section 8 and the

contracts' provisions, the Seventh Circuit concluded that "the needs of the third party motivated the government to enter into the contract in the first place." *D'Amato*, 760 F.2d at 1480 (citing *Holbrook*, 643 F.2d at 1270).

This case is distinguishable from *Holbrook* both as to the statute underlying the Agreement and the Agreement's provisions. Whereas Section 8 is a social welfare program "designed to provide rent subsidies to needy families" and "assist low income families in securing decent, safe and sanitary housing," *Holbrook*, 643 F.2d at 1271, the INA focuses on the security of the United States, the safety of the public, and the detainment of federal prisoners. Specifically, 8 U.S.C. § 1103(a)(11)(B) permits ICE to enter into detention contracts "for the necessary construction, physical renovation, acquisition of equipment, supplies or materials required *to establish acceptable conditions of confinement and detention services*." Unlike Section 8, the INA does not function to benefit detainees. And although subsection § 1103(a)(11)(A) provides that any payments made pursuant to a federal detention contract must be used for "necessary clothing, medical care, necessary guard hire, and the housing, care, and security" of detainees, this subsection does not speak to the purpose of the detention contract itself.

A later Seventh Circuit case, *D'Amato v. Wisconsin Gas Co.*, 760 F.2d 1474 (7th Cir. 1985), clarified the distinction between intentional and incidental third-party beneficiaries to government contracts. In *D'Amato*, the plaintiff, D'Amato, was terminated from his employment with Wisconsin Gas Company ("the Company") because his disability prevented him from performing certain job requirements. *Id.* at 1477. D'Amato sued the Company and other defendants for disability discrimination in violation of Section 503 of the Rehabilitation Act ("Section 503"). Section 503 requires certain government contractors to include an affirmative action clause in their contracts. *Id.* at 1477–78. Section 503 does not provide for a private cause of action, so D'Amato

sued as a third-party beneficiary to the affirmative action clause in the Company's contract. *Id.* at 1478. D'Amato, relying in part on *Holbrook*, argued that "because the affirmative action clauses benefit the handicapped, the handicapped are direct beneficiaries and therefore entitled to sue." *Id.* at 1479. The Seventh Circuit described D'Amato's analysis as "overly simplistic." *Id.* The Seventh Circuit explained that in *Holbrook*, the needs of low-income families motivated the government to enter into the Section 8 contracts, but "[t]he Company's contracts, on the other hand, are not designed to serve the interests of the handicapped. They merely require the Company to take affirmative action as a promise incidental to a contract to provide goods and services." *Id.* at 1480. The Seventh Circuit therefore affirmed the dismissal of D'Amato's claim.

Like D'Amato, Plaintiffs argue that because certain provisions in the Agreement and the incorporated laws and regulations benefit detainees, they are entitled to enforce the Agreement. But like the contract in *D'Amato*, nothing in the Agreement indicates it was "designed to serve the interests" of detainees. *Id.*at 1480. The Agreement merely requires Clay County to provide certain benefits and adhere to certain standards that are "incidental to a contract" to provide detention services. *Id.*; *see Kroekel v. U.S. Marshals Service*, No. 98 N 983, 1999 WL 33919792, at *18 (D. Colo. May 21, 1999) (holding that court security officers were not third-party beneficiaries to security services contract between Marshals Service and private security company, finding facts were similar to *D'Amato* and distinguishable from *Holbrook*; "It is clear from the language of the [contract] that [the parties] entered into the [contract] in order to provide security for federal judicial facilities . . . . [T]he needs of the [officers] who furnish that security were not what motivated the parties to enter into the agreement in the first place.").

Other courts in the Seventh Circuit, including this Court, that have addressed federal prisoners' third-party beneficiary rights have consistently concluded that prisoners are not third-

party beneficiaries to contracts related to their detention. *See Lewis v. Blackburn*, No. 8-cv-795, 2009 WL 1851096 (S.D. Ill. June 26, 2009) (dismissing breach of contract claim at screening stage, finding inmate was not third-party beneficiary to contract between Marshals Service and St. Clair County Jail "calling for the housing [and] the safekeeping of the inmates . . . since the third-party beneficiary status of a prisoner in such a contract is tenuous at best") (citing *Malone v. Corrections Corp. of America*, 553 F.3d 540, 543 (7th Cir. 2009) (stating in dicta that plaintiff-inmate "is not a party to the [detention] contract or even a third-party beneficiary")).  In *Harper v. Corizon Health Inc.*, No. 17-cv-228, 2018 WL 6019595 (S.D. Ind. Nov. 16, 2018), a federal inmate sued a prison healthcare provider for breaching its contract with the Illinois Department of Corrections. The inmate argued he was a third-party beneficiary to the healthcare services contract, but this Court, applying Indiana law, dismissed the claim. *Id.* at *9. Although the healthcare contract provided for "comprehensive medical services, including dental, medical, mental health and substance abuse" for inmates, which undoubtedly benefited them, "the intent of the contracting parties to bestow rights upon [inmates did] not affirmatively appear from the language of the instrument."  *Id.* (citing *Cain v. Griffin*, 849 N.E.2d 507, 514 (Ind. 2006)). Here, although the Agreement contains provisions that would be of benefit to Plaintiffs, those provisions do not express an affirmative intent to bestow third-party beneficiary rights on Plaintiffs. *See Weaver v. Wexford Health Sources, Inc.*, No. 19-cv-1950, 2021 WL 1175257, at *8 (S.D. Ind. Mar. 29, 2021) (concluding on summary judgment inmates are not third-party beneficiaries to same type of contract); *Barnett v. Wexford Health Sources, Inc.*, 18-cv-1716, 2019 WL 6909581, at *7 (S.D. Ind. Dec. 19, 2019) (same).[11]

---

[11] Plaintiffs argue that *Harper*, *Weaver*, and *Barnett* are inapplicable because they were decided on summary judgment, but Plaintiffs fail to identify what fact discovery would be needed to decide whether they are third-party beneficiaries, which is a question of contract interpretation and, thus, a question of law. Plaintiffs also argue *Harper* is inapplicable because the parties' briefing lacked a "substantive discussion regarding the contract claim." *Harper*, 2018 WL 601959, at *8; (Filing No. 68 at 53). However, the Court in *Harper* supported its decision with "independent research." *Id*

Plaintiffs also cite several decisions from the Second Circuit holding that federal detainees are third-party beneficiaries to detention contracts like the Agreement (Filing No. 68 at 49). These cases provide little persuasive value, as the Second Circuit appears to be alone in its reasoning. *See Stile v. Dubois*, No. 17-cv-406, 2019 WL 3317322, at *3 (D.N.H. July 24, 2019) (noting that although New York federal courts have held detainees are third-party beneficiaries, district courts in Rhode Island, Pennsylvania, New Jersey, and the Federal Circuit have held the opposite; applying New Hampshire law as not materially different from federal common law, dismissing inmate's third-party beneficiary to contract between Marshals Service and county department of corrections); *Luckern v. Suffolk County Sheriff's Dep't*, No. 07-12158, 2010 WL 1172648, at *7 (D. Mass. Mar. 22, 2010) ("[R]arely has a court ruled a prisoner to be a party to a medical services contract in a correctional institution.") (citing *Oliver v. Vose*, No. 89-1727-Z, 1991 WL 97453, at *5 n.10 (D. Mass. May 23, 1991) (noting only the Second Circuit "has held that a prisoner may be a third party beneficiary to such a contract")).

Federal courts in most other jurisdictions have held that federal inmates are not third-party beneficiaries to federal contracts related to their detention, even when those contracts provide benefits to inmates. *See, e.g.*, *Thomas v. CoreCivic Facility Support Ctr.*, No. 21-3166, 2022 WL 3139027, at *3 (D. Kan. Aug. 5, 2022) (applying federal common law, dismissing claim for breach of contract between private prison and Marshals Service at screening stage); *S.B. v. Wilson*, No. 19-773, 2021 WL 4494195, at *6 (S.D.W. Va. Sept. 30, 2021) (applying federal common law, dismissing claim for breach of inspection contract between Nakamoto and BOP); *Zeigler v. Correct Care Sys.*, No. 16-CV-1895, 2018 WL 1470786, at *4 (M.D. Pa. Mar. 26, 2018) (applying Pennsylvania law, dismissing claim for breach of contract between Department of Corrections and prison healthcare provider because the "clear and unambiguous terms of the contract" did not

contain language implying that contracting parties intended to make inmates third-party beneficiaries to the contract; citing other cases dismissing similar claims); *Murphy v. Central Falls Det. Facility Corp.*, No. 14-203 S, 2015 WL 1969178, at *13 (D.R.I. Apr. 30, 2015) (applying Rhode Island law, finding that inmate was not third-party beneficiary to detention contract between Marshals Service and detention facility operator, despite being the "subject and an integral component of the contract"); *Mathis v. GEO Group, Inc.*, No. 08-CT-21-D, 2009 WL 10736631, at *20 (E.D.N.C. Nov. 9, 2009) (applying federal common law, dismissing claim seeking to enforce healthcare provisions of contract between United States and private prison); *Jama v. U.S. I.N.S.*, 334 F. Supp. 2d 662, 688 (D.N.J. Sept. 9, 2004) (applying New Jersey law and federal common law as materially similar, dismissing detainees' claim for breach of INS detention contract because contract contained no provisions expressing "an intent to confer a right to performance on any of the detainees. Certainly the Contract contains provisions requiring that detainees not be subjected to abuse. . . . But these provisions, though they show that the INS intended the detainees to benefit under some provisions of the Contract, cannot by themselves show that the parties intended detainees to have rights of action for breach of contract"); *Clifton*, 642 A.2d at 515 (affirming dismissal of claim to enforce contract between prison and cable provider).

This Court agrees with the reasoning of the majority of courts and finds that the Agreement shows that its primary intent is to securely and humanely confine Plaintiffs and other detainees for public safety. Any benefits provided to those detainees are merely incidental to that purpose.

Plaintiffs alternatively argue that "[a]t a minimum, the Clay County Defendants' motion should be denied because they have not shown that Plaintiffs *unambiguously* are not third-party beneficiaries," and "[w]here there is ambiguity about the parties' intent, discovery on the issue is necessary" (Filing No. 68 at 55 (emphasis in original)). Clay County responds that the Agreement

43

itself contains no ambiguity, so dismissal at this stage is appropriate (Filing No. 71 at 16). The Court again agrees with Clay County. Plaintiffs have not identified any ambiguous language in the Agreement. They appear to instead argue that their third-party beneficiary status is ambiguous because the Agreement's provisions could be read to grant third-party beneficiary rights (Filing No. 68 at 48).  But "[u]nless the contract is ambiguous, the intent of the parties must be based on the contract alone, and not on extrinsic evidence." *Bristol-Myers Squibb Co. v. Ikon Office Sols., Inc.*, 295 F.3d 680, 684 (7th Cir. 2002); *see McWane, Inc. v. Crow Chicago Indus., Inc.*, 224 F.3d 582, 584 (7th Cir. 2000) ("If the district court determines that the contract is unambiguous, it may determine its meaning as a matter of law."); *Bucher & Christian Consulting, Inc. v. Novitex Enters. Sols., Inc.*, No. 15-cv-10, 2015 WL 5210668 (S.D. Ind. May 22, 2015) (applying Indiana law, finding contract was unambiguous and did not create third-party beneficiary rights; recommending district court dismiss claim with prejudice under Rule 12(b)(6)); *Bucher & Christian Consulting, Inc. v. Novitex Enters. Sols., Inc.*, No. 15-cv-10, 2015 WL 5210539, at *1 (S.D. Ind. Sept. 3, 2015) (adopting recommendation but modifying dismissal to be without prejudice). The unambiguous language in the Agreement does not show that the contracting parties intended to assume direct, enforceable obligations to Plaintiffs or other detainees. Plaintiffs are not third-party beneficiaries to the Agreement. Dismissal under Rule 12(b)(6) is appropriate.

As a final matter, Plaintiffs argue that if their claim against Clay County is dismissed, then "*no one* will enforce the relevant obligations that exist for the protection of Plaintiffs" (Filing No. 68 at 55 (emphasis in original)).  The allegations against Clay County concerning the deplorable conditions of the Jail are indeed serious. The Court recognizes that each Defendant appears to have disclaimed responsibility for complying with and enforcing the Agreement and placed that responsibility entirely on the other Defendant. But this strategic blame-shifting does not leave

Plaintiffs entirely without recourse. Decisions from other federal courts indicate that Plaintiffs may challenge a complete abdication of ICE's responsibility to enforce applicable laws and regulations. *See Simmons*, 2022 WL 1302888, at *12; *Irish 4 Reprod. Health v. U.S. Dep't of Health & Human Servs.*, 434 F. Supp. 3d 683, 697 (N.D. Ind. 2020).   Plaintiffs also may challenge the constitutionality of the conditions of their confinement.   However as pled, Plaintiffs lack standing to enforce the Agreement directly against Clay County, so Clay County's Motion to Dismiss is **granted**, and Count III is **dismissed**.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, ICE's Motion to Dismiss (<u>Filing No. 60</u>) is **GRANTED in part and DENIED in part**.

**Count I is DISMISSED** only as to Plaintiffs' Prayers for Relief (E), (G), (K), and (L). Plaintiffs' Prayers for Relief (E) and (G) are **dismissed with prejudice** because the Court cannot substitute its judgment for that of ICE and an amended complaint as to these requests for relief would be futile.[12]   Prayers for Relief (K) and (L) are **dismissed without prejudice as premature**. ICE's request to dismiss Count I is **DENIED** in all other respects.

**Count II is DISMISSED without prejudice**.[13]   Plaintiffs are granted leave to file an amended complaint as to Count II within **thirty (30) days** as of the date of this Entry.   If an amended complaint is an exercise in futility and/or if nothing is filed, then the dismissal of Count II will be converted to a dismissal **with prejudice**, and only Count I shall proceed against ICE, excluding Prayers for Relief (E), (G), and (K)–(L).

---

[12] The Court is under no obligation to allow further amendments where doing so would be futile, as it would be here. *See Doermer v. Callen*, 847 F.3d 522, 528 (7th Cir. 2017).

[13] "[A] plaintiff whose original complaint has been dismissed under Rule 12(b)(6) should be given at least one opportunity to try to amend her complaint before the entire action is dismissed." *Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 519 (7th Cir. 2015).

For the foregoing reasons, Clay County's Motion to Dismiss (Filing No. 56) is **GRANTED and Count III is DISMISSED without prejudice**. Plaintiffs are **granted leave to file an amended** Complaint with respect to any viable claims against Clay County, if such claims exists, within **thirty (30) days** of the date of this Entry.[14] Again, if an amended complaint against Clay County is an exercise in futility and/or if nothing is filed, the dismissal of Count III will be converted to a dismissal with prejudice, and Clay County will be terminated as a Defendant in this case.

**SO ORDERED**.

Date:   3/29/2023

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Benjamin N. Kelton
SIDLEY AUSTIN LLP
bkelton@sidley.com

Fiona Collins
SIDLEY AUSTIN LLP
fcollins@sidley.com

Thomas Aaron Weber
SIDLEY AUSTIN LLP
tweber@sidley.com

Gina R. Bohannon
SIDLEY AUSTIN LLP
gbohannon@sidley.com

Gregory Cui
SIDLEY AUSTIN LLP
gcui@sidley.com

Bradley M. Dick
BOSE MCKINNEY & EVANS, LLP (Indianapolis)
bdick@boselaw.com

---

[14] *See supra* fn. 12.

46

Mark Feldman
NATIONAL IMMIGRANT JUSTICE CENTER
markfeld@gmail.com

Mark Fleming
mfleming@heartlandalliance.org

Mary Georgevich
NATIONAL IMMIGRANT JUSTICE CENTER
mgeorgevich@heartlandalliance.org

Robert N. Hochman
SIDLEY AUSTIN LLP
rhochman@sidley.com

Andrew M. McNeil
BOSE MCKINNEY & EVANS, LLP (Indianapolis)
amcneil@boselaw.com

James R Powers
DOJ-Civ
james.r.powers@usdoj.gov

John Skakun, III
SIDLEY AUSTIN LLP
jskakun@sidley.com

Stephen C. Unger
BOSE MCKINNEY & EVANS, LLP (Indianapolis)
sunger@boselaw.com

Taisa M. Goodnature
DOJ-Civ
taisa.m.goodnature@usdoj.gov

Shelese M. Woods
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
shelese.woods@usdoj.gov

Keren Hart Zwick
NATIONAL IMMIGRANT JUSTICE CENTER
kzwick@heartlandalliance.org