UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| MARIBEL XIRUM, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | No. 1:22-cv-00801-TWP-KMB |
| ) | |
| U.S. IMMIGRATION AND CUSTOMS ) | |
| ENFORCEMENT (ICE), et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |
| ) | |
| MERRICK B. GARLAND, ) | |
| Zachary Myers, ) | |
| ) | |
| Miscellaneous. ) | |

**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION TO COMPEL COMPLETION OF THE ADMINISTRATIVE RECORD**

Presently pending before the Court is the Plaintiffs' Motion to Compel Completion of the Administrative Record. [Dkt. 182.] As explained below, the Motion is **GRANTED IN PART** and **DENIED IN PART**.

I. BACKGROUND

The Plaintiffs in this putative class action are noncitizens who were detained by United States Immigration and Customs Enforcement ("ICE") at the Clay County Jail in Brazil, Indiana (the "Jail"). [Dkt. 129 at 14.] They bring claims against ICE, the Department of Homeland Security ("DHS"), the Secretary of DHS, and several ICE officials (collectively, "Federal Defendants") under the Administrative Procedure Act ("APA").[1] [*Id.* at 68-82.]

---

[1] The Plaintiffs bring additional claims against Clay County, Indiana; the Clay County Council; the Clay County Sheriff's Office; and several Clay County officials. [Dkt. 129 at 82-89.] Those claims are not directly relevant to the Plaintiffs' Motion to Compel Completion of the Administrative Record and need not be discussed in detail in this Order.

ICE uses local facilities to house noncitizen detainees. Those facilities, such as the Jail, must comply with ICE's Performance-Based National Detention Standards ("National Detention Standards"). [*Id.* at 7.] ICE reviews each facility annually or biennially to ensure that it complies with the National Detention Standards. [Dkt. 185-1 at 506]. If a facility fails its annual or biennial review, ICE must conduct a follow-up review within six months. [*Id.*] If a facility fails two consecutive reviews, federal law prohibits ICE from using federal appropriations to contract with that facility moving forward. [Dkt. 129 at 7 (citing 2021 Appropriations Act § 215(a), 134 Stat. 1182, 1457).]

In May 2021, a private inspection company named the Nakamoto Group ("Nakamoto") inspected the Jail on behalf of ICE. [Dkt. 185-1 at 22-25.] Following its inspection, Nakamoto submitted an inspection summary and recommendation to ICE concluding that the Jail overall did not comply with the National Detention Standards. [*Id.*] ICE concurred with Nakamoto and likewise found that the Jail was not compliant. [*Id.*] Because the Jail failed the review, it had to undergo a follow-up review in 180 days. [*Id.*]

In December 2021, Nakamoto conducted a second inspection of the Jail on behalf of ICE. [*Id.*] As is undisputed and apparent from the Administrative Record, two of Nakamoto's inspectors involved in the December 2021 inspection "worked remotely and were unable to personally observe practices and procedures within the facility. [These] inspectors relied on photographs and/or videos and on-site inspectors to validate the observation of many standards." [*Id.* at 24.] After completing the inspection, Nakamoto submitted an inspection summary and recommendation to ICE that the Jail overall was compliant with the National Detention Standards. [*Id.* at 25.] ICE concurred with Nakamoto and likewise found that the Jail was compliant. [*Id.* at 228.]

2

In this lawsuit, the Plaintiffs seek judicial review under the APA of ICE's December 2021 finding that the Jail was compliant with the National Detention Standards. [Dkt. 129 at 68-82.] Count I of the Amended Complaint claims that ICE acted arbitrarily and capriciously and abused its discretion by (1) relying on Nakamoto to conduct the inspection and review, rather than conducting the review itself as required by law; (2) relying on Nakamoto's "deeply flawed inspection practices," which included preannouncing the inspection, conducting the inspection remotely, and failing to interview any detainees; and (3) finding that the Jail was overall in compliance with the National Detention Standards despite also finding that there were violations of individual aspects of those standards. [*Id.* at 68-73.]

The Federal Defendants served the Plaintiffs with the Administrative Record for this case on May 26, 2023. [Dkt. 180 at ¶ 2.] Following a meet-and-confer conference during which the Plaintiffs objected to the completeness of the Administrative Record, the Federal Defendants served the Plaintiffs with an Amended Administrative Record that includes some additional materials.[2] [*Id.* at ¶¶ 2-3.] The Plaintiffs believe that the Amended Administrative Record is still incomplete, but the Federal Defendants disagree and refuse to produce any additional materials. [*Id.* at ¶ 4.] The Court held a Telephonic Discovery Conference on February 2, 2024, but the Court and the Parties were unable to achieve a resolution of this dispute. [Dkt. 181.] The Court

---

[2] The Amended Administrative Record includes the following: An email from Nakamoto to ICE describing its remote inspection methodology; an email from Nakamoto preannouncing its December 2021 inspection to Jail officials; Nakamoto's Remote Inspections Methodology; Nakamoto's December 2021 inspection summary and recommendation; ICE's December 2021 Facility Significant Incident Summary of the Jail; ICE's December 2021 Condition of Confinement Inspection Worksheet of the Jail; a December 2021 ICE Memorandum declaring that the Jail is complaint with the National Detention Standards; ICE's December 2021 Uniform Corrective Action Plan for the Jail; Jail policies and procedures, training rosters, inspection reports, key counts, key lists, recreation schedules, staff unit assignments, internal memoranda, and emails; housing logs for ICE detainees at the Jail; inmate medical records from the Jail; jail officer course completion certificates; a contract between the United States and Nakamoto signed August 31, 2020; ICE's Annual Detention Facilities Inspection Program Statement of Work dated June 1, 2020. [Dkt. 185-1.]

encouraged the Parties to continue to meet and confer on this matter but authorized the Plaintiffs to file an appropriate discovery motion if those talks were unsuccessful. [*Id.*] The Plaintiffs then filed the instant Motion to Compel Completion of the Administrative Record, which is now fully briefed and ripe for review.

## II.  LEGAL STANDARD

The APA authorizes a reviewing court to set aside agency action found to be, among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The reviewing court must "review the whole record or those parts of it cited by a party." 5 U.S.C. § 706. Therefore, review focuses on "the administrative record already in existence," *Camp v. Pitts*, 411 U.S. 138, 142 (1973), rather than on the materials produced in discovery like a typical civil case. *Bodo v. McAleenan*, 2019 WL 3776064, at *5 (N.D. Ill. August 12, 2019) (citing *USA Group Loan Services, Inc. v. Riley*, 82 F.3d 708, 715 (7th Cir. 1996)).

"The complete administrative record consists of all documents and materials directly or indirectly considered by the agency." *Miami Nation of Indians of Indiana v. Babbitt*, 979 F. Supp. 771, 775 (N.D. Ind. 1996). The agency is responsible for compiling the administrative record, and there is a strong presumption that the administrative record as furnished by the agency is complete. *Univ. of Colorado Health at Memorial Hosp. v. Burwell*, 151 F. Supp. 3d 1, 12-13 (D.D.C. 2015). Plaintiffs may overcome this presumption by "identifying reasonable, non-speculative grounds for their belief that the documents" they seek to add to the administrative record "were considered by the agency and not included in the record." *Id.* at 13 (cleaned up). Plaintiffs must also "identify the materials allegedly omitted from the record with sufficient specificity, as opposed to merely proffering broad categories of documents and data that are 'likely' to exist as a result of other documents that are included in the administrative record." *Id.*

4

### III. DISCUSSION

The Plaintiffs contend that the Federal Defendants have not produced three categories of documents that are part of the Administrative Record: (1) Nakamoto's May 2021 inspection summary and recommendation; (2) materials underlying Nakamoto's and ICE's May 2021 review, such as videos, photographs, records, and other documents; and (3) materials underlying Nakamoto's and ICE's December 2021 review, such as videos, photographs, records, and other documents.[3]  [Dkt. 183 at 6.]

The Plaintiffs emphasize that ICE does not treat each performance review as an isolated event. [*Id.*]  Instead, when ICE conducts a six-month follow-up review of a facility that previously failed its previous review, it directs its examiners to "'review all previous reports, inspection results, or reviews of that facility'" and identify "'notable trends identified during the inspection based on these earlier reports (e.g., repeated deficiencies in an area) . . . as part of [the Contractor's] inspection report to ICE.'"  [*Id.* at 7 (quoting dkt. 185-1 at 507 (ICE Statement of Work)).]  According to the Plaintiffs, that would include Nakamoto's May 2021 inspection summary and recommendation and materials that Nakamoto produced or reviewed during that previous inspection. [Dkt. 183 at 7.]  They also argue that ICE's December 2021 Condition of Confinement Inspection Worksheet expressly compares the results of the December 2021 inspection to the May 2021 inspection and notes where conditions at the Jail had improved or had not improved. [Dkt. 183 at 7 (citing dkt. 185-1 at 45-50, 53).]  Finally, the Plaintiffs argue that any materials Nakamoto produced or reviewed during the December 2021 inspection were at least indirectly

---

[3] The Plaintiffs characterize their motion as requesting two categories of materials: those related to the May 2021 review and those underlying Nakamoto's and ICE's overall review in December 2021.  [Dkt. 183 at 6.]  For reasons discussed below, however, the Court believes that the May 2021 materials are more properly divided into two distinct categories: Nakamoto's May 2021 inspection summary and recommendation and materials underlying Nakamoto's and ICE's overall review in December 2021.

reviewed by ICE's final decisionmaker and are thus part of the Administrative Record. [Dkt. 183 at 8, 10-11.]

In response, the Federal Defendants argue that any materials that were reviewed by Nakamoto but that were not also reviewed by ICE employees in December 2021 are not part of the Administrative Record. [Dkt. 189 at 6.] They argue that ICE officials did not review any May 2021 materials during the December 2021 review and that materials underlying Nakamoto's December 2021 inspection are "raw data" that fall outside the Administrative Record. [*Id.* at 7, 11.] The Federal Defendants argue that ICE's ultimate determination in December 2021 that the Jail was compliant with the National Detention Standards did not depend in any way on the results of the May 2021 inspection. [*Id.* at 12 (citing dkt. 189-1 (Declaration of Monica Burke)).]

In reply, the Plaintiffs argue that "ICE cannot insulate its decisions from review under the APA by relying on the work of third-party contractors." [Dkt. 192 at 4.] They analogize Nakamoto's underlying inspection materials to work product and recommendations of subordinate agency employees, which in previous cases have been ruled to be part of the administrative record. [*Id.* at 4 (collecting cases).] They also provide additional examples of references in ICE's own reports to Nakamoto's May 2021 inspection results and argue that because ICE expressly considered the May 2021 inspection results during its December 2021 review, those are part of the Administrative Record. [*Id.* at 9.]

The issue before the Court is whether materials produced or reviewed by Nakamoto during the December 2021 inspection are part of the Administrative Record, even if those materials were not independently reviewed by ICE employees. Specifically, this includes the underlying materials produced or reviewed by Nakamoto during its December 2021 inspection of the Jail and any materials from its previous inspection in May 2021 that Nakamoto reviewed in December 2021 at

6

the direction of ICE. It is not necessary that the materials "literally pass before the eyes" of the agency's final decisionmaker to be "considered part of the administrative record." *Miami Nation*, 979 F. Supp. at 777. Instead, "a complete administrative record should include all materials that 'might have influenced the agency's decision,' and not merely those on which the agency relied in its final decision." *Amfac Resorts, L.L.C. v. U.S. Dept. of the Interior*, 143 F. Supp. 2d 7, 12 (D.D.C. 2001) (quoting *Bethlehem Steel v. EPA*, 638 F.2d 994, 1000 (7th Cir. 1984)). "Thus, if the agency decisionmaker based his decision on the work and recommendations of subordinates, those materials should be included as well." *Amfac*, F. Supp. 2d at 13.

At the same time, not every document that was handled by a final decisionmaker's subordinate during the review process will be included in the administrative record; rather, materials that are collected and organized by subordinates but not substantively reviewed are generally outside the administrative record. For example, in *Oceana, Inc. v. Ross*, which the Federal Defendants rely upon in opposition to the Plaintiff's motion, the court ruled that raw data that agency staffers pulled from databases and aggregated for the agency's final decisionmakers to review at a later time were properly excluded from the administrative record. 290 F. Supp. 3d 73, 82 (D.D.C. 2018). In that case, the plaintiff did not provide concrete, non-speculative evidence that the raw, disaggregated data itself was substantively reviewed by an agency subordinate or played any role in the agency's final decision. *Id.*; *see also Common Sense Salmon Recovery v. Evans*, 217 F. Supp. 2d 17, 22 (D.D.C. 2002) (ruling that raw data collected in studies that were relied upon by the agency were properly excluded from the administrative record). Because there was no concrete evidence that the raw, disaggregated data was reviewed by the agency's decisionmakers themselves or relied upon by a subordinate in making a recommendation to the

agency's final decisionmaker, the raw data played no role in the agency's final decision and was properly excluded from the administrative record in that case.  *Oceana*, 290 F. Supp. 3d at 82.

In this case, however, Nakamoto did not merely aggregate raw data into a usable form that ICE's final decisionmakers reviewed at a later time.  To the contrary, it is clear from the Administrative Record itself that Nakamoto was specifically hired for its expertise in inspecting detention facilities and determining whether those facilities comply with ICE's National Detention Standards.  [*See* dkt. 185-1 at 496 (ICE Statement of Work providing that Nakamoto "will establish and manage the Compliance Inspection Teams (CIT) for annual, biennial and pre-occupancy inspections at [the Jail], and technical assessments as required. . . . Each CIT will prepare and submit assessments on ICE designated forms which evaluates [the Jail's] status for compliance with all applicable ICE detention standards, relevant ICE policy, and provide snapshot information regarding conditions at [the Jail] as prescribed by ICE").]

Nakamoto's work was substantive, not administrative.  Nakamoto's inspection of the Jail in December 2021 and its review of past reports were essential steps in ICE's process to determine whether the Jail complied with its National Detention Standards.  Moreover, the materials that Nakamoto produced or reviewed during its inspection in December 2021 and the materials that Nakamoto reviewed from its previous inspection in May 2021 undoubtedly influenced ICE's ultimate determination in December 2021 to certify the Jail as compliant with its National Detention Standards.  ICE's final report from the December 2021 review includes factual findings that Nakamoto made after reviewing these materials.  [*See, e.g.*, dkt. 185-1 at 42-43, 45-48, 52, 53.]  Even if the materials that Nakamoto produced and reviewed did not "literally pass before the eyes" of ICE's final decisionmakers, given the circumstances described herein, it cannot be disputed that those materials were indirectly considered by ICE and must be included in the

8

Administrative Record. *Miami Nation*, 979 F. Supp. at 777; *see also Styrene Info. and Research Ctr., Inc. v. Sebelius*, 851 F. Supp. 2d 57, 64 (D.D.C. 2012) ("the subgroup drafts were an integral part of the Expert Panel's peer review process and influenced the Expert Panel's recommendation, upon which the [agency] based its listing determination. The mere fact that the subgroup drafts were not ultimately passed on to the final decisionmaker does not lead to the conclusion that they were not before the agency.").

The Federal Defendants' argument that the contested materials should be excluded simply because they were not reviewed by ICE employees is not persuasive. As explained above, these materials were indirectly considered by ICE's final decisionmakers and are analogous to similar work product that, when produced by subordinate agency employees, would be part of the administrative record. *See*, *e.g.*, *Amfac*, F. Supp. 2d at 13. The fact that ICE chose to delegate the task of inspecting local detention facilities to a private company rather than using its own employees to perform these inspections is not dispositive. Allowing ICE to limit judicial review over parts of that decision-making process by contracting with a private company would frustrate the strong interests of transparency and public confidence in administrative decision-making. *See Bethlehem Steel*, 638 F.2d at 1000 ("Private parties and reviewing courts alike have a strong interest in fully knowing the basis and circumstances of an agency's decision. The process by which the decision has been reached is often mysterious enough without the agency maintaining unnecessary secrecy.").

Turning now to the specific subsets of materials the Plaintiffs seek to compel, the Court rules as follows:

The Plaintiffs' Motion to Compel the underlying materials that Nakamoto produced or reviewed during the December 2021 inspection, including videos, photographs, records, and other

9

documents, is **GRANTED**. The Federal Defendants shall produce any such materials that they already possess and coordinate with Nakamoto to obtain and produce any additional underlying materials that Nakamoto produced or reviewed during the December 2021 inspection.

The Plaintiffs' Motion to Compel Nakamoto's May 2021 inspection summary and recommendation is **GRANTED**. Nakamoto's December 2021 inspection summary and recommendation and ICE's December 2021 Conditions of Confinement Inspection Worksheet expressly reference the results of Nakamoto's May 2021 inspection of the Jail. [*See* dkt. 185-1 at 23, 42-43, 45-48, 52, 53.] Further, ICE directed Nakamoto to review "previous reports, inspection results, or reviews" of the Jail during its December 2021 inspection, which included its May 2021 inspection summary and recommendation, "to inform their present assessment of the facility." [*Id.* at 509.] Taken together, the materials cited by the Plaintiffs provide non-speculative, concrete evidence that Nakamoto's May 2021 inspection summary and recommendation was considered by ICE during the December 2021 review of the Jail and is therefore part of the Administrative Record.

The Plaintiffs' Motion to Compel production of the underlying materials that Nakamoto produced or reviewed during the May 2021 inspection is **DENIED**. The Plaintiffs have not shown that officials from Nakamoto or ICE considered these materials during the December 2021 inspection and review. Nakamoto's December 2021 inspection summary and recommendation lists areas where the Jail met or did not meet standards in May 2021 and identifies repeat deficiencies. [*Id.* at 25.] But aside from this high-level overview of the May 2021 inspection results, the December 2021 inspection summary and recommendation does not describe in detail the conditions of the Jail in May 2021, and Nakamoto could have created this document without ever reviewing the underlying materials from May 2021. Similarly, ICE's December 2021 Condition

of Confinement Inspection Worksheet references the results of the May 2021 inspection but does not reference any specific underlying materials. [*Id.* at 44-45, 47-50, 54, 55.] Finally, although ICE directed Nakamoto to review "previous reports, inspection results, or reviews" of the Jail, [*id.* at 509], the Plaintiffs have not shown that ICE specifically directed Nakamoto to review the underlying materials from previous inspections, such as videos, photographs, records, or other documents. Accordingly, the Plaintiffs' argument that ICE considered the underlying materials from May 2021 is mere speculation and does not overcome the strong presumption of completeness afforded to federal agencies on the contents of the administrative record. *See Univ. of Colorado Health at Memorial Hosp.*, 151 F. Supp. 3d at 12-13.

In sum, the Plaintiffs have produced concrete, non-speculative evidence that Nakamoto's May 2021 inspection summary and recommendation and the underlying materials Nakamoto produced and reviewed during its December 2021 inspection were considered by ICE during its December 2021 review of the Jail. Accordingly, the Plaintiffs' Motion to Compel the inclusion of these materials in the Administrative Record is **GRANTED**. However, the Plaintiffs have not shown that ICE's final decisionmakers directly or indirectly considered the underlying materials Nakamoto produced and reviewed during its May 2021 inspection of the Jail, and their request to compel the inclusion of those materials in the Administrative Record is **DENIED**.

### IV. CONCLUSION

The Plaintiffs' Motion to Compel Completion of the Administrative Record, [dkt. 182], is **GRANTED IN PART** and **DENIED IN PART** as set forth more fully herein. The Federal Defendants shall serve the Plaintiffs with a Second Amended Administrative Record in compliance with this Order and file a Notice of Service with the Court within **30 days of the issuance of this Order**.

11

**So ORDERED**.

Date: 4/25/2024

*Kellie M. Barr*
Kellie M. Barr
United States Magistrate Judge
Southern District of Indiana

Distribution:

Electronic distribution to registered counsel of record via Court's CM/ECF system