**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| MARIBEL XIRUM, | ) |
| JAVIER JAIMES JAIMES, | ) |
| BAIJEBO TOE, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )  Case No. 1:22-cv-00801-TWP-KMB |
| | ) |
| U.S. IMMIGRATION AND CUSTOMS | ) |
| ENFORCEMENT (ICE), | ) |
| U.S. DEPARTMENT OF HOMELAND | ) |
| SECURITY (DHS), | ) |
| ALEJANDRO MAYORKAS under the title of | ) |
| Secretary of DHS, | ) |
| TAE JOHNSON under the title of Acting Director | ) |
| of ICE, | ) |
| MONICA S. BURKE under the title of ICE Acting | ) |
| Assistant Director of Custody Management, | ) |
| RICARDO A. WONG under the title of ICE | ) |
| Deputy Assistant Director, Oversight Compliance | ) |
| and Acquisition Division, | ) |
| TRAVIS GRAHAM under the title of ICE Officer, | ) |
| ANGELINA RAMOS under the title of ICE | ) |
| Officer, | ) |
| VIRGINIA SUTTER under the title of ICE Officer, | ) |
| CLAY COUNTY, INDIANA, | ) |
| CLAY COUNTY COUNCIL, | ) |
| JACKIE MITCHELL under the title of Clay County | ) |
| Council Member, | ) |
| JASON BRITTON under the title of Clay County | ) |
| Council Member, | ) |
| JASON THOMAS under the title of Clay County | ) |
| Council Member, | ) |
| LARRY J. MOSS under the title of Clay County | ) |
| Council Member, | ) |
| JOHN NICOSON under the title of Clay County | ) |
| Council Member, | ) |
| DAVID AMERMAN under the title of Clay County | ) |
| Council Member, | ) |
| PATRICIA HEFFNER under the title of Clay | ) |
| County Council Member, | ) |

BRYAN ALLENDER under the title of Clay )
County Commissioner, )
MARTY HEFFNER under the title of Clay County )
Commissioner, )
PAUL SINDERS under the title of President of the )
Clay County Board of Commissioner, )
ELIZABETH HUGHETT under the title of Clay )
County Sergeants and ICE Contract Coordinator, )
DAVID PARKER under the title of Clay County )
Sergeants and ICE Contract Coordinator, )
JASE GLASSBURN under the title of Clay County )
Sergeants and ICE Contract Coordinator, )
JENNIFER M. FLATNER[1] under the title of Clay )
County Auditor, )
CLAY COUNTY BOARD OF )
COMMISSIONERS, )
CLAY COUNTY JAIL, )
BRISON SWEARINGEN )
PATTI FOXX, )
MIKE MELENDEZ )
                                                                     )
                          Defendants.                   )

## ORDER ON FEDERAL DEFENDANTS'[2] MOTION TO DISMISS IN PART

This matter is before the Court on a second Motion to Dismiss filed pursuant to Federal

Rule of Civil Procedure 12(b)(6) by Defendant U.S. Immigration and Customs Enforcement

("ICE") and the nine other federal government defendants (the "Federal Defendants") (Filing No.

152).   The twenty-one defendants who work for or otherwise represent Clay County, Indiana

("Clay County") (the "Clay County Defendants") bring a separate second Motion to Dismiss

---

[1] The Civil Cover Sheet filed with the Court indicates the name of this defendant as "Jennifer M. Flater" (Filing No. 1-3 at 3), which is consistent with the party alleged in the operative Amended Complaint (*see* Filing No. 129 at 2), on whose behalf counsel has entered an appearance (*see,* Filing No. 36 at 1).  The Clerk is hereby **directed** to update the parties' information in CM/ECF to correctly reflect the defendant's name.

[2] This term encompasses Defendants U.S. Immigration and Customs Enforcement (ICE); U.S. Department of Homeland Security (DHS); Alejandro Mayorkas, in his official capacity as Secretary of DHS; Tae Johnson, in his official capacity as Acting Director of ICE; Ricardo A. Wong, in his official capacity as ICE Deputy Assistant Director, Oversight Compliance and Acquisition Division; Monica S. Burke, in her official capacity as ICE Acting Assistant Director of Custody Management; Mike Melendez, in his official capacity as Acting Field Office Director of the ICE Chicago Field Office; Travis Graham, in his official capacity as an ICE Officer; Angelina Ramos, in her official capacity as an ICE Officer; and Virginia Sutter, in her official capacity as an ICE Officer.

(Filing No. 150), which this Court will rule on in a separate order.  (Federal Defendants and Clay County Defendants together are referred to as "Defendants".)

Plaintiffs Maribel Xirum, Javier Jaimes Jaimes, and Baijebo Toe (collectively, "Plaintiffs") are non-citizens who are or were detained at the Clay County Jail in Brazil, Indiana (the "Jail") pursuant to an Intergovernmental Service Agreement (the "Agreement") between ICE and Clay County. Plaintiffs initiated this action originally challenging ICE's certification of the Jail as compliant with the Performance-Based National Detention Standards ("PBNDS"), ICE's authority to continue paying federal funds to Clay County for the detention of non-citizens, and Clay County's discretion to use the federal funds for purposes other than the care and safekeeping of non-citizens.  Plaintiffs filed a Class Action Complaint seeking a variety of declaratory and injunctive relief that all served to stop ICE from continuing to house detainees at the Jail and to prevent ICE from paying any more federal detention funds to Clay County.

Defendants' first motions to dismiss (Filing No. 56; Filing No. 60) were partially successful; the Court dismissed with prejudice certain portions of Count I and dismissed without prejudice other portions of the count, as well as dismissed without prejudice Counts II and III (*see* Filing No. 116).  Plaintiffs filed an Amended Complaint (Filing No. 129), pleading again the claim challenging ICE's certification of the Jail as PBNDS compliant and adding five claims challenging: (a) ICE's abdication of enforcement authority pursuant to a federal appropriations provision (Count II), (b) ICE's unlawful payments of federal funds in violation of both federal immigration law and administrative regulation (Count III), (c) ICE's decision to abdicate enforcement responsibility pursuant to regulatory authority (Count IV), (d) Clay County's violations of state law and jail policy (Count V), and (e) Clay County's violations of federal law governing the detention payments (Count VI).  As before, Plaintiffs seek a variety of declaratory and injunctive relief.

The Federal Defendants' second Motion to Dismiss followed and is now ripe before the Court. For the following reasons, the Court **grants in part and denies in part** the Federal Defendants' Motion to Dismiss.

## I.     BACKGROUND

The following facts are not necessarily objectively true, but, as required when reviewing a motion to dismiss, the Court accepts as true all factual allegations in the Amended Complaint and draws all inferences in favor of Plaintiffs as the non-moving party. *See Bielanski v. County of Kane*, 550 F.3d 632, 633 (7th Cir. 2008).

Since the facts alleged in the 89-page Amended Complaint contain many of same facts alleged in the original complaint, the Court refers the parties to the Court's Order on Defendants' First Motions to Dismiss for a more comprehensive factual background (*see* Filing No. 116 at 3– 12). The Court's recitation below assumes familiarity with the Court's Order and contains mostly additional novel facts relevant to Counts II, III, and IV as alleged in Plaintiffs' Amended Complaint.

### A.     The Agreement

In 2013, ICE issued an addendum to the Agreement, originally entered into in 2006, to start sending non-citizens to the Jail, and Clay County began detaining people in immigration custody at the Jail. (Filing No. 129 at 21 ¶¶ 61, 63.) The Agreement incorporates laws and regulations limiting the purpose for which ICE may enter into detention contracts and limiting the use of federal funds paid pursuant to those contracts. The incorporated laws and regulations at issue here are the Immigration and Nationality Act, 8 U.S.C. §§ 1101–1557, the Uniform Administrative

Requirements, Cost Principles, and Uniform Audit Requirements for Federal Awards, 2 C.F.R., Part 200 ("UAR"),[3] ICE's PBNDS; and the "Two Strikes Mandate".

### 1.     The Immigration and Nationality Act ("INA")

While the INA permits ICE to enter into detention contracts with non-federal entities and to make payments under those contracts, it restricts both the purpose of the detention contracts and the use of federal funds paid under the contracts.  Specifically, ICE may only enter into detention contracts "for the necessary construction, physical renovation, acquisition of equipment, supplies or materials required to establish acceptable conditions of confinement and detention services."  8 U.S.C. § 1103(a)(11)(B).  And ICE may only "make payments" from federal funds allocated to ICE "for necessary clothing, medical care, necessary guard hire, and the housing, care, and security of persons detained" under one of ICE's detention contracts.  *Id.* at § 1103(a)(11)(A).

### 2.     The UAR

As described by Plaintiffs, the UAR "sets forth mandatory cost-allowance, accounting, and auditing requirements for federal and state agencies with respect to entering and maintaining agreements" (Filing No. 129 at ¶ 64).  Adopted in 2016, the UAR in part prohibits recipients from "earn[ing] or keep[ing] any profit resulting from Federal financial assistance, unless explicitly authorized by the terms and conditions of the Federal award."  *Id.* ¶¶ 66 (quoting 2 C.F.R. § 200.400(g)), 64.  To ensure compliance with provisions like Section 200.400(g), awarding agencies are required to, among other things, "[e]nsure that audits are completed and reports are received in a timely manner" and "ensure that the recipient takes appropriate and timely corrective action" when necessary.  *Id.* ¶ 67 (quoting 2 C.F.R. § 200.513(c)).

---

[3] The Agreement incorporates 28 C.F.R. Part 66, which has since been superseded by the UAR.

The UAR requires federal agencies paying federal funds to non-federal entities to "manage and administer the Federal award in a manner so as to ensure that Federal funding is expended and associated programs are implemented in full accordance with the U.S. Constitution, Federal Law, and public policy requirements." 2 C.F.R. § 200.300(a).  It defines "[i]mproper payment" to mean "[a]ny payment that should not have been made or that was made in an incorrect amount under statutory, contractual, administrative, or other legally applicable requirements" and indicates that "payment" in this definition means "any disbursement or transfer of Federal funds (including a commitment for future payment . . .) to any non-Federal person, non-Federal entity . . . that is made by a Federal agency . . . administering a Federal program or activity." 2 C.F.R. § 200.1.

The UAR also requires federal funding recipients to "[e]stablish and maintain effective internal control over the Federal award that provides reasonable assurance that the non-Federal entity is managing the Federal award in compliance with Federal statutes, regulations, and the terms and conditions of the Federal award." *Id.* § 200.303(a).

### 3. **The Two Strikes Mandate**

As part of a consolidated appropriations act, Congress restricted ICE's expenditure of federal detention funds to ensure that contracted facilities comply with the PBNDS.  *See* Pub. L. No. 110-329, Div. D, Tit. II (Sep. 30, 2008), 122 Stat. 3574.  Congress provided that no federal detention funds "may be used to continue any contract for the provision of detention services if the *two most recent overall performance evaluations* received by the contracted facility are less than 'adequate' or the equivalent median score in any subsequent performance evaluation system." *Id.* (emphasis added).  The parties call this restriction the "Two Strikes Mandate."

**B.**     <u>Clay County's Misuse of Federal Detention Funds</u>

Plaintiffs allege that, for years, Clay County has used the Agreement as a "cash cow" at the expense of federal detainees (Filing No. 129 ¶ 5).  Clay County is alleged to have taken federal funds meant for detainees' benefit and used those funds for unrelated, discretionary expenditures. *Id.* ¶ 83.  For example, in 2020, Clay County received roughly $1.4 million from ICE and spent more than half of that amount on County "budget items" including employee raises and bonuses. *Id.* ¶ 84.  Clay County "openly trumpets" that it profits from the Agreement and is able to "keep down taxes" for residents by misusing federal detention funds.  *Id.* ¶¶ 86–90, 100.

**C.**     <u>The Jail Conditions</u>

As a result of Clay County's diversion of federal detention funds, the conditions in the Jail grossly violate the PBNDS and the Jail's own policy for non-citizens ICE detainees, which are described in the Clay County Jail ICE Handbook.  *Id.* ¶ 108.  The Plaintiffs' Amended Complaint alleges the violations in detail, *see generally id.* ¶¶ 108–89, and the Court's order on Defendants' first motions to dismiss recites them in brief (*see* Filing No. 116 at 7–9).

**D.**     <u>ICE's Performance Evaluations of the Jail</u>

While ICE "maintains the largest civil detention system in the United States, the agency does not own or operate most of the facilities it uses" (Filing No. 129 ¶ 192).  Recently, several facilities in the Midwest have stopped working with ICE, making ICE increasingly reliant on cooperating facilities "to accommodate ICE's ever-increasing detention efforts."  *Id.* at ¶¶ 194–97.

To avoid losing access to remaining facilities under the Two Strikes Mandate, ICE works to ensure those facilities do not fail two consecutive overall performance evaluations.  Plaintiffs claim ICE has "consciously and expressly ignored the appalling and grossly inadequate conditions at the Jail," choosing to suspend all enforcement of the Two Strikes Mandate and doing "whatever

it takes to ensure that the Jail is not certified as violating the PBNDS in two consecutive overall performance evaluations . . . ."  *Id.* ¶ 190.  It also has ignored Clay County's violations of federal laws, "expressly taken the position that 2 C.F.R. Part 200 does not apply to detention agreements like the Agreement at all," and has abdicated enforcement of the UAR's requirements against Clay County.  *Id.* ¶ 191.  The reason ICE has chosen to abdicate all authority to enforce the laws is because, as previously stated, it "depends on access to the Jail to support [its] massive detention efforts."  *Id.* ¶ 192.

Since 2007, ICE has used a private company called The Nakamoto Group, Inc. ("Nakamoto") to inspect detention facilities and ensure their compliance with the PBNDS. *Id.* ¶¶ 13, 200.  Inspection reports generated by Nakamoto are submitted to ICE for final approval.  *Id.* ¶ 209.  Plaintiffs describe Nakamoto's inspections as "deeply flawed."  *Id.* ¶ 200.  Nakamoto's inspectors "breeze by the [PBNDS] standards" and do not check if the facilities are actually implementing required policies.  *Id.* ¶ 201.

Plaintiffs allege ICE has been aware of the deficiencies in Nakamoto's inspections. Nevertheless, "ICE continued to rely on Nakamoto to conduct its overall performance evaluations . . . ."  *Id.* ¶ 211.  The OPR only conducts remote, "*ad hoc* inspections of a handful of facilities each year through its Office of Detention Oversight ('ODO'), evaluating compliance with only a subset of requirements of the PBNDS."  *Id.*  Plaintiffs' claims challenge Nakamoto's May and December 2021 inspections and ICE's overall performance evaluations.

1.  **May 2021 Inspection and Evaluation**

Conditions at the Jail have warranted a failing grade for years.  *Id.* ¶ 281.  A number of the deficiencies documented in the May 2021 overall performance evaluation, which resulted in a failing grade, reflect structural defects in the Jail.  *Id.*  For example, the Jail is configured so that there are not enough toilets and sinks in the housing units for non-citizens detained by ICE.  *Id.*

Plaintiffs allege that, with these structural defects, the Jail should not have been able to pass a valid overall performance evaluation. *Id.* Other deficiencies documented in the May 2021 overall performance evaluation have persisted for years due to Clay County's neglect. *Id.* ¶ 282.

Despite consistently substandard conditions at the Jail, ICE has never given the Jail a failing grade on two consecutive overall performance evaluations because, as Plaintiffs claim, ICE officials "abdicated their responsibility to terminate detention" at the Jail. *Id.* ¶¶ 283, 284. ICE's decision is part of a broader pattern of abdication of enforcement responsibility for more than a decade. *Id.* ¶ 290. To Plaintiffs' knowledge, ICE has "*never* applied the Two Strikes Mandate to terminate any contract for detention since at least 2009"; instead, ICE "demonstrate[s] a pattern of finding ways to manipulate the inspection process to avoid documenting consecutive failures." *Id.* (emphasis in original).

### 2.    <u>Actions Preceding the December 2021 Inspection and Evaluation</u>

To avoid the possibility of the Jail failing its next overall performance evaluation, "ICE and the County immediately began working to ensure that no subsequent failure was ever documented." *Id.* ¶ 221. "Following the May 2021 overall performance evaluation, ICE officials made up their minds that the Jail was going to receive a passing grade on the critical December 2021 evaluation regardless of whether conditions at the Jail warranted a second consecutive failing grade." *Id.* ¶ 284. As a result, ICE disregarded, and in effect suspended, the restrictions and requirements of the Two Strikes Mandate for detention at the Jail. *Id.* ¶ 285.

The "decision to abdicate enforcement authority" was reflected in several actions. *Id.* ¶ 286. "An internal ICE email from October 26, 2021, more than a month before the inspection, showed that ICE officials had already made up their minds that the Jail 'passed after [] 180 [day] re-inspection' so that ICE would not have to terminate detention at the Jail under the Two Strikes Mandate." *Id.* ¶ 235 (citing Filing No. 101-20); *see id.* ¶ 286. Additionally, "[i]n the same memo

recognizing that a failing grade would require termination of detention at the Jail, ICE's Assistant Director specifically stated: 'Please ensure the CLAY COUNTY JAIL Sheriff is notified of the upcoming inspections (specific dates still to be determined).'" *Id.* ¶ 287 (emphasis in original). ICE rescheduled the December 2021 evaluation at the request of Jail officials, giving them even more time to temporarily modify practices to pass the inspection. *Id.* ¶ 288. ICE "inexplicably certified a passing grade" despite Nakamoto's inspection report in December 2021 that concluded, "[s]anitation levels and conditions of confinement were observed to be unacceptable in housing units dedicated to ICE detainees." *Id.* ¶ 289.

The December 2021 inspection identified twenty-one deficient components across eight detention standards, including unacceptable sanitation levels, inadequate seating for meals, the use of "boat beds,"[4] the presence of graffiti, a lack of privacy panels in toilet areas, and malfunctioning toilets. *Id.* ¶¶ 238–40. Nevertheless, Nakamoto recommended the Jail receive a "Meets Standard" rating for Environmental Health and Safety standards and Personal Hygiene standards. *Id.* ¶¶ 241–43. "ICE rubber-stamped Nakamoto's recommendation without any meaningful review or analysis of the December 2021 inspection report." *Id.* ¶ 252. As a result, ICE was not forced to terminate the Agreement, and "non-citizens like Plaintiffs continue to be held at the Jail in grossly inadequate conditions." *Id.* at ¶ 20.

E.     **ICE's Continuation of Payments and Abdication of Enforcement**

In spite of the aforementioned misuse of funds and grossly inadequate conditions, ICE makes payments to maintain access to the Jail "no matter the actual costs of detention at the Jail, regardless of the conditions at the Jail, and despite the County's improper uses of the funds." *Id.* ¶

---

[4] "Boat beds" are thin, plastic tub-shaped pallets placed on the floor and intended for use as temporary sleeping arrangements (Filing No. 129 ¶ 18 n.3).

306.  Plaintiffs maintain these payments from congressionally appropriated funds violate federal law.  *See id.* ¶¶ 6, 7.

More broadly, ICE knows Clay County misappropriates detention payments.  *Id.* ¶ 6.  ICE further consciously and expressly ignores the appalling and grossly inadequate conditions at the Jail.  *Id.* ¶ 190.  Plaintiffs allege ICE continues making payments anyway to ensure Clay County continues to cooperate and allow ICE to detain non-citizens by making the Jail available, as ICE has become increasingly dependent on the Jail in the Chicago Area of Responsibility after other facilities closed their doors to ICE detention.  *Id.* ¶¶ 6, 303–04.  In support, Plaintiffs point to an April 2021 incident wherein the ICE Facility Compliance Officer assigned to the Jail "lamented to then-Clay County Sheriff Harden that ICE had already lost the use of three other Indiana facilities" and "specifically told Harden that ICE was looking for the County to expand its capacity to accommodate ICE's ever-increasing detention efforts."  *Id.* ¶ 196; *see id.* ¶ 305.

Correspondingly, Plaintiffs allege that ICE has consciously and expressly adopted a policy of non-enforcement for violations of federal laws governing the permissible uses of federal funds by non-Federal entities, suspending enforcement of those laws wholesale.  *Id.* ¶ 7.  They contend ICE has abdicated all enforcement of the UAR's requirements in expressly taking the position that 2 C.F.R. Part 200 does not apply to detention agreements like the Agreement at all.  *Id.* ¶ 191.  Because of ICE's continued payments and abdications of enforcement authority, "non-citizens continue to be held at the Jail in grossly inadequate conditions."  *Id.* ¶ 22.

## II.    <u>LEGAL STANDARD</u>

A motion to dismiss under Rule 12(b)(6) allows a defendant to move to dismiss a complaint that has failed to "state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  When deciding a motion to dismiss under Rule 12(b)(6), the court accepts as true all factual allegations

in the complaint and draws all inferences in favor of the plaintiff.  *Bielanski*, 550 F.3d at 633. However, courts "are not obliged to accept as true legal conclusions or unsupported conclusions of fact."  *Hickey v. O'Bannon*, 287 F.3d 656, 658 (7th Cir. 2002).

The complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  In *Bell Atlantic Corp. v. Twombly*, the United States Supreme Court explained that the complaint must allege facts that are "enough to raise a right to relief above the speculative level."  550 U.S. 544, 555 (2007).  Although "detailed factual allegations" are not required, mere "labels," "conclusions," or "formulaic recitation[s] of the elements of a cause of action" are insufficient.  *Id.*; *see also Bissessur v. Indiana Univ. Bd. of Trs.*, 581 F.3d 599, 603 (7th Cir. 2009) ("[I]t is not enough to give a threadbare recitation of the elements of a claim without factual support").  The allegations must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555.  Stated differently, the complaint must include "enough facts to state a claim to relief that is plausible on its face." *Hecker v. Deere & Co.*, 556 F.3d 575, 580 (7th Cir. 2009) (citation and quotation marks omitted). To be facially plausible, the complaint must allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

In considering a 12(b)(6) motion, district courts may take judicial notice of matters of public record without converting the motion into one for summary judgment.  *Henson v. CSC Credit Servs.*, 29 F.3d 280, 284 (7th Cir. 1994); *see also Fosnight v. Jones*, 41 F.4th 916, 922, 2022 WL 2965668 (7th Cir. 2022); *Martinez v. Universal Laminating, Ltd.*, 2002 WL 31557621, at *1 (N.D. Ill. Nov. 18, 2002) (citing *Henson*, 29 F.3d at 284) ("Moreover, the court may take

judicial notice of matters of public record, *including records of administrative bodies*, without converting a 12(b)(6) motion . . . ." (emphasis added)).

### III.    DISCUSSION

In addition to reasserting their claim against ICE for improper certification of the Jail as PBNDS compliant, Plaintiffs add three additional claims.  The Amended Complaint also asserts two claims against Clay County under the Indiana Declaratory Judgment Act and Indiana Trial Rule 57, which the Court will address by separate order.

Plaintiffs bring their claims against ICE pursuant to the Administrative Procedure Act, 5 U.S.C. § 706(2) (the "APA").  The APA governs judicial review of agency actions and waives federal sovereign immunity in some circumstances to allow for equitable relief from agency action or inaction.  *See* 5 U.S.C. § 702.  Section 701(a)(2) of the APA precludes judicial review of agency actions "committed to agency discretion by law."  5 U.S.C. § 701(a)(2).  Under the APA, a court may "hold unlawful and set aside agency action" that is found to be "arbitrary, capricious, an abuse of discretion," "short of statutory right," or "without observance of procedure required by law."  *Id.* § 706(2)(A), (C)–(D).  ICE moves to dismiss three of the four claims.

### A.  Counts II and IV – ICE's Abdication of Enforcement Authority

Count II challenges ICE's abdication of "responsibility to terminate detention" at the Jail "under the Two Strikes Mandate" when it "disregarded, and in effect suspended" the Mandate's "restrictions and requirements" (Filing No. 129 ¶¶ 284, 285).  Count IV challenges another abdication of enforcement responsibility and claims ICE, "[i]n effect, . . . revoked the restrictions and requirements of the UAR in connection with detention at the Jail."  *Id.* ¶ 313; *see id.* ¶ 314. Plaintiffs maintain in both counts that abdicating the enforcement authority, or the decision to do so, was arbitrary, capricious, and an abuse of discretion.  *See id.* ¶¶ 279–93, 312–24.

ICE argues Counts II and IV are barred from APA review and fails to adequately allege discrete and final agency action (*see* Filing No. 153 at 11).  Ultimately, with regard to Count II, the Court agrees with ICE that Plaintiffs fatally do "not demonstrate any violation" of a statute restricting the agency's enforcement discretion.  *Id.* at 14.  Concerning Count IV, however, the Plaintiffs allege an "extreme" policy of "abdication" that meets the potential exception to the general rule of non-reviewability under section 701(a)(2).  *Id.* at 17.

### 1.  Discretionary Enforcement Decisions under section 701(a)(2)

"The APA establishes a 'basic presumption of judicial review [for] one' "suffering legal wrong because of agency action."'"  *Department of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020) [hereinafter *Regents*] (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 140 (1967) (quoting 5 U.S.C. § 702)) (alteration in original).  "This presumption can be rebutted by a showing that the relevant statute 'preclude[s]' review, § 701(a)(1), or that the 'agency action is committed to agency discretion by law,' § 701(a)(2)."  *Id.*  ICE invokes the latter exception here.

"To 'honor the [APA's] presumption of review,'" the Supreme Court has "'read the exception in § 701(a)(2) quite narrowly,' confining it to those rare 'administrative decision[s] traditionally left to agency discretion.'"  *Id.* (internal citations omitted) (quoting *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 370 (2018) and *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993)).  Phrased differently, the exception to the presumption of review "applies 'in those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply.'"  *Head Start Family Educ. Program, Inc. v. Coop. Educ. Serv. Agency 11*, 46 F.3d 629, 632 (7th Cir. 1995) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971)) (internal quotation marks omitted).

This limited category of unreviewable actions includes an agency's decision not to institute enforcement proceedings. *Regents*, 140 S. Ct. at 1905 (citing *Heckler v. Chaney*, 470 U.S. 821, 831–32 (1985)). By and large, agency enforcement decisions are generally unsuitable for judicial review because they "involve[] a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise," such as "whether the particular enforcement action requested best fits the agency's overall policies" or "whether the agency has enough resources to undertake the action at all." *Heckler*, 470 U.S. at 831.

## 2. Count II Alleges Enforcement Decisions Relegated to ICE's Discretion

ICE's contends that *Heckler* supports dismissal of Count II. In *Heckler*, several death-row inmates petitioned the Food and Drug Administration for enforcement action against two States to prevent their use of certain drugs for lethal injection. The Supreme Court held that section 701(a)(2) of the APA prevented review because there was "no meaningful standard against which to judge the agency's exercise of discretion." *Id.* at 830; *see also Vahora v. Holder*, 626 F.3d 907, 917 (7th Cir. 2010) (commenting on *Heckler*). The decision against taking enforcement action mirrors, "'to some extent,' a prosecutor's decision not to indict, which has 'long been regarded as the special province of the Executive Branch.'" *Regents*, 140 S. Ct. at 1906 (quoting *Heckler*, 470 U.S. at 832). In this vein, ICE contends that the appropriations provision of the Two Strikes Mandate "provides no relevant restrictions on ICE enforcement authority," but rather only "forbids the agency from expending appropriated funds on facilities that fail two consecutive overall performance evaluations," which has not occurred yet (Filing No. 153 at 14).

As a side note, the Court previously observed in its order on the original motion to dismiss that ICE had not determined that the Jail had failed two consecutive evaluations (*see* Filing No. 116 at 21). The Amended Complaint likewise does not include any such averments. Although ICE correctly notes the actual number of failures (one), *see, e.g.*, Filing No. 101-23 at 2 (assigning

final rating of "Meets Standards" for December 9, 2021 annual review), the Court is not convinced that this fact by itself is fatal to Count II.  In fact, the entire theory behind this second claim, unlike the claim found in Count I, rests on the very premise that the Jail has not, *but should have*, received two consecutive failed performance evaluations — if only ICE officials had not "made up their minds that the Jail was going to receive a passing grade on the critical December 2021 evaluation" regardless of whether conditions *actually* warranted a second consecutive failing grade ([Filing No. 129](#) ¶ 284).

ICE's point about the underlying statute (the Two Strikes Mandate) is well-taken in the context of *Heckler*'s presumption against judicial review.  Plaintiffs counter that Count II properly falls within a potential exception to the general rule of non-reviewability for agency enforcement decisions — one which applies where "it could justifiably be found that the agency has 'consciously and expressly adopted a general policy' that is so extreme as to amount to an abdication of its statutory responsibilities."[5]  *Heckler*, 470 U.S. at 833 n.4 (internal citation omitted) (citing *Adams v. Richardson*, 480 F.2d 1159 (D.C. Cir. 1973) (en banc)); *see id.* at 839 (Brennan, J., concurring).  In essence, Plaintiffs urge the Court to find ICE's alleged inaction in "never giv[ing] the Jail a failing grade" on two consecutive evaluations ([Filing No. 129](#) ¶ 282) amounts to "an extreme abdication of . . . statutory responsibility mandated by Congress."  ([Filing No. 168 at 36](#).)

Whether such an exception exists or applies in this instance is ultimately inconsequential, however, without any meaningful statutory standard against which the Court can effectively judge

---

[5] Plaintiffs allege as much in their Amended Complaint (*see, e.g.*, [Filing No. 129](#) ¶ 2), and they argue that ICE "orchestrated an artificial inspection and certification regime that ensures that no facility, no matter how troubled, will ever receive a second failing grade."  ([Filing No. 168 at 36](#).)

the agency's exercise of enforcement discretion over its own regulations. The Court cannot reach what Plaintiffs wish it to decide without "law to apply". *Head Start*, 46 F.3d at 632.

Section 701(a)(2) "requires careful examination of the statute on which the claim of agency illegality is based." *Id.* (quoting *Webster v. Doe*, 486 U.S. 592, 600 (1988)). A review of the statute on which Plaintiffs base their claim of illegality, presumably the Two Strikes Mandate (*see* Filing No. 129 ¶ 291), reveals from its broad terms a dearth of "law to apply" by this Court in its review. *Id.* (quoting *Overton Park*, 401 U.S. at 410).

Originating within the Consolidated Security, Disaster Assistance, and Continuing Appropriations Act, 2009, the Two Strikes Mandate restricted ICE's expenditure of federal detention, providing that "none of the [federal detention funds] may be used to continue any contract for the provision of detention services if the two most recent overall performance evaluations received by the contracted facility are less than 'adequate' or the equivalent median score in any subsequent performance evaluation system." Pub. L. No. 110-329, Div. D, Tit. II, 122 Stat. 3574 (Sep. 30, 2008). The appropriations act in effect during the relevant periods in 2021, the Consolidated Appropriations Act of 2021, contained the same language.[6] *See* Pub. L. No. 116-260, Div. F, Tit. II, § 215 (Dec. 27, 2020), 134 Stat. 1182, 1457; *see also* Filing No. 129 ¶ 105 (collecting history of relevant appropriations acts).

"[N]one . . . may be used", the operative language taken to task in Count II, indicates a nondiscretionary duty to refrain from using, or to cease the existing use of, federal funds for the provision of detention services *if and when* the two most recent overall performance evaluations

---

[6] The Consolidated Appropriations Act of 2021 additionally required the performance evaluations "be conducted by [ICE's] Office of Professional Responsibility," Pub. L. No. 116-260, Div. F, Tit. II, § 215 (Dec. 27, 2020), 134 Stat. 1182, 1457, which the Amended Complaint addresses in Count I (*see, e.g.*, Filing No. 129 at 265). In contrast, Count II does not expressly address this requirement or allege a violation of it by ICE; rather, it only involves an abdication of the "responsibility to *terminate* detention . . . ." *Id.* ¶ 284 (emphasis added).

are less than adequate.  This standard, which restricts which contracts receive federal funding, is separate and distinct from a standard by which to judge ICE's conduct in reaching the point described in the restriction.  The appropriations statute is otherwise silent as to how frequently evaluations and inspections must be conducted or the criteria ICE should apply therein. Consequently, in this case, the federal funding restriction is inadequate "law to apply" to help discern guidelines to apply to ICE's enforcement decisions about monitoring and assigning failing grades.  *See American Disabled for Attendant Programs Today v. U.S. Dep't of Housing & Urban Dev.*, 170 F.3d 381, 385 (3d Cir. 1999) (affirming dismissal of challenge to agency's refusal to investigate misallocation of federal funds as an unreviewable enforcement decision; "[Plaintiff] confuses the existence of a standard restricting federal funding recipients with the existence of a standard by which to judge HUD's conduct").

Importantly, Plaintiffs do not point to other authorities that they allege provide the Court with sufficient indicia of an intent by Congress to circumscribe the enforcement discretion challenged by Plaintiffs' claim.  When it comes to Count II, the INA and UAR do not provide any such meaningful standard either, for reasons similar to those discussed by the Court in finding they did not provide standards to judge the enforcement discretion for alleged inaction described in Count II of the original complaint (*see* Filing No. 116 at 27–28).

Plaintiffs ask this Court to review whether ICE has systematically botched assigning failing grades in the face of noncompliance.  The Court finds, from what Plaintiffs identify, that Congress has provided no guidelines, or law to apply, to constrain ICE's enforcement or application of overall performance evaluations.  Therefore, without a meaningful standard to apply, the Court is forced to conclude that the decisions are committed exclusively to agency discretion and the

presumption against non-reviewability is left unrebutted.[7] *See American Disabled for Attendant Programs Today*, 170 F.3d at 386.

For the reasons stated above, Plaintiffs' Count II must be dismissed.  The Court need not and will not address the parties' arguments as to whether ICE's alleged inaction constitutes final agency actions.  ICE's Motion to Dismiss is **granted** as to Count II.

### 3.     <u>Count IV Alleges Actions that fit into *Heckler*'s Abdication Exception</u>

Plaintiffs' Count IV takes off where the Court's order on the original complaint left off — that is, it alleges "a complete abdication of ICE's responsibility to enforce applicable laws and regulations" of the UAR (*see* <u>Filing No. 116 at 45</u> (citing *United States v. Simmons*, 2022 WL 1302888, at *12 (D.D.C. May 2, 2022); *Irish 4 Reprod. Health v. U.S. Dep't of Health & Human Servs.*, 434 F. Supp. 3d 683, 697 (N.D. Ind. 2020)).

ICE contends that the abdication exception to section 701(a)(2) "requires more than [] inference — it requires an express policy of non-enforcement," which Plaintiffs do not allege (<u>Filing No. 153 at 16</u>).  Instead of pointing to a rule or publication "establishing any such policy," Plaintiffs allege "disparate actions and statements as inferentially supporting the existence of such policies." *Id.*

Plaintiffs respond that ICE "expressly stated" it has never followed the UAR with respect to any payments under detention agreements with local governments in a 2018 report by the Office of Inspector General ("OIG") of the Department of Homeland Security ("DHS") (<u>Filing No. 168 at 31</u> (citing <u>Filing No. 129</u> ¶ 191)).  The report serves, for Plaintiffs, as the adoption of a "conscious and express policy" to ignore the diversion of funds unrelated to non-citizens' care and

---

[7] Accordingly, the Court need not address Plaintiffs' argument that abdication can be inferred or their contention that ample factual allegations support the inferred abdication.

custody and the maintenance of adequate conditions at the Jail that fits into *Heckler*'s exception (Filing No. 129 ¶ 313).  Plaintiffs reason that, if such an abdication were deemed committed to agency discretion by law, then entities like Clay County could violate, say, the prohibitions on "earn[ing] or keep[ing] any profit" (Filing No. 168 at 34 (quoting 2 C.F.R. § 200.400(g)).

The Court finds that the report to which Plaintiffs point supports its position that ICE undertook a general policy of non-enforcement regarding its UAR restrictions.  Paragraph 313 of the Amended Complaint points to comments made in January 2018 by then-Senior Official, Thomas Homan ("Homan"), in response to a Draft Report completed by the DHS OIG (Filing No. 129 ¶ 313 (citing DHS Off. of Inspector Gen., *Immigration and Customs Enforcement Did Not Follow Federal Procurement Guidelines when Contracting for Detention Services*, OIG-18-53 at 10–14 (Feb. 21, 2018) (hereinafter *2018 OIG Report*), *available at* https://tinyurl.com/mrxhu4nj)). The Court takes judicial notice that Homan therein asserts ICE's Intergovernmental Services Agreement ("IGSA") authority stems from 8 U.S.C. § 1103(a)(11)(A) and its IGSAs "are not generally required to follow the Federal Acquisition Regulation (FAR)."[8]  *2018 OIG Report*, OIG-18-53 at 11.  Homan further asserts that an IGSA is not a cooperative agreement, *see* 31 U.S.C. § 630, which is unlike a procurement contract, *see* 31 U.S.C. § 6303, which are "used when the principal purpose is to obtain services or property, by purchase, lease or barter, for the direct benefit or use of the United States."  *2018 OIG Report*, OIG-18-53 at 11.

The parties dispute the meaning of Homan's next statement:

Despite the OIG's conclusion ICE has never defined IGSAs nor followed the FAR and or federal contracting guidelines contained in part 200 of Title 2 of the Code of Federal Regulations, both ICE OAQ and the Office of the Principal Legal Advisor

---

[8] Count IV does not challenge ICE's failure to follow FAR regulatory restrictions in its IGSAs.

(OPLA) have long taken the position that an IGSA is a type of procurement [contract] rather than a cooperative agreement.[9]

*Id.*

Plaintiffs argue that Homan's statement "shows that ICE 'has consciously and expressly adopted a general policy' of not enforcing the UAR with respect to [IGSAs] for detention services — an explicit abdication of its legal responsibilities." (Filing No. 168 at 32.)  ICE responds that the memorandum, when properly interpreted, rejects Plaintiffs' assertions, and contains no general policy to abdicate enforcement responsibilities.

The Court agrees with Plaintiffs' interpretation, which it finds to be plausible when resolving interpretive inferences in their favor.  When interpreted to mean, "the agency has long taken the position that the UAR does not govern the IGSAs (like the Agreement) in the first instance since it considers the agreements to be procurement contracts," then Homan's statement supports Plaintiffs' position that ICE's express disregard of UAR requirements with respect to the Agreement is contrary to law.  The "[d]espite the . . . conclusion" language at the sentence's beginning prefaces disagreement with a necessary supposition to the OIG's conclusion: that the IGSAs were at the time cooperative agreements regulated by the UAR nearly in its entirety (*see generally Award Management Corrections*, 80 Fed. Reg. 54407 (Sept. 10, 2015) (providing for an applicability table, and codified at 2 C.F.R. § 200.101 until November 11, 2020)).  According to the OIG, the IGSAs were cooperative agreements governed by the UAR; according to ICE, the IGSAs were procurement agreements *that were not so governed* as they were excluded from several major provisions of the UAR.  The Court understands Plaintiffs to be pointing to this very

---

[9] The Amended Complaint does not — and it need not — take a position on whether the IGSA is either a procurement contract or a cooperative agreement; rather, it only alleges correctly that certain provisions of 2 C.F.R. Part 200 apply to the Agreement (*see, e.g.*, Filing No. 129 ¶ 4), which the Court finds to be the successor of 28 C.F.R. Part 66.  *See Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards*, 78 Fed. Reg. 78608 (Dec. 26, 2013); *Federal Awarding Agency Regulatory Implementation of OMB's UAR*, Fed. Reg. 75880 (Dec. 19, 2014); Filing No. 75-2 at 6, art. IX ¶ 1; *see also* 2 C.F.R. § 2800.101.

disagreement aimed at the nature of ICE's IGSAs, born out in the 2018 OIG Report, when they claim ICE's action exceeded its legal authority.  The Court, therefore, finds Plaintiffs to allege plausibly the agency had a general policy of disregarding UAR requirements regarding its detention contracts.

The Court deals easily with ICE's pushback that the abdication exception in *Heckler* applies only to statutory duties, and not to duties imposed by promulgated regulations.  ICE cites to at least one case that applies *Hecker*'s exception to claims involving promulgated regulations, undercutting ICE's argument.  *See Irish 4 Reprod. Health*, 434 F. Supp. 3d at 698 (citing *N. Ind. Pub. Serv. Co. v. FERC*, 782 F.2d 730, 745-46 (7th Cir. 1986) ("[W]e do not think that the Commission can essentially abandon its regulatory function . . . under the guise of unreviewable agency inaction.")).  *Heckler* turns the presumption of reviewability into a presumption the other way, *which may be rebutted*.  *See* 470 U.S. at 832.  Significantly for this case, "judicially manageable standards 'may be found in formal and informal policy statements *and regulations* as well as in statutes.'"  *Steenholdt v. F.A.A.*, 314 F.3d 633, 638 (D.C. Cir. 2003) (quoting *Padula v. Webster*, 822 F.2d 97, 100 (D.C. Cir. 1987)) (emphasis added).

Moreover, Count IV's allegations, taken together, convince the Court that the alleged general policy of abdication is sufficiently "extreme."  Plaintiffs point out that ICE's own representations over the course of this litigation confirm their argument, but the Court is not convinced such representations extend beyond the context in which they were made.  *See* Filing No. 129 ¶ 319 (quoting for example Filing No. 61 at 8 ("Although ICE has the ability to exert fiscal leverage, such as by threatening to cease sending detainees and federal funds to the Jail, it has no supervisory control over the Jail.")).  The Court looks instead to a separate conclusion made by the OIG about ICE's non-enforcement.  Specifically, a 2019 DHS OIG report evinces the same

broader pattern of non-enforcement when it finds ICE "rarely imposed financial penalties" "[d]espite documentation of thousands of deficiencies and instances of serious harm to detainees that occurred" at the 106 detention facilities subject to its review (Filing No. 129 ¶ 320 (citing DHS Off. of Inspector Gen., *ICE Does Not Fully Use Contracting Tools to Hold Detention Facility Contractors Accountable for Failing to Meet Performance Standards*, OIG-19-18 at 15 (Jan. 29, 2019), *available at* https://tinyurl.com/h5dax23s)).

Judicial review seems particularly warranted, then, in light of Plaintiffs' plausible allegation that ICE has consciously and expressly adopted a policy of non-enforcement for violations of federal laws governing the permissible uses of federal funds by non-Federal entities, like Clay County.  *See id.* ¶ 7.  Plaintiffs specifically aver ICE eschewed all monitoring and enforcement options against Clay County.  *See id.* ¶ 317.  The Agreement, it follows, is alleged as a component piece of that conscious and express general policy that authorizes ICE to prospectively circumvent its statutory duty under 8 U.S.C. § 1103(a)(11)(A) and accompanying monitoring duty under 2 C.F.R. § 200.300(a).  *See id.* ¶ 313, 314.  Furthermore, it is at least plausible to view the Agreement *itself* as a general enforcement policy that is impacting several dozen detainees on any given day, *see* Filing No. 101-7 (Jail Daily Population for 2019-2021 of ICE Detainees), *see also* Filing No. 101-1 ¶¶ 3, 4, and not just a single fact-specific resource-allocation decision subject to *Heckler* discretion.  Consequently, and for the reasons above, ICE's general policy of abdication alleged in Count IV is reviewable.

### 4.   Count IV Alleges Final Agency Action

The APA "allow[s] any person 'adversely affected or aggrieved' by agency action to obtain judicial review thereof, so long as the decision challenged represents a 'final agency action' for which there is no other adequate remedy in a court."  *Webster v. Doe*, 486 U.S. 592, 599 (1988) (quoting 5 U.S.C. §§ 701–06).  The APA defines an "agency action" as "the whole or a part of an

agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13).

The Supreme Court has explained that the "rule, order, license, sanction, [or] relief" at issue must "involve circumscribed, discrete agency actions." *Norton v. Southern Utah Wilderness All.*, 542 U.S. 55, 62 (2004). This "discreteness" requirement "precludes a broad programmatic attack" on agency operations and "rules out judicial direction of even discrete agency action that is not demanded by law." *Id.* at 64.

For an "agency action" to be "final," 5 U.S.C. § 704, two conditions must be satisfied. "First, the action must mark the consummation of the agency's decisionmaking process — it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citation omitted). In other words, the final agency action requirement "asks whether a 'terminal event' has occurred." *Driftless Area Land Conservancy v. Rural Utilities Serv.*, 74 F.4th 489, 493 (7th Cir. 2023) (quoting *Salinas v. Railroad Retirement Board*, 141 S. Ct. 691, 697 (2021)); *see also U.S. Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590, 597 (2016) (quoting *Bennett*, 520 U.S. at 178).

ICE argues Plaintiffs challenge disparate defects in its inspection and evaluation program, amounting to an "impermissible challenge to numerous and various matters seeking wholesale changes to agency operations." (Filing No. 153 at 23.) Instead of asserting sufficiently discrete final agency action, Plaintiffs have "essentially 'attached a policy label to their own amorphous description of [ICE's] practices.'" *Id.* at 25 (quoting *Bark v. United States Forest Serv.*, 37 F. Supp. 3d 41, 50 (D.D.C. 2014)). Rather than point to any specific "written rules, orders, or even guidance

documents," Plaintiffs maintain that an overarching policy is "reflected" in various disparate datapoints. *Id.* (quoting *Bark*, 37 F. Supp. 3d at 50; Filing No. 129 ¶ 318).

As discussed earlier, the Plaintiffs need not concoct a description of ICE's practices when it can refer instead to findings of the DHS OIG and positions articulated by ICE authorities in response. Looking to those specific allegations, the Court finds the cases upon which ICE relies to be sufficiently distinguishable. Unlike in *Lujan v. National Wildlife Federation*, Plaintiffs do not challenge a wholesale failure of the agency to comply with an array of loosely related legal requirements. *See* 497 U.S. 871, 891 (1990) (describing plaintiff's claim to include various diverse failures from "submit[ing] certain recommendations to Congress" to "inordinate focus upon mineral exploitation"). Plaintiffs instead challenge the discrete decision to abdicate the specific legal obligation of enforcing the requirements of the UAR (Count IV) with respect to contracting for ICE detentions at the Jail.

Critically, *Bark* was decided on a motion for summary judgment. *See* 37 F. Supp. 3d at 44. After being granted an opportunity for discovery, unlike here, the plaintiffs were unable to demonstrate the challenged actions related to the granting of permits were set forth in an express policy. *Id.* at 49–50. This case, only at the motion to dismiss phase, should be allowed to proceed to discovery. Plaintiffs move beyond a "generalized complaint about agency behavior," *id.* at 51, with the facts alleged in the Amended Complaint. That Plaintiffs have yet to identify a written policy is not persuasive because "agency action need not be in writing to be judicially reviewable as a final action." *Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 138 (D.D.C. 2018) (citing *Venetian Casino Resort LLC v. Equal Emp't Opportunity Comm'n*, 530 F.3d 925, 929, 931 (D.C. Cir. 2008) (adjudicating challenge to agency's "decision . . . to adopt [an unwritten] policy of disclosing confidential information without notice")).

25

In sum, Count IV plausibly shows a conscious abdication of statutory and regulatory responsibilities – and that it was adopted at some point prior to 2018. This policy meets the definition of a final action, which is an agency action that (1) marks the consummation of the agency's decision-making process, and (2) by which rights or obligations have been determined, or from which legal consequences flow. Accordingly, ICE's Motion to Dismiss is **denied** as to Count IV.

**B.**     **Count III – ICE's Violations of the INA and UAR in Paying Federal Funds**

Count III challenges ICE's payments to Clay County despite knowing that the County "has used and continues to use payments from ICE for impermissible purposes" "because ICE seeks to ensure that the County continues cooperating . . . and making the Jail available for the detention of non-citizens." (Filing No. 129 ¶¶ 303, 304.) Plaintiffs claim ICE's payments, as well as their decision to continue making payments, violate the INA and the UAR and are arbitrary, capricious, and an abuse of discretion. *Id.* ¶¶ 307, 308, 309, 310; *see id.* ¶¶ 294–311.

ICE argues Count III rehashes Count II from the original Complaint: it "manifestly challenges ICE's asserted failure to avail itself of 'a number of enforcement options to respond to' the County's alleged misuse of federal funds, [] something that is foreclosed from review under section 701(a)(2)." (Filing No. 153 at 21 (quoting Filing No. 129 ¶ 316)). ICE also argues Count III fails to challenge discrete and final agency actions. *See id.*

The Court disagrees with ICE. Sufficiently different from its predecessor, Count III plausibly alleges an abdication of ICE's statutory duties, and Plaintiffs have also demonstrated that the actions at issue were final agency actions.

1. **Count III Alleges Payments Judicially Reviewable under 8 U.S.C. § 1103(a)(11)(A) and 2 C.F.R. Part 200**

Unlike Count II in Plaintiffs' original Complaint, which this Court found to have "contain[ed] no factual allegations indicating the payments themselves are unlawful" ([Filing No. 116 at 26](#)), Count III of the Amended Complaint alleges ICE paid federal detention funds to Clay County for purposes other than "clothing, medical care, necessary guard hire, and the housing, care, and security" of detainees.  8 U.S.C. § 1103(a)(11)(A); *see, e.g.*, [Filing No. 129](#) ¶ 304.  It further alleges ICE makes payments to the county to maintain access "no matter the actual costs of detention . . . , regardless of the conditions . . . , and despite the County's improper uses of the funds," which it has known for years.  *Id.* ¶ 306; *see id.* ¶ 303.  Plaintiffs explain that ICE took this action to maintain use of the Jail because it has "become increasingly dependent on the Jail to detain non-citizens in the Chicago Area of Responsibility," since other facilities have recently stopped accepting non-citizen detainees.  *Id.* ¶¶ 305, 275.  Unlike its former counterpart, then, Count III alleges "unlawful agency *action*" instead of inaction.  ([Filing No. 168 at 27](#) (emphasis added).)

Plaintiffs argue the underlying statute, 8 U.S.C. § 1103(a)(11)(A), clearly enumerates what ICE is authorized to pay for and, thus, provides meaningful standards against which the Court can judge ICE's actions.  *Id.* at 29.  It further contends that the additional standards of the UAR provide "that only 'allowable' costs may be paid to non-federal entities using federal funds," *id.* at 29–30 (citing C.F.R. § 200.400(g)), and that "costs must be 'necessary and reasonable for the performance of the Federal award'" and "adequately documented."  *Id.* at 30 (citing C.F.R. § 200-403(a), (g)).

ICE maintains that Count III remains indistinguishable from the prior Count II ([Filing No. 174 at 12](#)).  It argues Plaintiffs do not plausibly allege the Agreement is a "kind of sham"; instead, Plaintiffs' position only posits ICE makes payments, already earmarked by the United States for

detention reimbursement, for which it "purportedly knows will not be *ultimately* used for that purpose because of alleged *actions by the County*." *Id.* at 14 (first emphasis added, second emphasis in original).

The Court recognizes first the alleged basis for Plaintiffs' conclusion that ICE's actions were short of statutory right or without observance of procedure required by law — ICE makes the payments not because it believes the funds would be used appropriately, but rather because it "seeks to ensure that the County continues cooperating with ICE and making the Jail available for the detention of non-citizens" ([Filing No. 129](#) ¶ 304).  It is of no consequence that Plaintiffs may have directly lifted this assertion from the Court's previous order (*compare* [Filing No. 116 at 26](#) (dismissing the prior Count II)), since at this stage the Court must accept as true any factual allegations and draw inferences in the favor of Plaintiffs. *See Bielanski*, 550 F.3d at 633.  Plaintiffs at any rate lend additional context and explain that ICE makes such payments regardless of the conditions and despite the improper use of the funds, which Plaintiffs aver ICE had known for years.  Regarding ICE's motivations, Plaintiffs further allege the need for a detention facility in the Chicago Area of Responsibility ([Filing No. 129](#) ¶ 305), which they extrapolate from, among other allegations, laments occurring in April 2021 from ICE's Facility Compliance Officer assigned to the Jail. *See id.* at ¶ 196.  This purported need translates to an "increasing[] dependen[ce] on the Jail" as and when other facilities stopped accepting non-citizen detainees. *Id.* ¶ 305; *see id.* ¶ 275.

In light of the averred "continued cooperation and availability" bases, which the Court finds are sufficiently supported at this stage, the allegation that ICE knew about the County's misappropriation of detention payments yet "continue[d] making payments from congressionally appropriated funds anyway" ([Filing No. 129](#) ¶ 6) takes on a new life.  This minor shift of focus revises Plaintiffs' claim, which now can be read to assert affirmative action on the behalf of the

agency for the payments themselves, not just ICE's "refusal to ensure the funds were ultimately used for their intended purpose by their recipient"[10] ([Filing No. 116 at 27](#)).  ICE's payments, viewed from the perspective of an exigent need to house detainees, make the agency's knowledge of the alleged actions of the federal fund recipient — *i.e.*, "widespread misuse" of the payments ([Filing No. 129](#)) — an operative (albeit not determinative) fact in resolving whether ICE ran afoul of its statutory mandate to only "make payments" for certain delineated reasons under 8 U.S.C. § 1103(a)(11)(A), and ultimately whether its actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

In sum, Count III is no longer Count II of yesteryear.  It now alleges affirmative action — not an unreviewable discretionary decision not to institute enforcement proceedings.[11]

From this perspective, the Court also distinguishes Count III from Count II of the Amended Complaint as it relates to *Heckler*'s presumption against judicial review.  When it comes to payments made for continued cooperation despite knowledge of misuse, the INA and UAR are not drawn in such broad terms that there is no "law to apply"; instead a review of the statutes and regulations allegedly violated by the agency's actions reveals there is sufficient guidance to apply by a reviewing court.  The INA authorizes payments only for six delineated items related to detained persons.  *See* 8 U.S.C. § 1103(a)(11)(A).  2 C.F.R. § 200.300(a) directs ICE to "manage and administer" payments in a manner that "ensure[s]" the funding is expended and the associated programs are implemented "*in full accordance with* . . . Federal Law[] and public policy requirements."  (Emphasis added).  The Court finds, at a minimum, that managing and

---

[10] The Court acknowledges the quoted clause's reference to Count III is an inadvertent scrivener's error.

[11] With that said, the Court distinguishes ICE's "payments" ([Filing No. 129](#) ¶ 308) from its "decision to continue making payments", *id.* ¶ 307, for reasons explained in its previous order and related to its previous claims that ICE unlawfully failed to enforce the INA and UAR against Clay County (*see* [Filing No. 116 at 28](#); [Filing No. 1 at ¶ 273](#)). Nevertheless, the latter's inclusion does not mandate dismissal of the entire claim in light of the other changes made.

administering payments in "full accordance" with the mandates of the INA is a meaningful standard to apply to payments of federal funds to the Jail in light of alleged foreknowledge. This is to say nothing about the other provisions found in the UAR, which sets cost-allowance, accounting, and auditing requirements and provides "guidance to Federal agencies that helps ensure consistent and uniform government-wide policies and procedures for management of the agencies' . . . agreements." 2 C.F.R. § 1.200(a) (describing the purpose of certain chapters within Title 2 of the Federal Regulations that contain the UAR).

The Court finds that Count III sufficiently alleges that ICE's actions in paying federal funds under the Agreement is short of statutory right, without observance of procedure required by law, or arbitrary, capricious, and an abuse of discretion.

### 2.      Count III Alleges Final Agency Action

The Court's previous Order dismissed Count II of the original Complaint without finding whether or not each of the payments were final agency action (*see* Filing No. 116 at 26).  ICE argues now that Count III does not allege discrete and final agency action, since "agency action does not encompass all day-to-day activities of an agency, such as 'operating a program, or performing a contract.'" (Filing No. 153 at 26 (quoting *Vill. of Bald Head Island v. U.S. Army Corps of Engineers*, 714 F.3d 186, 193 (4th Cir. 2013)).)  Making payments on a contract, not something akin to an order or a rule, is a "moving target" far from discrete or final, as it "challeng[es] a category of asserted agency action encompassing perhaps dozens of payments over years, which will only grow as the litigation progresses and further payments are made." *Id.*

Plaintiffs address the *Bennett* prongs in arguing that the payments signify "the culmination of ICE's decisionmaking as to whether to pay for detention at the Jail for the period." (Filing No. 168 at 43.)  "Moreover, legal consequences flow from these payments: each one authorizes ICE to

detain non-citizens at the Jail and allows the County to spend the money on unrelated expenses."

*Id.*

At first glance, the Agreement attached to the Amended Complaint seems to provide support for the proposition that final agency action is afoot.  Initially, IGSA No. 28-07-005 was entered into "for the housing, safekeeping, and subsistence of federal prisoners" (Filing No. 72-2 at 2).  Then, in March 2014, ICE entered into a "Unilateral Modification."  *See* Filing No. 1-1 at 9 (boxes 3, 10A, 13D, and 16C).  On the second page, the modification states:

> The service provider [(Clay County)] agrees to perform to the point that does not exceed the total amount currently allotted to the items funded under this task order. The Government will not be obligated to reimburse the service provider in excess of the amount allotted to those item(s) for performance beyond the funding allotted.

*Id.* at 10.  A subsequent modification provided that, effective September 1, 2015, Clay County would "comply with the following optimal requirement(s) under the ICE 2011 Performance Based National Detention Standards (PBNDS 2011): Standard 5.4: Recreation," meaning Clay County would "purchase additional recreation equipment for the General Population and Special Management Units."[12]  (Filing No. 1-2 at 6.)

The Court understands Plaintiffs' position, however, to assert final agency action arising from "ICE's payments"[13] (Filing No. 129 ¶ 308).  The Court notes the novelty in the position that each tender of a payment itself constitutes final agency action.  Plaintiff has not identified any decisions in this Circuit or beyond explicitly holding that payments — made pursuant to a procurement

---

[12] No party appears to dispute, here or elsewhere, that the modifications referenced in the Amended Complaint were still operative and governed the payments in question for the time period relevant to this lawsuit, and the Court will draw such inferences in Plaintiffs' favor at this stage (*see* Filing No. 75-2 at 5, art. V ("This agreement shall be in effect indefinitely until terminated in writing by either party."); *cf.* Filing No. 1-1 at 9 (stating that funding for the order under the attached modification was "estimated to cover performance through April 30, 2014")).

[13] *See supra* note 10.

contract such as the Agreement, or to any "Federal award[]" to a non–Federal entity, 2 C.F.R. §

200.101, like Clay County — constitute final agency action, apart or separate from the agreement

under which they arise, as Plaintiffs' position implies.

Despite similarities, crucial differences exist between the agency action in the cases to

which Plaintiffs point and the action in this case.  Plaintiffs cite cases involving formal agency

actions unlike those here — such as the legality of a particular agency's funding authorization or

decision to *withhold* advance refunds, or some other agency policy, like methodology or eligibility.

*See Head Start*, 46 F.3d at 631; *California v. Trump*, 963 F.3d 926, 933, 941–42 (9th Cir. 2020);

*Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 101 (D.C. Cir. 2021); *Scholl v. Mnuchin*, 489 F. Supp.

3d 1008, 1027–28 (N.D. Cal. 2020); *Lloyd v. Illinois Reg'l Transp. Auth.*, 548 F. Supp. 575, 588–

90 (N.D. Ill. 1982).  To the extent *Overton Park* involved the "the expenditure of federal funds,"

it is clear that the holding fundamentally addressed the defendant agency's "decision to allow" the

expenditure in light of statutory prohibitions entirely dissimilar to those before this Court.  401

U.S. at 414; *see id.* at 405–05 (*e.g.*, the Highway Act of 1968 requires "all possible planning to

minimize harm").

Notwithstanding these concerns, the Court determines that the payments "mark the

consummation[14] of the agency's decisionmaking process", *Hawkes*, 578 U.S. at 597 (quoting

*Bennett*, 520 U.S. at 177–78), and are not of a tentative or interlocutory nature.  ICE brings to the

Court's attention that these authorized payments "reimburse" Clay County for actual and allowable

costs (Filing No. 174 at 13–14 (citing Filing No. 75-2 at 5, art. VI ¶¶ 1, 2, 3)).  The Agreement

further provides that the local government prepares and submits original, separate invoices "each

---

[14] Black's Law Dictionary does not provide the definition for "consummation" and defines the verb "consummate" as: "1. To bring to completion; . . . 2. To achieve; to fulfill. 3. To perfect; to carry to the highest degree." *Consummate*, BLACK'S LAW DICTIONARY (11th ed. 2019).

month" "for certification and payment" ([Filing No. 75-2 at 5](), art. VII ¶ 1).  Thus, by reimbursing allowable costs incurred, ICE's payments perfect (or bring to completion) a decision to house detainees under the Agreement for the relevant period.  The Court additionally finds both (1) the Jail's provision of services described in 8 U.S.C. § 1103(a)(11)(A), and (2) the continuation of an "indefinite[]" contract, *id.* at 5, art. V, made pursuant to 8 U.S.C. § 1103(a)(11)(B), to be legal consequences flowing from ICE's payments.  In concluding such "terminal event[s]" to have occurred, *Rural Utilities Serv.*, 74 F.4th at 493 (quoting *Salinas*, 141 S. Ct. at 697), the Court interprets the APA's finality requirement in a "flexible" and "pragmatic way." *Dhakal v. Sessions*, 895 F.3d 532, 539 (7th Cir. 2018).

ICE's likening of the payments to "operating a program, or performing a contract" ([Filing No. 153]() (quoting *Vill. of Bald Head Island*, 714 F.3d at 193)) does not convince the Court to the contrary.  Plaintiffs do not ask the Court to intervene in a "day-to-day managerial role over agency operations", *Vill. of Bald Head Island*, 714 F.3d at 195; rather, they seek judicial review of a finite set of circumscribed and discrete actions, provided for by a certain procurement agreement and governed by statutory restrictions on federal awards.

On the whole, the Court finds Defendants disregard the breadth of the definition of "agency action" under 5 U.S.C. § 551(13).  Section 551(13) includes the residual term "the equivalent . . . thereof" and also incorporates by reference the fourteen examples of "agency action" in section 551(11)'s definition of "relief," which in turn includes, in relevant part, "part of an agency . . . grant of money."  At the very least, issuing the payments was an "equivalent" action equally discrete to the listed terms in section 551(13) that would meet the APA's "expansive" definition of "agency action." *See Planned Parenthood of New York City, Inc. v. U.S. Dep't of Health & Human Servs.*,

337 F. Supp. 3d 308, 327 (S.D.N.Y. 2018).  Accordingly, ICE's Motion to Dismiss is **granted** as to Count II.

## IV.  CONCLUSION

A motion to dismiss pursuant to Rule 12(b)(6) does not test whether the plaintiff will prevail on the merits but instead whether the claimant has properly stated a claim.  *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974).  For the foregoing reasons, ICE's Motion to Dismiss (Filing No. 152) is **GRANTED in part and DENIED in part**. The motion is **granted** as to Count II and Count II is **DISMISSED with prejudice** because the Court cannot substitute its judgment for that of ICE and an amended complaint as to the accompanying requests for relief would be futile.[15] The motion is **DENIED** as to Counts III and IV, as the Court finds dismissal improper.

**SO ORDERED**.

Date: 8/8/2024

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION

Jacob Antrim
BOSE MCKINNEY & EVANS LLP
jantrim@boselaw.com

Gina R. Bohannon
SIDLEY AUSTIN LLP
gbohannon@sidley.com

Bradley M. Dick
BOSE MCKINNEY & EVANS, LLP (Indianapolis)
bdick@boselaw.com

Mark Feldman
NATIONAL IMMIGRANT JUSTICE CENTER
mfeldman@immigrantjustice.org

---

[15] The Court is under no obligation to allow further amendments where doing so would be futile, as it would be here. *See Doermer v. Callen*, 847 F.3d 522, 528 (7th Cir. 2017).

Mark Fleming
mfleming@immigrantjustice.org

Mary Georgevich
NATIONAL IMMIGRANT JUSTICE CENTER
mgeorgevich@immigrantjustice.org

Taisa M. Goodnature
DOJ-Civ
taisa.m.goodnature@usdoj.gov

Robert N. Hochman
SIDLEY AUSTIN LLP
rhochman@sidley.com

Benjamin N. Kelton
SIDLEY AUSTIN LLP
bkelton@sidley.com

Andrew M. McNeil
BOSE MCKINNEY & EVANS, LLP (Indianapolis)
amcneil@boselaw.com

John Skakun, III
SIDLEY AUSTIN LLP
jskakun@sidley.com

Ross McNeill Slaughter
DOJ-Civ
ross.m.slaughter@usdoj.gov

Stephen C. Unger
BOSE MCKINNEY & EVANS, LLP (Indianapolis)
sunger@boselaw.com

Thomas Aaron Weber
SIDLEY AUSTIN LLP
tweber@sidley.com

Jennifer Martin Wheeler
SIDLEY AUSTIN LLP
jwheeler@sidley.com

Shelese M. Woods
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
shelese.woods@usdoj.gov

Keren Hart Zwick
NATIONAL IMMIGRANT JUSTICE CENTER
kzwick@immigrantjustice.org